**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| AMANDA WATZKA, BROOKE LA COUNT, and GRACE WILLIAMS, | ) ) ) Case No. |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT, | ) ) ) ) |
| Defendant. | ) JURY TRIAL DEMANDED |

**COMPLAINT**

AMANDA WATZKA (Amanda), BROOKE LA COUNT (Brooke), and GRACE

WILLIAMS (Grace) (collectively, Plaintiffs), by and through their undersigned counsel, Cass T.

Casper, Esq., DISPARTI LAW GROUP, P.A., submit the following Complaint against THE

BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT (Board)

(Defendant).

1. This is a civil rights action arising from the sexual grooming and abuse of three students at

Oconto Falls High School by teachers and coaches employed by the Board.

2. Plaintiff Amanda was groomed and sexually abused by her Tech Education Teacher,

David Heisel, while she was a student at Oconto Falls High School from approximately 2010 to

2013, when she was between the ages of 16 and 18.

3. Plaintiff Brooke was groomed and sexually abused by assistant volleyball coach Brynn

Marie Larsen while Brooke was a 15-year-old sophomore at Oconto Falls High School during the

2013-2014 school year.

4. Plaintiff Grace was groomed and sexually abused by substitute teacher Brynn Marie Larsen while Grace was a 17-year-old junior at Oconto Falls High School in February through April 2018.

5. Throughout the periods of their abuse, Plaintiffs were minors who did not understand that their teachers' conduct was predatory, criminal, or constituted actionable civil wrongs. Each Plaintiff always remembered the facts of what occurred to her, but did not understand until 2025 that those facts reflected criminal conduct and constitutional violations.

6. The theory of Plaintiffs' case against the Board is not simply that they were sexually abused, but that they were abused by teachers and coaches under circumstances created by the Board through its pervasive custom and policy of knowing about teacher-student sexual abuse and failing to act.[1] While Plaintiffs were aware of their abuse, they had no knowledge, and no reason to know, of the Board's unwritten policies, customs, and practices tolerating sexual abuse and grooming across many teachers and students, and the Board's deliberate indifference to such conduct until Fall 2025, when they learned of the full scope of teacher-student sexual abuse at Oconto Falls High School and the Board's decades-long pattern of ignoring it. The Board's conduct in maintaining such unwritten policies, customs, and practices was entirely within the Board's own control, and wholly unknown to Plaintiffs prior to 2025.

---

[1] Federal civil rights claims accrue "when the alleged constitutional violation was complete, and [when the plaintiff] knew of her injury ***and its cause***," *Greene v. Woodlawn Unit Sch. Dist. #209*, 2023 WL 6216943, at *7 (S.D. Ill. 2023) (emphasis added); *accord Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (claim accrues "when a plaintiff knows the fact ***and the cause*** of an injury") (emphasis added); *Doe v. Bd. of Educ. of Hononegah Cmty. High Sch. Dist. No. 207*, 833 F. Supp. 1366, 1375 (N.D. Ill. 1993); *Doe v. Paukstat*, 863 F. Supp. 884, 892 (E.D. Wis. 1994) ("Ms. Doe's cause of action against the School District accrued only when she realized, or a reasonable person exercising due diligence in the same circumstances would have realized, that she was injured by the School District's alleged unconstitutional conduct of promulgating policies that fostered child abuse.").

7. In Fall 2025, Plaintiffs discovered for the first time that the Board had such unwritten policies, customs, and practices of fostering and condoning sexual abuse and grooming by discovering that at least nine different teachers, including their own abusers, had engaged in grooming and/or sexual abuse as to at least fourteen identified victims spanning a period of at least twenty years (2005-2025), and that the Board had consistently failed to investigate, discipline, or otherwise act on reports of abuse.

8. The following chart summarizes the known pattern of teacher-student grooming, sexual conduct, and sexual abuse at Oconto Falls High School that Plaintiffs discovered in 2025:

| Victim Initials | Description of Conduct | Date Range | Perpetrator |
|---|---|---|---|
| A.W. | Grooming, inappropriate touching, hand-holding, sexual assault (hotel room incident at Skills USA competition) | 2010-2013 | David Heisel |
| B.L. | Alleged grooming, digital penetration, oral sex, multiple sexual assaults | 2013-2014 | Brynn Marie Larsen |
| G.W. | Alleged grooming, sexual assault (kissing/making out in bedroom) | Feb-Apr 2018 | Brynn Marie Larsen |
| K.F. | Alleged sexual relationship | Approx. 2011 | Staff Member A |
| K.Ki. | Alleged sexual conduct in ice shack | Approx. 2011 | Staff Member A |
| J.M. | Alleged grooming ("hottest girls list"), inappropriate comments about appearance and body | 2011-2013 | Staff Member B & Staff Member A |
| A.R. | Alleged inappropriate conduct, required to grab keys from front pocket in sexualized manner | 2011-2013 | Staff Member B |
| K.K. | Alleged inappropriate touching during class | Approx. 2010-2012 | Staff Member B and Staff Member C |
| R.E. | Alleged sexualized quid pro quo for grades | Approx. 2012-2015 | Staff Member B |
| S.P. | Alleged verbal harassment on multiple occasions, propositioned to be "sugar baby" after graduation, inappropriate social media messages | 2011-2015, 2017 | Staff Member D and Staff Member C |
| J.D. | Alleged sexual misconduct | Approx. 2011/2012 | Gayle Gander |

3

| Victim Initials | Description of Conduct | Date Range | Perpetrator |
|---|---|---|---|
| M.D./R. | Alleged sexual misconduct | 2005 | Gayle Gander |
| B.K. | Alleged sexual misconduct | 2010/2012 | Staff Member E |
| Unknown Students (5) | Alleged sexual misconduct (led to criminal arrest) | 2025 | Gayle Gander |

9. Amanda brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment of the United States Constitution via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

10. Brooke brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

11. Grace brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

12. Plaintiffs seek compensatory damages and all other available appropriate relief.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), 42 U.S.C. § 1983, and the Fourteenth Amendment of the United States Constitution.

14. Venue is proper in this Court because Defendant Board has its principal place of operation in Oconto Falls, Wisconsin, within this judicial district, and the acts and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

15. Plaintiff Amanda Watzka is an adult resident of this judicial district and was a high school student at Oconto Falls High School during the time of Heisel's grooming and abuse as alleged herein.

16. Plaintiff Brooke La Count is an adult resident of Chicago, Illinois and was a high school student at Oconto Falls High School during the time of Brynn Marie Larsen's grooming and abuse as alleged herein.

17. Plaintiff Grace Williams is an adult resident of this judicial district and was a high school student at Oconto Falls High School during the time of Brynn Marie Larsen's grooming and abuse in 2018 as alleged herein.

18. Defendant Board of Education of Oconto Falls Public School District is a governmental body and school district operating within this judicial district. Four schools fall within the Board's jurisdiction, including Oconto Falls High School, where the abuse alleged herein occurred.

19. Defendant Board is a recipient of federal funds.

## FACTS COMMON TO ALL COUNTS

### I. Facts Pertaining to Plaintiff Amanda Watzka

20. During Amanda's sophomore year at Oconto Falls High School, she first met Defendant Heisel, who was her Tech Education Teacher.

21. Amanda was interested in drafting and architecture and aspired to become a tech ed teacher.

22. During her sophomore year, Heisel initially treated Amanda like other students, but became increasingly attentive as her interest in tech ed subjects became apparent. He nominated her for student of the month and gave her the special privilege of competing in Skills USA as a sophomore.

5

23. In her sophomore and junior years, Amanda continued to take Heisel's tech ed courses, during which time Heisel began grooming her.

24. Heisel began discussing personal subjects with Amanda, including his personal life, interests, and hobbies, while asking Amanda about her personal interests, home life, and hobbies.

25. Heisel started inviting Amanda on drives during her sophomore year, continuing through her senior year.

26. During these drives, they would go to Heisel's job sites, go out to eat, and sit in his vehicle and talk for hours. Amanda does not have an exact count but avers these drives occurred at least weekly, sometimes multiple times per week, over approximately three years, including her junior and senior years. Destinations included his construction sites, Green Bay, his house, and his grandmother's house.

27. During these drives, Heisel discussed his sex life with Amanda, inquired about her sexual history and experiences, and discussed his home life, his marriage, and his children while alone with Amanda. Amanda was 16 and a sophomore when these drives began.

28. Heisel told Amanda about his Christian upbringing and explained that he could take good care of her as a Christian family man.

29. Heisel told Amanda about his wife, including that his wife had cheated on him, and described what life would be like for him and Amanda after he left his wife.

30. During drives, Heisel held Amanda's hand and made soft, intimate, and affectionate physical contact with her. These acts caused Amanda to begin perceiving herself as being in a romantic relationship with Heisel.

31. During tech ed class, students' tools were marked for identification. Amanda's tools were marked "Amanda Boulanger." Heisel engraved his own initials after hers, as follows:

6



32. Heisel sang to Amanda during drives and made romantic comments, including drawing attention to his blue eyes and saying, "baby blues so deep you could swim in them."

33. Heisel spoke to Amanda about his family's wealth and connections, suggesting he could marry her and take care of all of her problems, and stated that he did his teaching job only for community service and insurance, not for the money.

34. Heisel frequently brought up another teacher and his wife from Oconto Falls who had met while the wife was a student there and later married.

35. Amanda frequently babysat Heisel's oldest child at school during after-school hours. Heisel did not pay Amanda for this babysitting.

36. Amanda began to perceive herself as being in a relationship with Heisel while she was a sophomore. As a result of Heisel's grooming, she turned down a male student who had expressed romantic interest in her because she believed she was in a relationship with Heisel.

37. Heisel became defensive whenever Amanda interacted with other boys, as can be seen in this photograph:



38. In or about Spring 2012, Amanda attended a Skills USA competition at Chula Vista Resort in Wisconsin Dells.

39. During this trip, Heisel entered Amanda's hotel room, and scoped out the room and bathrooms for other students. Amanda immediately felt threatened and fearful.

40. As Heisel attempted to engage Amanda in sexual activity, she was able to leave the room and return to the common hallway. Heisel followed her into the hotel stairway.

41. In the stairway, Heisel coerced Amanda by asking her if she was "just a tease." Amanda, feeling defeated and cornered, allowed Heisel to place her sitting on a window rail. He inserted himself between her legs and began undressing her top. With her top removed, Heisel groped her breasts and kissed her repeatedly. Heisel unbuttoned her belt and pulled her pants down around her ankles. He stood between her legs with his erection felt against her body. His own belt was unbuckled and his pants were unzipped. He sexually assaulted her during this incident.

42. At the most escalated point, Amanda found the courage to tell Heisel that what they were doing was wrong because he was a married man. She told him to stop and expressed that she was not ready for sexual activity. Heisel stopped, but not before having repeatedly touched her, undressed her, kissed her multiple times, and attempted to engage in further sexual activity.

8

43. Amanda avers that she was 17 years old at the time of this assault.

44. When Amanda graduated in May 2013, Heisel attended her graduation with his child and took a photograph with Amanda and the child that made it appear as though they were a family.



## II. The Board's Knowledge and Failure to Act

45. Throughout the period of Heisel's grooming and abuse (2010-2013), Amanda was a minor between the ages of 16 and 18.

46. During this time, Amanda believed she was in a romantic relationship with Heisel and did not understand that his conduct constituted criminal grooming and sexual abuse.

47. Amanda always remembered the facts of what occurred between her and Heisel. However, due to her youth, Heisel's manipulation, and the grooming process, she did not

9

understand until March and April 2025 that Heisel's conduct was predatory, criminal, and constituted actionable civil wrongs.

48. In or about March and April 2025, Amanda first realized that what Heisel did to her while she was a student and a minor constituted grooming and sexual abuse.

49. As Amanda began to investigate and discuss her experiences with others, she learned for the first time that numerous other students had experienced teacher-on-student sexual abuse at Oconto Falls High School, and that the Board had created an environment in which such abuse was enabled and empowered to occur.

50. Amanda learned in 2025 that multiple school officials had observed, received reports about, or had actual knowledge of Heisel's inappropriate relationship with her, but the Board failed to act to protect her. Specifically, Amanda learned in 2025 that:

a. Multiple teachers and administrators—including Tracy Tate, John Bursa, Mr. Karbon, Art Paulson, Matt Beschta, Staff Member C, Dave Braiser, Mrs. Jill Braiser, Staff Member A, Mr. Gayle Gander, Carla Nielsen, administrators Bruce Russell and Lou Hobyan, and former janitors Bob and John—observed Amanda and Heisel together in off-hours in his office and classroom on multiple occasions over a three-year period;

b. Amanda had confided in teacher Tracy Tate (Business Education) about aspects of her relationship with Heisel, and Tate was aware that Amanda and Heisel spent extensive time together and that Amanda parked in the teachers' area for quick access to Heisel;

c. Amanda wrote a disturbing paper in her senior year that described how broken she was and mentioned a teacher who shared details about his personal home life with her; this paper was submitted to Christine Glover;

d. Administrator Bruce Russell appeared near Heisel's shop area on many occasions and observed Amanda and Heisel together;

10

e. Staff Member A gave Heisel a conspicuous grin when encountering Heisel and Amanda walking the hallway together;

f. The school secretary knew that Amanda was signed in with Heisel during non-class hours and permitted it to continue;

g. Other students regularly referred to Amanda as Heisel's "teacher's pet";

h. Amanda was placed on an adults-only wrestling list along with Heisel, which school officials had to approve;

i. Amanda posted pictures of Heisel's child on her social media pages, where she was connected with other school adults; and

j. Other tech education teachers frequently encountered Amanda and Heisel together in circumstances that should have prompted concern.

51. Prior to 2025, Amanda did not know that these school officials had failed to act as part of a larger unwritten policy, practice, and custom of condoning grooming and sexual abuse pervading the school.

52. Amanda also learned in 2025 for the first time that the Board had knowledge of a pervasive pattern and practice of teacher-student sexual abuse at Oconto Falls High School involving multiple teachers and multiple victims spanning multiple years, including during the same time period as her own abuse.

53. Amanda learned in 2025 that school officials had knowledge of abuse by numerous other teachers—including Staff Member A, Staff Member B, Staff Member C, Staff Member D, Gander, Beschta, Staff Member E, and Brynn Marie Larsen—yet failed to take adequate action to protect students.

54. Amanda learned in 2025 that Athletic Director Jerry Moynihan had actual knowledge of Brynn Marie Larsen's abuse of Brooke in 2013-2014 because people complained to him about seeing

11

Brynn and Brooke together, but Moynihan merely had "a discussion with Brynn about boundaries" and allowed her to continue as assistant coach.

55. Amanda learned in 2025 that a police investigation of Brynn Marie Larsen's abuse of Brooke occurred in May-June 2014, yet the Board failed to properly report, flag, or discipline Larsen, allowing her to be hired at another school district and later return to Oconto Falls, where she abused Grace Williams in 2018.

56. Amanda learned in 2025 that the Board's pattern of knowledge of teacher-student abuse and failing to act spanned at least twenty years (2005-2025), involved at least nine different teachers, and affected at least fourteen identified victims.

57. Prior to 2025, Amanda did not know that the Board had a pervasive problem with other teachers engaging in abuse and grooming and failed to act, or that the Board's systemic failures had created a culture in which teachers like Heisel could abuse students without consequence.

58. Amanda did not learn that the Board injured her through its own institutional conduct until 2025.

59. Amanda's high school experience with Heisel caused her severe mental and emotional harm, including complex PTSD, depression, anxiety, hypervigilance, and low self-esteem, all ongoing.

### III. Facts Pertaining to Plaintiff Brooke La Count

60. In the summer before her sophomore year, Brooke participated in summer volleyball camp at Oconto Falls High School.

61. The head coach of the volleyball team was Dawn Larsen, a health education teacher at Oconto Falls and head varsity coach for volleyball and softball. Dawn Larsen was at all times relevant a mandated reporter for child abuse under Wisconsin law.

12

62. Dawn Larsen's daughter, Brynn Marie Larsen, was an assistant volleyball coach and substitute teacher at Oconto Falls High School.

63. Around August 2013, Brynn Marie Larsen began sending Snapchat messages to Brooke, often late at night.

64. Brynn Marie Larsen began sending Brooke photographs of her naked body and asking Brooke to reciprocate. Brooke had just turned 15 years old and felt uncertain, confused, and pressured because Brynn was one of her volleyball coaches.

65. Brynn Marie Larsen quickly escalated the grooming by asking Brooke to go out. Their first meeting took place at a Panera in Green Bay, after which they drove to a Target parking lot.

66. Brynn Marie Larsen had an SUV with fold-down backseats. At their first meeting, she asked Brooke to get into the backseat and then engaged Brooke in sexual activity. Brooke had just turned 15 years old and was a student on Larsen's volleyball team.

67. Brooke did not know what sex between women was and was not interested in sexual activity with women, but she felt obligated to comply because of the power differential between her and Brynn Marie Larsen and because of her youth and inexperience.

68. Around the same time, Brynn Marie Larsen told Brooke she could turn her into a college athlete.

69. Brynn Marie Larsen also began attempting to separate Brooke from her family by telling her that her family did not come to enough games and did not care about her, but that Brooke could always rely on Brynn.

70. That fall 2013, Brynn Marie Larsen began asking Brooke to come to her house. Brooke would oblige and end up staying the night.

71. Brynn Marie Larsen had Brooke sleep in her bed, where Larsen would sleep nude and engage or attempt to engage Brooke in sexual acts. Larsen also played pornography on her television.

72. When Brooke stayed overnight, Dawn Larsen (health education teacher, head coach, and mandated reporter) was present in the home and aware of Brooke's presence. Dawn Larsen observed Brooke and Brynn Marie Larsen snuggling on the couch and had to have been aware that they were sleeping in the same bed.

73. Brynn Marie Larsen's grooming and sexual abuse of Brooke continued throughout Brooke's sophomore year until police intervened in or around May or June 2014.

74. During the police investigation, an officer threatened to put Brooke in handcuffs unless she cooperated, placing Brooke in a state of terror. Brooke was taken to a child protective services agency called Willow Tree in Green Bay, where she denied that anything was happening with Brynn because she was terrified and confused, and because she was still 15 years old and did not understand that Brynn had done anything wrong.

75. Despite the police investigation, nothing was done to stop Brynn Marie Larsen's contact with Brooke. Larsen subsequently showed up at Brooke's mother's workplace, sent Brooke flowers, and continued engaging with her online.

76. That summer of 2014, Brynn Marie Larsen engaged Brooke in sexual activity again when Larsen asked Brooke to help her move.

77. In fall 2014, Brooke transferred out of Oconto Falls High School because other students were calling her "lesbian" and making her life miserable as a result of Larsen's grooming and abuse.

78. Also in fall 2014, Brynn Marie Larsen was hired by the School District of Waupaca.

79. In 2013, a report was made to Athletic Director Jerry Moynihan about Brynn Marie Larsen's improper conduct with Brooke and/or other students. In response, Moynihan merely

pulled Larsen aside and told her to be more careful, and permitted her to continue interacting with students as assistant coach.

80. In the police report from the 2014 investigation, the investigating officer recounted the following regarding his conversation with Moynihan: "I did speak with Jerry Moynihan, the Oconto Falls High School Athletic Director. Jerry said that he remembered people complaining to him about seeing Brynn and Brooke together but that he wasn't really able to substantiate anything. Jerry said that he did have a discussion with Brynn about boundaries."

81. Other Board employees had knowledge of Brynn Marie Larsen's abuse of Brooke, including:

a. Brooke's guidance counselor and driver's education teacher, Lee Kournaus, who saw Brooke and Brynn Marie Larsen together on numerous occasions outside of school, including once at his own girlfriend's house, but failed to inquire or report;

b. Rochelle Vandenlangenberg Otto, a staff member on the volleyball team and elementary school teacher with the Board, who would have observed improprieties in the relationship;

c. Katie Strelow-Ripley, also part of the volleyball team staff, who would have observed improprieties in the relationship; and,

d. Joy Bielinski, Dawn Larsen's sister and Brynn's aunt, who was also a teacher at DePere High School and had knowledge of the relationship.

**IV. The Board's Knowledge and Failure to Act**

82. Throughout the period of Brynn Marie Larsen's grooming and abuse (2013-2014), Brooke was 15 years old and a minor.

83. During this time, Brooke did not fully understand that Larsen's conduct was predatory, criminal, or constituted actionable civil wrongs, particularly given the coercive nature of the relationship and the power differential between them.

15

84. Brooke was aware of the 2014 police investigation because she was interviewed as part of it, and she knew that Larsen left Oconto Falls High School in fall 2014.

85. Brooke did not know until 2025 about the massive extent of teacher-student grooming and sex abuse pervading the school environment while she was there and before.

86. In 2025, Amanda contacted Brooke about Amanda's own experiences of abuse at Oconto Falls High School. Through this contact and subsequent investigation in 2025, Brooke learned for the first time that:

a. Despite the 2014 police investigation, the Board permitted Larsen to return to Oconto Falls as a substitute teacher in 2018, where she victimized Grace Williams in substantially the same manner;

b. Heisel's abuse of Amanda was occurring during substantially the same time period (2010-2013) as Larsen's abuse of Brooke (2013-2014), and school officials would have been aware of Heisel's inappropriate relationship with Amanda but failed to act;

c. The Board had knowledge of widespread teacher-student sexual abuse involving at least nine different teachers and at least fourteen victims over a twenty-year period (2005-2025), with school officials receiving reports or having knowledge about this abuse but failing to take adequate protective action; and

d. The Board's pattern of having knowledge and failing to act was the moving force that enabled both her abuse and the abuse of other victims.

87. Prior to 2025, Brooke did not know about the massive extent of teacher-student sex abuse and grooming while she was there and before, nor was she aware of policies or procedures requiring reporting of such conduct while she was a student.

88. Prior to 2025, Brooke did not know about the volume and number of other incidents of teacher-student grooming and abuse that occurred around the time of her own injuries.

89. Brooke did not learn that the Board injured her through its own institutional conduct—to wit, its unwritten policies, practices, and custom of failing to act to prevent teacher-student sexual abuse and grooming, and the massive extent of student-teacher pervasive sexual misconduct and grooming—until 2025.

**V. Facts Pertaining to Plaintiff Grace Williams**

90. Grace Williams was a junior at Oconto Falls High School during the 2017-2018 school year and had just turned 17 years old.

91. Brynn Marie Larsen returned to Oconto Falls School District as a substitute teacher for physical education and other classes during this time period.

92. Larsen was known as a popular substitute teacher whom "all the kids loved."

93. In or about February 2018, Brynn Marie Larsen added Grace on Snapchat. Grace accepted because she knew Larsen was adding popular students.

94. Larsen was aware that Grace had come out as bisexual.

95. All of Grace's friends communicated with Larsen, and Larsen initiated contact with Grace, eventually telling Grace that she had feelings for her.

96. Larsen told Grace that she loved her and wanted to leave her girlfriend for Grace.

97. Larsen began sending flowers to Grace in class and started substituting into Grace's classes.

98. Larsen invited Grace to her house along with other students, including T.F. and M.K.

99. When Grace went to Larsen's house, Larsen asked Grace to come to the bedroom with her and began making out with Grace in her room. Grace tried to stop it so she could leave peacefully.

100. Grace then saw Dawn Larsen, who was present in the home at the time. Grace and Dawn locked eyes, and Dawn walked away. This occurred in or about March 2018. Dawn Larsen

17

was at all times relevant a mandated reporter for child abuse under Wisconsin law and was employed by the Board as a health education teacher and head varsity coach.

101. After the bedroom incident, Grace told her mother what had happened. Grace's mother wanted to go to the police, but Grace did not want to because she was scared of being bullied or harassed by other students.

102. Grace eventually disclosed the abuse to her friend T.F., who went to the School Resource Officer and reported it. The School Resource Officer spoke with Grace and had her explain what had happened.

103. Grace believes the school principal and guidance counselor were also notified.

104. Despite these reports, the Board conducted no formal investigation, and Grace was never formally interviewed by school officials.

105. Grace was not given any emotional support, counseling, or other supportive measures.

106. Students began blaming Grace for Brynn and Dawn's departure.

107. Grace's story "was not taken seriously" by school officials, and for her, "no one really cared."

108. Years later, after Grace graduated, she saw an anonymous post from Brooke stating that Larsen had abused her as well. Grace felt "it felt like a pattern and like Brynn was very strategic about it."

109. Brooke reached out to Grace through Facebook Messenger in 2025.

110. Grace's abuse by Larsen in 2018 occurred because the Board had previously received reports about Larsen's abuse of Brooke in 2013-2014 and had failed to properly report, flag, or discipline Larsen, thereby allowing her to obtain a position at another school district and later return to Oconto Falls with access to students.

18

## VI. Grace's Discovery of the Board's Receipt of Prior Reports and Failure to Protect Her

111. Although Grace always remembered Larsen's abuse, she did not know until 2025 that the Board had received prior reports about Larsen abusing Brooke and had failed to act on those reports, thereby enabling Larsen's abuse of Grace.

112. Grace did not learn until 2025 that the Board had received complaints and reports about Larsen's abuse of Brooke in 2013-2014 and had failed to act in response. Through Brooke's contact and subsequent investigation in 2025, Grace learned for the first time that:

a. Athletic Director Moynihan had received complaints in 2013 about seeing Brynn Marie Larsen and Brooke together, but Moynihan merely had "a discussion with Brynn about boundaries" and failed to take protective action;

b. Multiple school staff—including Dawn Larsen, Lee Kournaus, Rochelle Vandenlangenberg Otto, Katie Strelow-Ripley, and Joy Bielinski—observed or had knowledge of Larsen's conduct with Brooke in 2013-2014 but failed to intervene;

c. A police investigation of Larsen's abuse of Brooke occurred in May-June 2014, four years before Grace's abuse;

d. Despite the complaints to Moynihan and the 2014 police investigation, the Board failed to properly flag, report, or discipline Larsen, allowing her to be hired at Waupaca School District;

e. The Board's failure to act in response to those prior reports was what enabled Larsen to return to Oconto Falls as a substitute teacher in 2018 with access to Grace; and

f. The Board had knowledge of widespread teacher-student sexual abuse involving at least nine different teachers over a twenty-year period (2005-2025), with school officials having knowledge but failing to take adequate action.

113. Prior to 2025, Grace did not know that the Board had received complaints about Larsen in 2013, that a police investigation had occurred in 2014, or that the Board had failed to act on those reports.

114. Grace did not learn that the Board injured her through its own institutional conduct—its receipt of prior reports about Larsen and its deliberate failure to flag, report, or discipline Larsen in response—until 2025. The Board's liability to Grace rests on conduct entirely within the Board's own control and wholly unknown to Grace before 2025.

## VII. Facts Pertaining to Additional Teacher Misconduct - Pattern and Practice of Abuse

115. The sexual abuse and grooming of Amanda, Brooke, and Grace did not occur in isolation, but rather within a pervasive culture at Oconto Falls School District in which teacher-student sexual abuse, grooming, and misconduct was widespread, known to school officials through reports and/or direct observations, and tolerated without meaningful consequence.

### A. Staff Member A (Teacher)

116. Staff Member A was a teacher at Oconto Falls High School. As noted above, Staff Member A gave Heisel a conspicuous grin when encountering Heisel and Amanda walking the hallway together.

117. Students have reported that Staff Member A engaged in sexual conduct with a female student. Specifically, it has been reported that a student named K.Ki. "used to give [Staff Member A] blow jobs in his ice shack."

118. During student J.M.'s time at Oconto Falls High School (graduating approximately mid-2013), Staff Member A engaged in inappropriate conduct with her beginning when she was a freshman, approximately 14 years old. Staff Member A asked J.M. to stay after class and, after shutting the door, told her that he and junior and senior boys put together a "top 5 hottest girls" list and that she was at the top of it.

119. Staff Member A made inappropriate comments about J.M.'s appearance and body throughout her high school years.

120. Staff Member A had an inappropriate sexual relationship with a student named K.F. When K.F. was a senior and J.M. was a sophomore, K.F. told J.M. that Staff Member A had taken her virginity. K.F. and another friend used to go to Staff Member A's house to meet him, and K.F. showed J.M. texts from Staff Member A.

121. J.M. believes Staff Member A may still be employed as a teacher.

**B. Staff Member B (Teacher)**

122. Staff Member B was a teacher at Oconto Falls High School who taught J.M. during her sophomore and junior years, when she was 15-16 years old.

123. Staff Member B would permit J.M. to leave class if she flirted with him, and told J.M. she could go to another classroom if she grabbed keys out of his front pocket. J.M. observed another student, A.R., having the same interaction with Staff Member B.

124. Student R.E. experienced an incident with Staff Member B during her senior year. R.E. had not turned in a paper for Staff Member B's class. Later, Staff Member B called R.E. back to his desk, told her "not to worry about writing the paper," stated that she was "a good student and deserved a break," and gave her an A without her completing the assignment. At the time, R.E. was wearing "a black bodycon dress with a deep scoop neck, denim jacket, floral leggings." R.E. stated: "I remember feeling so exposed and creeped out when it happened."

125. Student K.K. stated that both Staff Member B and Staff Member C touched her inappropriately while she was a student, and that because of this conduct, "she was able to do whatever she wanted"—indicating that teachers were providing special privileges in exchange for tolerating sexual misconduct.

126. Staff Member B is believed to still be employed as a teacher.

### C. Staff Member A and Staff Member B - Joint Misconduct

127. Staff Member A and Staff Member B were friends and colleagues. When J.M. was 15 years old, she attended a graduation party where Staff Member A and Staff Member B, who were in their 30s, brought alcohol for students. It was known that Staff Member A and Staff Member B regularly attended high school parties. This conduct was so prevalent that it felt normal to students.

### D. Staff Member C (Teacher)

128. Staff Member C was a teacher and coach at Oconto Falls High School and is believed to still be a teacher.

129. Student K.K. stated that both Staff Member B and Staff Member C touched her inappropriately while she was a student, and that Staff Member C's conduct occurred during class in circumstances so obvious that K.K. wondered how other students didn't see or say anything. K.K. never told her friends at the time because "I always kept my mouth shut about that stuff because I felt embarrassed." K.K. stated that she had "buried so deep" the trauma of Staff Member C and Staff Member B's abuse, and that she avoided any chance of having to deal with either of them alone because their conduct made her super uncomfortable.

130. In 2016, Staff Member C proposed that S.P. babysit for him and his wife during the entire summer. In 2017, while Staff Member C was married, he engaged in inappropriate social media communications with S.P., demonstrating an unusually close relationship.

### E. Staff Member D (Teacher)

131. Staff Member D was a long-term substitute teacher at Oconto Falls High School.

132. Staff Member D was verbally inappropriate with student S.P. on multiple occasions while substituting in classes.

133. After S.P. graduated from Oconto Falls High School (approximately 2015), Staff Member D propositioned her about being his sugar baby.

22

134. In 2017, Staff Member D engaged in inappropriate social media communications with S.P., attempting to meet with her privately and making persistent requests for her time despite her reluctance, including statements such as "I'm pretty important u know" and "I'll be holding my breath."

135. Despite this history of inappropriate conduct with students at Oconto Falls, Staff Member D is believed to be currently employed as a school staff person.

136. Staff Member D also has an alleged history with a former teacher, T.W., who retained legal representation to address harassment she experienced.

**F. Gayle Gander (Staff Member) - Recent Criminal Arrest**

137. Gayle Gander was a staff member at Oconto Falls High School who engaged in sexual misconduct with male students.

138. On or about December 15, 2025, Gander was arrested on criminal charges for allegations of misconduct during his employment with the District. The arrest relates to allegations from five student victims whose allegations are sufficiently recent to fall within the applicable statute of limitations.

139. An additional victim of Gander's misconduct, known as M.D., has come forward stating: "I wish I had the courage to speak up about Gander back in 05 but I didn't." M.D.'s statement indicates that Gander was engaging in sexual misconduct with students as early as 2005—meaning the Board allowed Gander's abuse to continue for at least twenty years.

140. Following Gander's arrest in or about December 2025, Superintendent Stuart Russ[2] sent an official communication to "Staff and Families of the Oconto Falls Public School District" stating: "A staff member of Oconto Falls High School has been arrested on allegations of misconduct during his employment with the District. We are deeply disappointed by the nature of the allegations. The District has been and will continue to coordinate fully with law enforcement. As

23

soon as the allegations were communicated to school officials, the staff member was immediately removed from school and relieved of his responsibilities."[2]

141. The Board's response to Gander's arrest in 2025, immediately removing a staff member upon receiving a report, demonstrates that the Board possessed both the authority and capability to take immediate protective action when allegations were communicated to school officials.

### G. Additional Incidents Involving Tracy Tate

142. Student R.E. experienced an incident with teacher Tracy Tate during R.E.'s freshman year. Tate "sort of cornered" R.E. in the student bathroom to talk about FBLA. At the time, R.E. "was actively bleeding through [her] clothing and had just snagged a pad from someone," and Tate "was washing her breast pump." R.E. "dropped FBLA after that encounter" and stated that it "always felt like [Tate] was flirting with every boy in class" and that Tate "held everyone to different standards based on how much she liked you."

143. Tate is significant to this case because she was one of the teachers identified as having observed Amanda and Heisel spending time together, and Amanda had confided in Tate about her relationship with Heisel.

### H. Summary of Pattern and Practice Victims

144. Additional victims and witnesses who have come forward include:

a. K.K.— alleged inappropriately touched by both Staff Member B and Staff Member C;

b. R.E.— alleged experienced Staff Member B's sexualized quid pro quo for grades and an inappropriate bathroom encounter with Tate;

---

[2] Plaintiffs in this case notified Superintendent Russ of this pending lawsuit in Fall 2025, before Gander's arrest.

c. S.P.— alleged verbally harassed by Staff Member D on multiple occasions, propositioned after graduation, and received inappropriate social media messages from Staff Member C while he was married;

d. K.Ki.— alleged sexual conduct in ice shack;

e. B.K.— willing to speak about victimization;

f. M.D.— alleged victim of Gander in 2005;

g. J.D.— alleged victim of Gander; and

h. Five current or recent student victims whose reports led to Gander's arrest in 2025.

145. There is believed to be at least one additional victim of Brynn Marie Larsen's misconduct involving touching, though that person does not wish to participate in litigation.

146. As recently as 2025, a liaison officer stated concerns about a teacher's conduct crossing the line, which led to an internal investigation.

**I. School Officials' Knowledge and Failure to Act**

147. The pattern and practice of teacher-student sexual abuse, grooming, harassment, and misconduct described above was known to school officials through reports, or direct observations, yet was tolerated without meaningful investigation, discipline, or preventive measures.

148. Students and staff observed Staff Member C inappropriately touching K.K. "during class" in conduct so obvious that K.K. herself wondered "how other students didn't see or say anything," yet no staff member intervened or reported.

149. Staff Member D was "verbally inappropriate" with S.P. "on multiple occasions" while serving as a teacher—conduct observable to students and staff—yet Staff Member D was permitted to continue teaching and later was hired at another school district, indicating the Board never flagged or reported his conduct.

25

150. Gander engaged in sexual misconduct with students beginning no later than 2005, with at least five known victims, over a period of approximately twenty years without the Board taking meaningful action until his arrest in 2025.

151. Despite observing and/or receiving reports and rumors about Gander's conduct spanning two decades, the Board failed to act. When Gander was finally arrested in 2025, the Superintendent stated that "as soon as the allegations were communicated to school officials, the staff member was immediately removed," demonstrating that the Board possessed the authority and capability to act swiftly when it chose to do so.

152. Despite multiple teachers engaging in grooming, sexual conduct with students, providing alcohol to minors, and attending student parties, conduct that was reported or observed by, or known to school officials, the Board failed to implement or enforce adequate policies to protect students.

153. This widespread practice created an environment in which teachers understood they could engage in inappropriate conduct with students without meaningful consequence.

**J. Summary of Pattern and Practice**

154. At least nine teachers or staff members engaged in sexual abuse, grooming, harassment, or severe misconduct with students at Oconto Falls High School, including: Heisel, Brynn Marie Larsen, Staff Member A, Staff Member B, Staff Member C, Staff Member D, Staff Member E, and Gander.

155. Multiple victims have been identified: Amanda Watzka, Brooke La Count, Grace Williams, K.F., J.M., A.R., K.K., R.E., S.P., K.Ki., J.D., M.D., the recent students who reported Gander, and a boy touched inappropriately by a different teacher.

156. The abuse spans from at least 2005 through 2025, a period of at least twenty continuous years of teacher-student sexual abuse at Oconto Falls High School.

26

157. The abuse affected both male and female students and involved teachers from multiple departments, Tech Education, History, English, Spanish, Math, Health, and others—as well as coaches and substitute teachers.

158. The Board's response to Gander's arrest in 2025 demonstrates that it possessed both the authority and capability to take immediate protective action when allegations were communicated to school officials.

159. The Board's swift action in 2025 contrasts sharply with its decades-long failure to act on substantially similar reports and allegations involving Heisel, Brynn Marie Larsen (multiple occasions in 2013-2014 and 2018), Staff Member A, Staff Member B, Staff Member C, Staff Member D, and Gander himself (since at least 2005).

160. Victims like K.K. "kept [their] mouth shut" because they "felt embarrassed" and had "buried so deep" the trauma of their abuse that they temporarily forgot about it.

161. The prevalence of teacher misconduct at Oconto Falls was so widespread that students perceived it as normal.

162. Grace's experience is emblematic of the Board's failures: her story "was not taken seriously" and "no one really cared," despite a report to the School Resource Officer and notification of the principal and guidance counselor.

## VIII. Statute of Limitations and Accrual[3]

---

[3] "The theory of plaintiff's case, however, is not simply that she was sexually abused but that she was abused by a teacher under circumstances created by defendants. In other words, had it not been for defendants' alleged failure to properly take action to prevent abuse by the teacher, plaintiff would not have been abused by him." *Doe v. Bd. of Education of Hononegah Community High School District #207*, 833 F.Supp. 1366, 1376 (N.D. Ill. 1993) ("The Seventh Circuit strongly intimated *** that a plaintiff could allege a claim that school administrators 'promoted school policies that 'encourage[ed] a climate to flourish where innocent [children] were victimized.'"" J.O. v. Alton Community Unit Sch. Dist. 11, 909 F.2d at 272 (citing *Stoneking v. Bradford Area Sch. Dist.*, 882 F.2d 720, 730 (3d Cir.1989), cert. denied, 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990))).

163. Federal civil rights claims accrue, and the statute of limitations begins to run, when a plaintiff discovers both the fact of her injury and its cause. A plaintiff must know, or have reason to know, not only that she was harmed, but also who or what caused that harm.

164. The theory of Plaintiffs' case against the Board is not simply that they were sexually abused, but that they were abused by teachers and coaches under circumstances created by the Board through its unwritten policies, practices, and customs of allowing teacher-student sexual conduct and grooming to flourish, and failing to act. Knowing they were abused did not give Plaintiffs knowledge, or reason to know, that the Board had such unwritten policies, customs, and practices about groomers and abusers and failed to act, because that information resided entirely within the Board's own possession and control.

165. The Board's liability to each Plaintiff rests on conduct separate and distinct from that of the individual abuser: it rests on the Board's own unwritten policies, practices, and customs, and its deliberate failure to investigate, discipline, or otherwise act on those reports. These are different acts, directed at different rights, from those of the individual abuser. A plaintiff cannot discover this cause of injury until she learns that such unwritten policies and practices existed and that the Board failed to respond to rectify such abuse, allowing a culture of abuse and toleration of such conduct to flourish.

166. Whether each Plaintiff knew or reasonably should have known of the Board's unwritten policies and practices, and failure to act at an earlier date is a question of fact that cannot be resolved at the pleadings stage.

167. Each Plaintiff avers that she did not discover, and had no reason to discover, the Board's role in causing her injuries until Fall 2025, when she first learned of the full scope of teacher-student sexual abuse at Oconto Falls High School and the Board's decades-long pattern of maintaining unwritten policies and practices and allowing abuse and grooming to go unchecked.

28

### A. Amanda's Federal Claims Accrued in 2025

168. Amanda's federal claims against the Board are based on the Board's knowledge and observations about Heisel's conduct and the Board's deliberate failure to investigate or take protective action as to a wide range of teacher-student sex abuse and grooming outlined herein. Prior to 2025, Amanda had no knowledge, and no reason to know, that the Board had knowledge and failed to act, nor about the widespread pattern of teacher-student abuse and grooming alleged herein. That information was entirely within the Board's own control.

169. Amanda's federal claims against the Board accrued in 2025, when she first discovered both that she had been injured and that the Board's institutional conduct was the cause.

### B. Brooke's Federal Claims Accrued in 2025

170. Brooke's federal claims against the Board are based on the Board's knowledge about Brynn Marie Larsen's conduct with Brooke and the Board's deliberate failure to investigate, flag, report, or discipline Larsen in response, as well as the widespread custom and pattern of abuse that Brooke learned about in Fall 2025. Brooke's claims, filed in 2026, are timely.

### C. Grace's Federal Claims Accrued in 2025

171. Grace's federal claims against the Board are based on the Board's receipt of prior reports about Larsen's abuse of Brooke in 2013-2014 and its deliberate failure to act on those reports, failures that directly enabled Larsen to return to Oconto Falls and abuse Grace in 2018, as well as the widespread custom and pattern of abuse that Brooke learned about in Fall 2025. Although Grace always remembered Larsen's abuse and it was reported to the School Resource Officer, she did not know until 2025 that the Board had previously received reports about Larsen's abuse of Brooke, or that the Board's failure to act on those prior reports was what enabled Larsen to return and abuse Grace. That information was entirely within the Board's own control. Grace's claims against the Board accrued in 2025, when she first discovered both that she had been injured

by the Board's institutional conduct and the nature of the Board's role in enabling Larsen's access to Grace, as well as the widespread, tolerant custom and practice that the Board had with respect to teacher-student sex abuse and grooming. Grace's claims, filed in 2026, are timely.

**D. Continuing Violation**

172. Grace's abuse in 2018 further demonstrates that the Board's unconstitutional custom and practice of maintaining unwritten policies, customs, and practices allowing a climate of abuse and grooming to flourish, and failing to act continued to operate as the moving force behind constitutional violations occurring within the applicable limitations period.

173. Grace would not have been victimized in 2018 if the Board had properly acted on the complaints to Moynihan in 2013 and the 2014 police investigation of Larsen's abuse of Brooke.

174. The Board's response in December 2025, immediately removing Gander from his position upon receiving a report of his arrest, demonstrates that the Board's unconstitutional policy of deliberate indifference continued to operate throughout the limitations period and up to the date of this filing.

**COUNT 1 - VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)**
*(Plaintiff Amanda v. Defendant Board)*

175. Amanda restates, realleges, and incorporates by reference paragraphs 1-59, 115-162, and 163-166 as if fully stated herein.

176. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

177. Amanda is female and was a student at Oconto Falls High School.

178. From approximately 2010 through 2013, Defendant Heisel, acting as Amanda's Tech Education Teacher and in a position of authority over Amanda, subjected Amanda to ongoing grooming and sexual abuse because of her sex, female, including: repeated personal and sexual

30

conversations while she was a minor; repeated intimate physical contact, including hand-holding and groping; a sexual assault at the Skills USA competition in Wisconsin Dells when Amanda was 17; and the three-year grooming campaign described in the facts above.

179. Heisel's sex-based harassment and abuse was so severe and pervasive that it altered the conditions of Amanda's education, including by causing her to form a false belief that she was in a romantic relationship with Heisel, causing her to reject healthy peer relationships, stunting her normal social and emotional development, and causing her to graduate early.

180. The Board had actual knowledge of Heisel's conduct through its observations and direct knowledge of school officials as set forth in paragraphs 50(a)-(j) above.

181. Despite this actual knowledge, the Board was deliberately indifferent to Heisel's conduct and failed to investigate or take protective action.

182. The Board's deliberate indifference is further demonstrated by its knowledge about teacher-student sexual abuse by multiple other teachers during the same period—including reports to Moynihan about Larsen's abuse of Brooke in 2013, the 2014 police investigation of Larsen, and the Board's knowledge of abuse by Staff Member A, Staff Member B, Staff Member C, Staff Member D, Gander, and others as set forth in Section VII above—yet the Board consistently failed to investigate, discipline, or otherwise act.

183. The Board's custom and practice of failing to act created an environment in which teachers understood they could abuse students without consequence, thereby enabling Heisel's ongoing abuse of Amanda.

184. As a result of Heisel's grooming and abuse and the Board's deliberate indifference, Amanda suffered and continues to suffer damages, including loss of equal educational opportunity, emotional distress, complex PTSD, depression, anxiety, hypervigilance, low self-esteem, and substance abuse issues.

WHEREFORE, Plaintiff Amanda respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

## COUNT 2 - VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
### *(Plaintiff Grace v. Defendant Board)*

185. Grace restates, realleges, and incorporates by reference paragraphs 90-114, 115-162, 163-167, and 171 as if fully stated herein.

186. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

187. Grace is female and was a student at Oconto Falls High School.

188. From approximately February through April 2018, Brynn Marie Larsen, acting as Grace's substitute teacher and in a position of authority over Grace, subjected Grace to ongoing grooming and sexual abuse because of her sex and sexual orientation, including: initiating a romantic relationship with Grace through Snapchat; sending flowers to Grace in class; substituting into Grace's classes to gain access to her; and sexually assaulting Grace by making out with her in Larsen's bedroom while Grace was a 17-year-old minor student.

189. Larsen's harassment and abuse was so severe and pervasive that it altered the conditions of Grace's education, including by causing emotional distress, fear of reporting, loss of peer relationships due to being blamed for Larsen's departure, and ongoing discomfort when encountering Larsen in public.

190. The Board had actual knowledge of Larsen's abuse of Grace through reports made to school officials with decision-making authority: Grace's friend T.F. reported the abuse to the School

Resource Officer; the School Resource Officer spoke with Grace directly about the abuse; and the school principal and guidance counselor were notified. Following these reports, Larsen and Dawn Larsen were removed from the school almost immediately, demonstrating that school officials with decision-making authority had received the report and understood it warranted action.

191. Despite receiving these reports, the Board was deliberately indifferent to Grace's abuse: it conducted no formal investigation; it never formally interviewed Grace; and Grace's story "was not taken seriously" and "no one really cared."

192. Dawn Larsen, a mandated reporter and Board employee who was present in the home when Grace fled Larsen's bedroom after being kissed, observed what happened and failed to report it.

193. Most significantly, the Board had received prior reports about Larsen's abuse of Brooke through complaints to Athletic Director Moynihan in 2013 and through the 2014 police investigation, yet failed to properly flag, report, or discipline Larsen. This failure is what enabled Larsen to be hired at Waupaca School District and later return to Oconto Falls with access to Grace.

194. The Board's pattern of knowledge about teacher-student sexual abuse involving at least nine teachers over twenty years and consistently failing to take adequate action demonstrates that the Board's deliberate indifference to Grace's abuse was a continuation of its established custom and practice.

195. The Board's swift removal of Gander upon receiving a report of his arrest in 2025, contrasted with its failure to act on reports about Larsen in 2013-2014 and on Grace's report in 2018, demonstrates that the Board had the authority and capability to protect Grace and deliberately chose not to exercise it.

196. As a result of Larsen's grooming and abuse and the Board's deliberate indifference, Grace suffered and continues to suffer damages, including loss of equal educational opportunity,

emotional distress, fear of reporting, harm caused by being blamed for Larsen's departure, and ongoing discomfort when encountering Larsen in public.

WHEREFORE, Plaintiff Grace respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

## COUNT 3 - VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
*(Plaintiff Brooke v. Defendant Board)*

197. Brooke restates, realleges, and incorporates by reference paragraphs 60-89, 115-162, and 170 as if fully stated herein.

198. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

199. Brooke is female and was a student at Oconto Falls High School.

200. From approximately August 2013 through the summer of 2014, Brynn Marie Larsen, acting as Brooke's assistant volleyball coach and substitute teacher and in a position of authority over Brooke, subjected Brooke to ongoing grooming and sexual abuse because of her sex, female, including: initiating a romantic and sexual relationship with Brooke through Snapchat while Brooke was a 15-year-old minor; sending Brooke photographs of her naked body and pressuring Brooke to reciprocate; engaging Brooke in sexual activity in the backseat of her vehicle at their first in-person meeting; requiring Brooke to sleep in her bed and engaging or attempting to engage Brooke in sexual acts on multiple occasions; exploiting the coach-athlete power differential to isolate Brooke from her family; and continuing contact and sexual conduct with Brooke even after a police investigation began in May-June 2014.

34

201. Larsen's sex-based harassment and abuse was so severe and pervasive that it altered the conditions of Brooke's education, including by causing her to become isolated from her family and peers, causing her to feel obligated to submit to sexual conduct she did not desire, and ultimately forcing her to transfer out of Oconto Falls High School in fall 2014 because other students were calling her "lesbian" and making her life miserable as a direct result of Larsen's grooming and abuse.

202. The Board had actual knowledge of Larsen's conduct through school officials with decision-making authority. Specifically: in 2013, Athletic Director Jerry Moynihan received complaints from multiple people about seeing Brynn Marie Larsen and Brooke together and responded only by having "a discussion with Brynn about boundaries," permitting Larsen to continue as assistant coach with full access to Brooke; Dawn Larsen, a mandated reporter and Board employee, was present in the home on multiple occasions when Larsen and Brooke slept in the same bed and snuggled on the couch, yet failed to report; guidance counselor and driver's education teacher Lee Kournaus observed Brooke and Larsen together outside of school on multiple occasions, including at his own girlfriend's house, yet failed to inquire or report; and a police investigation into Larsen's abuse of Brooke was conducted in May-June 2014, of which the Board was or should have been aware.

203. Despite this actual knowledge, the Board was deliberately indifferent to Larsen's conduct and failed to meaningfully investigate, discipline, flag, or report Larsen in response to any of these reports. Moynihan's response—a single conversation with Larsen about "boundaries"—was clearly unreasonable in light of the known risk of ongoing abuse to a 15-year-old student.

204. The Board's deliberate indifference is further demonstrated by its failure to take any action following the 2014 police investigation: the Board did not discipline Larsen, did not flag her conduct to licensing authorities, and did not prevent her from being hired by the Waupaca School

District. The Board subsequently allowed Larsen to return to Oconto Falls as a substitute teacher in 2018, where she abused Grace Williams in substantially the same manner.

205. The Board's pattern of receiving reports about teacher-student sexual abuse involving at least nine teachers over twenty years and consistently failing to take adequate action demonstrates that the Board's deliberate indifference to Brooke's abuse was not an isolated failure, but a continuation of an established custom and practice.

206. The Board's swift removal of Gander upon receiving a report of his arrest in December 2025, contrasted with its failure to act on multiple reports about Larsen in 2013-2014, demonstrates that the Board had the authority and capability to protect Brooke and deliberately chose not to exercise it.

207. As a result of Larsen's grooming and abuse and the Board's deliberate indifference, Brooke suffered and continues to suffer damages, including loss of equal educational opportunity, forced transfer from her high school, emotional distress, and other ongoing harm.

WHEREFORE, Plaintiff Brooke respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

## COUNT 4 - MONELL CLAIM, DEPRIVATION OF RIGHT TO BODILY INTEGRITY UNDER THE FOURTEENTH AMENDMENT OF THE UNITED STATES CONSTITUTION VIA 42 U.S.C. § 1983
*(Plaintiffs Amanda, Brooke, and Grace v. Defendant Board)*

208. Amanda, Brooke, and Grace restate, reallege, and incorporate by reference paragraphs 1 through 174 as if fully stated herein.

209. Students have a constitutional right to bodily integrity under the substantive due process protections of the Fourteenth Amendment. A student who is sexually abused by a public

36

school official acting under color of state law has a cognizable claim under the Fourteenth Amendment.

210. Amanda was deprived of her right to bodily integrity by Heisel's grooming and sexual assault as described in paragraphs 20-44 above.

211. Brooke was deprived of her right to bodily integrity by Brynn Marie Larsen's repeated grooming and sexual assaults as described in paragraphs 60-81 above.

212. Grace was deprived of her right to bodily integrity by Brynn Marie Larsen's grooming and sexual assault in February through April 2018, as described in paragraphs 90-110 above.

213. Heisel's abuse of Amanda (2010-2013) and Larsen's abuse of Brooke (2013-2014) occurred during substantially the same time period at Oconto Falls High School. Larsen's subsequent abuse of Grace in 2018 demonstrates that the Board's custom and practice of maintaining unwritten policies, practices, and customs allowing sexual abuse and grooming of students to flourish, and failing to act continued beyond the initial abuse of Amanda and Brooke, causing additional constitutional violations.

214. The sexual abuse of Amanda, Brooke, and Grace did not occur in isolation, but within a pervasive culture of teacher-student sexual abuse at Oconto Falls School District spanning from at least 2005 through 2025, a period of at least twenty years involving at least nine different teachers and at least fourteen identified victims.

215. School officials received reports about, observed, or had actual knowledge of this pattern of abuse as set forth in Section VII above, yet consistently failed to investigate, discipline, or take protective action.

216. The Board maintained a custom and practice as set forth above of teacher-student sexual abuse and responding with deliberate indifference, specifically:

a. Heisel's conduct with Amanda was known by multiple teachers and administrators as set forth in paragraphs 50(a)-(j) above, yet the Board failed to investigate or intervene;

b. In 2013, Athletic Director Moynihan received complaints from multiple people about seeing Brynn Marie Larsen and Brooke together but responded only by having "a discussion with Brynn about boundaries" and allowed Larsen to continue as assistant coach with full access to Brooke;

c. Dawn Larsen, a mandated reporter and Board employee, was present in the home on multiple occasions when Larsen and Brooke slept in the same bed and snuggled on the couch, yet failed to report;

d. Despite the 2014 police investigation of Larsen, the Board failed to flag, report, or discipline Larsen, allowing her to be hired at another school district and later return to Oconto Falls, where she abused Grace in 2018;

e. In early 2018, Grace's friend reported Larsen's abuse of Grace to the School Resource Officer, the principal was notified, and the guidance counselor was notified, yet the Board conducted no formal investigation and never formally interviewed Grace;

f. Staff Member C inappropriately touched K.K. "during class" in conduct K.K. said was so obvious she wondered "how other students didn't see or say anything," yet no school official intervened;

g. Staff Member D was "verbally inappropriate" with S.P. "on multiple occasions" while serving as a substitute teacher, yet the Board permitted him to continue substituting and never flagged his conduct; and

h. Gander engaged in sexual misconduct with students from at least 2005 through 2025—with at least five known victims—for two decades without the Board taking action.

38

217. The contrast between the Board's decades of inaction despite receiving these reports and its immediate removal of Gander from employment in December 2025 upon receiving a report of his arrest demonstrates that the Board has always possessed the authority and capability to act promptly when it chose to do so, and that its prior failures were the result of an affirmative custom and policy of deliberate indifference rather than institutional inability.

218. The Board failed to adopt and enforce adequate policies, including policies requiring formal investigations of reports of teacher-student sexual misconduct; mandating reporting of accused teachers to licensing authorities and other school districts; prohibiting accused abusers from returning to positions with student access; training staff on recognizing and reporting grooming behavior; establishing consequences for staff who fail to report suspected abuse; and creating a safe reporting system for students.

219. The Board's custom and practice set forth above, and its failing to act, and its failure to adopt adequate policies, was the moving force behind all three Plaintiffs' constitutional injuries:

a. The Board received complaints about Larsen and Brooke through Moynihan in 2013, but Moynihan's minimal response allowed the abuse to continue;

b. The Board received a report through the 2014 police investigation of Larsen, but failed to flag, report, or discipline Larsen, which directly enabled Larsen to return to Oconto Falls and abuse Grace in 2018;

c. If the Board had properly acted on the complaints to Moynihan and the 2014 police investigation, Larsen would not have been permitted to return to Oconto Falls, and Grace would not have been victimized;

d. The Board knew about Heisel's conduct with Amanda over three years, through teachers, administrators, Amanda's own disclosures, and observable conduct, yet failed to investigate or intervene; and

39

e. The Board's decades-long unwritten policies, practices, and customs, and failing to act on knowledge of teacher-student abuse and grooming, created an environment in which teachers like Heisel and Larsen understood they could engage in abuse without consequence, enabling and emboldening their conduct toward each Plaintiff, and generally allowing teacher-student sexual abuse and grooming to flourish.

220. All three Plaintiffs suffered substantial damages, including loss of equal educational opportunities, emotional distress, and other compensatory damages.

WHEREFORE, Amanda, Brooke, and Grace respectfully request that this Court enter judgment in their favor and against the Board, award compensatory damages in amounts to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

## JURY DEMANDED AS TO ALL COUNTS

Respectfully submitted,

AMANDA WATZKA
BROOKE LA COUNT
GRACE WILLIAMS

By:      *s/ Cass T. Casper*

Attorney for Plaintiffs

*Cass T. Casper, Esq.*
WIED Bar Number 6303022
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: cass.casper@dispartilaw.com

40

**PATTERN OF ABUSE - VICTIMS, PERPETRATORS, CONDUCT, BOARD KNOWLEDGE**

| Victim | Perpetrator | Timeframe | Comp. ¶¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| A.W. (Amanda Watzka) | David Heisel (Tech Ed Teacher) | 2010-2013 | ¶¶ 2, 20-44, 50(a)-50(j), 168-169, 178-184, 210 | Grooming over three years; intimate personal conversations; hand-holding; sexual discussions with a minor; sexual assault at Skills USA competition in Wisconsin Dells when Amanda was 17 | Tracy Tate; John Bursa; Art Paulson; Matt Beschta; Staff Member C; Dave and Jill Braiser; Staff Member A; Gayle Gander; Carla Nielsen; Administrators Bruce Russell and Lou Hobyan; school janitors Bob and John; school secretary; Christine Glover | No investigation; no disciplinary action; Heisel continued employing Amanda as unpaid babysitter and taking her on drives throughout her three-year enrollment |
| B.L. (Brooke La Count) | Brynn Marie Larsen (Asst. Volleyball Coach / Substitute Teacher) | 2013-2014 | ¶¶ 3, 60-81, 170, 200-207, 211 | Grooming via Snapchat; sending nude photographs; sexual activity in vehicle at first meeting when Brooke was 15; repeated overnight stays with sexual conduct; isolation from family | Jerry Moynihan (Athletic Director) received complaints from multiple people about seeing Larsen and Brooke together; Dawn Larsen (mandated reporter, Board health teacher) observed Brooke and Larsen sleeping in same bed and snuggling on couch; Lee Kournaus (guidance counselor) observed them together outside school multiple times including at | Moynihan's only response: "a discussion with Brynn about boundaries"; Larsen permitted to continue as assistant coach with full access to Brooke; Dawn Larsen never reported; Kournaus never reported; no formal investigation after 2014 police investigation; Larsen not disciplined or |

| Victim | Perpetrator | Timeframe | Comp. ¶¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | | | | | his own girlfriend's house; Rochelle Vandenlangenberg Otto; Katie Strelow-Ripley; 2014 police investigation | flagged to licensing authorities |
| G.W. (Grace Williams) | Brynn Marie Larsen (Substitute Teacher) | Feb-Apr 2018 | ¶¶ 4, 90-114, 171, 188-196, 212 | Grooming via Snapchat; sending flowers to class; substituting into Grace's classes; sexual assault (making out) in Larsen's bedroom when Grace was 17 | T.F. (Grace's friend) reported to School Resource Officer; SRO spoke with Grace; principal notified; guidance counselor notified; Dawn Larsen (mandated reporter, Board employee) present in home, made eye contact with Grace as she fled Larsen's bedroom | No formal investigation; Grace never formally interviewed; no counseling or support provided; story "not taken seriously" and "no one really cared"; Larsen and Dawn Larsen removed from school but no further action |
| K.F. | Staff Member A (Teacher) | Approx. 2011 | ¶120 | Sexual relationship; Staff Member A took her virginity; K.F. and a friend would go to Staff Member A's house; K.F. showed classmates texts from Staff Member A | Classmates including J.M. were aware; K.F. disclosed directly to J.M. | No known Board action |
| K.Ki. | Staff Member A (Teacher) | Approx. 2011 | ¶¶ 117, 144(d) | Sexual conduct in ice shack ("used to give [Staff Member A] blow jobs in his ice shack") | Reported by students | No known Board action |

| Victim | Perpetrator | Timeframe | Comp. ¶¶ | Conduct | Who Had Knowledge | Board Response |
|--------|-------------|-----------|----------|---------|-------------------|----------------|
| J.M. | Staff Member B (Teacher) & Staff Member A (Teacher) | 2011-2013 | ¶¶ 118, 119, 122, 123, 127 | Staff Member A told J.M. she was on a "top 5 hottest girls" list when she was a 14-year-old freshman; Staff Member B allowed J.M. to leave class if she flirted with him; Staff Member B and Staff Member A (in their 30s) provided alcohol to students and attended high school parties | Other teachers and staff; conduct occurred in classrooms and at off-school social events involving faculty and students | No known Board action; conduct described as so prevalent students perceived it as normal |
| A.R. | Staff Member B (Teacher) | 2011-2013 | ¶ 123 | Required to grab keys from Staff Member B's front pocket in a sexualized manner; same pattern as J.M. | J.M. directly observed the conduct; other students present | No known Board action |
| K.K. | Staff Member B (Teacher) & Staff Member C (Teacher / Coach) | Approx. 2010-2012 | ¶¶ 125, 129, 144(a), 148 | Inappropriate touching during class; conduct so obvious K.K. wondered "how other students didn't see or say anything"; K.K. avoided both teachers; given special privileges in exchange for tolerating misconduct | Other students present in class during the touching | No action taken; Staff Member C currently employed |
| R.E. | Staff Member B (Teacher) | Approx. 2012-2015 | ¶¶ 124, 144(b) | Sexualized quid pro quo for grades: gave R.E. an A without | Unknown | No known Board action; Staff Member B believed to |

| Victim | Perpetrator | Timeframe | Comp. ¶¶ | Conduct | Who Had Knowledge | Board Response |
|--------|-------------|-----------|----------|---------|-------------------|----------------|
| | | | | completing paper while commenting on her appearance; R.E. stated she felt "so exposed and creeped out" | | be employed as a teacher |
| S.P. | Staff Member D (Teacher) & Staff Member C (Teacher) | 2011-2015 (in school); 2017 (post-graduation) | ¶¶ 130, 132, 133, 134, 135, 144(c), 149 | Staff Member D verbally inappropriate with S.P. on multiple occasions while substituting; Staff Member C proposed S.P. babysit for entire summer (2016); both engaged in inappropriate social media communications with S.P. in 2017; Staff Member D propositioned S.P. to be his "sugar baby" after graduation | Board staff aware of Staff Member D substituting in classes | No action; Staff Member D later hired as staff person at another school; no flagging of conduct to other districts |
| J.D. | Gayle Gander (Staff Member) | Approx. 2011-2012 | ¶ 144(g) | Sexual misconduct | Unknown | No known action |
| M.D./R. | Gayle Gander (Staff Member) | 2005 | ¶¶ 139, 144(f), 150 | Sexual misconduct; M.D. stated: "I wish I had the courage to speak up about Gander back in 05 but I didn't" | Unknown (M.D. did not report at the time) | No action; abuse continued for approximately twenty years |
| B.K. | Staff Member E | 2010-2012 | ¶ 144(e) | Sexual misconduct | Unknown | No known action |

| Victim | Perpetrator | Timeframe | Comp. ¶¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | (Athletic Trainer) | | | | | |
| Unknown Students (5) | Gayle Gander (Staff Member) | 2025 | ¶¶ 138, 140, 141, 151, 158, 174, 217 | Sexual misconduct (five victims; reports led to criminal arrest December 15, 2025) | Board officials received report of arrest | Gander immediately removed from school and relieved of all responsibilities upon arrest |

**APPENDIX B**

**ACTUAL NOTICE TIMELINE - REPORTS TO THE BOARD, BOARD RESPONSE**

| Date | Report / Observation | Reported To / Who Had Knowledge | Complaint ¶¶ | Board Response | Consequence of Inaction |
|------|---------------------|--------------------------------|--------------|----------------|------------------------|
| 2005 | M.D. victimized by Gander; M.D. did not report at the time out of fear | None (disclosed in 2025) | ¶¶ 139, 144(f), 150 | None | Gander remained employed; abuse continued for approximately twenty more years |
| 2010-2013 | Multiple teachers and administrators observe Amanda and Heisel together in his office and classroom during off-hours over a three-year period; Amanda signed into Heisel's classroom during non-class hours by the school secretary; Amanda placed on an adults-only wrestling list with Heisel; Amanda posted pictures of Heisel's child on social media visible to school adults; Amanda confided in Tracy Tate about her relationship with Heisel; Amanda submitted a disturbing senior paper describing her situation to teacher Christine Glover | Tracy Tate; John Bursa; Art Paulson; Matt Beschta; Staff Member C; Dave and Jill Braiser; Staff Member A; Gayle Gander; Carla Nielsen; Administrators Bruce Russell and Lou Hobyan; school janitors Bob and John; school secretary; Christine Glover | ¶¶ 50(a)-50(j), 143, 180, 216(a) | None | Heisel continued grooming and ultimately sexually assaulting Amanda at Skills USA in Spring 2012; abuse continued through Amanda's graduation in May 2013 |

| Date | Report / Observation | Reported To / Who Had Knowledge | Complaint ¶¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| Approx. 2010-2012 | Staff Member C touches K.K. inappropriately during class in front of other students; conduct observable to any teacher or staff in or near classroom | Other students and staff present | ¶¶ 125, 129, 148, 216(f) | None | Staff Member C remained employed; K.K. "buried" the trauma and avoided Staff Member C throughout high school |
| 2011-2013 | Staff Member D verbally inappropriate with S.P. on multiple occasions while substituting in Spanish classes; conduct observable to other students and staff during substituting | Board staff and students present during substituting | ¶¶ 132, 149, 216(g) | None | Staff Member D later hired at another school in WI with no flag from the Board |
| Approx. 2011 | Students aware of Staff Member A's sexual conduct with K.F. (virginity) and K.Ki. (ice shack); K.F. showed classmates texts from Staff Member A | Classmates including J.M. aware; conduct at Staff Member A's home known to students | ¶¶ 117, 120, 144(d) | None | Staff Member A believed still employed at time of filing |
| 2011-2013 | Staff Member B and Staff Member A (in their 30s) provide alcohol to students and attend high school parties; Staff Member B permits students to leave class in exchange for flirting; Staff Member A puts together "hottest girls" list with junior and senior boys | Other teachers and staff; conduct so prevalent students perceived it as normal | ¶¶ 118, 119, 122, 123, 127, 161 | None | Both teachers continued employment; conduct escalated with additional victims |

| Date | Report / Observation | Reported To / Who Had Knowledge | Complaint ¶¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| 2013 | Multiple people complained to Athletic Director Jerry Moynihan about seeing Brynn Marie Larsen and Brooke together | Jerry Moynihan (Athletic Director) | ¶¶ 54, 79, 80, 202, 203, 216(b) | Moynihan had "a discussion with Brynn about boundaries" only; permitted Larsen to continue as assistant coach with full access to Brooke | Larsen's grooming and sexual abuse of Brooke continued throughout the 2013-2014 school year |
| 2013-2014 | Dawn Larsen (mandated reporter, Board health teacher, head varsity coach) observed Brooke and Brynn Marie Larsen sleeping in the same bed and snuggling on the couch in the Larsen home on multiple occasions | Dawn Larsen | ¶¶ 61, 72, 202, 216(c) | Dawn Larsen never filed a mandated reporter report | Larsen's abuse of Brooke continued; Dawn Larsen was later present when Larsen assaulted Grace in 2018 and again failed to report |
| 2013-2014 | Lee Kournaus (guidance counselor and driver's education teacher) observed Brooke and Larsen together outside school on multiple occasions, including at his own girlfriend's house | Lee Kournaus | ¶¶ 81(a), 202 | No report made; no inquiry made | Larsen's abuse of Brooke continued through June 2014 |
| May-June 2014 | Police investigation of Larsen's abuse of Brooke; officer spoke with Jerry Moynihan, who confirmed people had complained to him about seeing Larsen and Brooke together | Board was or should have been aware of the police investigation; Moynihan confirmed prior complaints to police | ¶¶ 73, 74, 80, 202, 204, 216(d) | No disciplinary action; Larsen not flagged to licensing authorities; no report made to prevent future employment | Larsen hired by Waupaca School District in fall 2014; Board later permitted Larsen to return to Oconto Falls as substitute teacher in 2018 |

| Date | Report / Observation | Reported To / Who Had Knowledge | Complaint ¶¶ | Board Response | Consequence of Inaction |
|------|---------------------|--------------------------------|--------------|----------------|------------------------|
| Fall 2014 | Larsen hired by Waupaca School District | Board had opportunity to flag conduct to licensing authorities or Waupaca; failed to do so | ¶¶ 78, 204 | No action | Larsen gained access to new student population; returned to Oconto Falls in 2018 |
| 2016-2017 | Staff Member C proposes S.P. babysit for entire summer (2016); engages in inappropriate social media communications with S.P. while married (2017) | Unknown Board officials | ¶¶ 130, 144(c) | None | Staff Member C continued employment |
| 2017 | Staff Member D propositions S.P. to be his "sugar baby" after her graduation; engages in persistent inappropriate social media communications | Unknown Board officials | ¶¶ 133, 134, 135 | None | Staff Member D later hired at another school in WI with no flag from the Board |
| March 2018 | Dawn Larsen (mandated reporter, Board employee) present in home when Larsen and Grace are alone in bedroom; makes direct eye contact with Grace as Grace flees the bedroom after being assaulted | Dawn Larsen | ¶¶ 100, 192 | Dawn Larsen does not report | Larsen's contact with Grace continued |
| Early 2018 (post-incident) | T.F. (Grace's friend) reports Larsen's abuse of Grace to School Resource Officer; SRO speaks with Grace; | School Resource Officer; principal; guidance counselor | ¶¶ 102, 103, 104, 107, 162, 190, 191, 216(e) | Larsen and Dawn Larsen removed from school; no formal investigation; | Grace's story "was not taken seriously" and "no one really cared"; Grace blamed by other |

| Date | Report / Observation | Reported To / Who Had Knowledge | Complaint ¶¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| | principal and guidance counselor notified | | | Grace never formally interviewed; no counseling or support provided | students for Larsen's departure; no licensing report or flag made against Larsen |
| Approx. 2025 | Liaison officer expresses concern that a teacher's conduct was crossing the line; internal investigation initiated | Board officials | ¶ 146 | Internal investigation—outcome unknown | Pending |
| December 15, 2025 | Gander arrested on criminal charges for sexual misconduct with five student victims during his employment with the District | Board officials; Superintendent notified | ¶¶ 138, 140, 141, 151, 158, 174, 217 | Gander immediately removed from school and relieved of all responsibilities; Superintendent sent official communication to staff and families | First instance of prompt Board action in response to a report across the entire twenty-year pattern; demonstrates Board always had authority and capability to act swiftly |

# APPENDIX C

## MANDATED REPORTER AND SCHOOL OFFICIAL FAILURES TO REPORT

Under Wis. Stat. § 48.981, teachers, school counselors, administrators, and other school personnel are mandated reporters required to immediately report to child protective services or law enforcement any reasonable suspicion of child abuse or neglect, including sexual abuse. Every Board employee listed above had an independent legal obligation to report—the failure of one does not excuse the failure of others.

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| Dawn Larsen | Health Education Teacher; Head Varsity Volleyball & Softball Coach | Yes | Observed Brooke and Brynn Marie Larsen sleeping in the same bed and snuggling on the couch on multiple occasions in the Larsen home | 2013-2014 | ¶¶ 61, 72, 202, 216(b)-(c) | No | Larsen's abuse of Brooke continued; Larsen was never flagged or disciplined; Larsen later returned to Oconto Falls and abused Grace |
| Dawn Larsen | Health Education Teacher; Head Varsity Volleyball & Softball Coach | Yes | Present in the home when Grace fled Larsen's bedroom after being kissed; made direct eye contact with Grace as she fled | March 2018 | ¶¶ 100, 192 | No | Grace received no support; no formal investigation was triggered; Larsen continued contact with Grace |
| Jerry Moynihan | Athletic Director | School official with decision-making authority | Received complaints from multiple people about seeing Brynn Marie Larsen and Brooke together; | 2013 | ¶¶ 54, 79, 80, 202, 203, 216(b) | No formal report; responded only with "a discussion with Brynn about | Larsen permitted to continue as assistant coach with full access to Brooke; abuse continued |

51

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | confirmed this to police during 2014 investigation | | | boundaries" | through 2014; Larsen never flagged to licensing authorities |
| Lee Kournaus | Guidance Counselor; Driver's Education Teacher | Yes | Observed Brooke and Brynn Marie Larsen together outside of school on numerous occasions, including at his own girlfriend's house | 2013-2014 | ¶¶ 81(a), 202, 216(d) | No | Larsen's abuse of Brooke continued without intervention |
| Tracy Tate | Business Education Teacher | Yes | Amanda confided in Tate about her relationship with Heisel; Tate was aware that Amanda spent extensive time alone with Heisel and parked in the teachers' area for quick access to him | 2010-2013 | ¶¶ 50(a), 50(b), 143 | No | Heisel's grooming and abuse of Amanda continued for three years; Amanda was sexually assaulted at Skills USA in Spring 2012 |
| Christine Glover | Teacher | Yes | Received Amanda's senior paper describing how broken | 2013 | ¶ 50(c) | No known report | No investigation triggered; Heisel faced no |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp ¶ | Did They Report? | Outcome |
|----------|------|-----------------|---------------------------|------|--------|------------------|---------|
| | | | she was and referencing a teacher who shared personal home life details with her | | | | consequences |
| Bruce Russell | Administrator | Yes | Appeared near Heisel's shop area on many occasions and observed Amanda and Heisel together | 2010-2013 | ¶¶ 50(a), 50(d) | No known report | Heisel's grooming and abuse of Amanda continued |
| Lou Hobyan | Administrator | Yes | Observed Amanda and Heisel together in circumstances that should have prompted concern | 2010-2013 | ¶ 50(a) | No known report | Heisel's grooming and abuse of Amanda continued |
| School Resource Officer | Law Enforcement / School Official | Yes | Received T.F.'s report of Larsen's abuse of Grace; spoke with Grace directly and had her explain what happened | Early 2018 | ¶¶ 102, 103, 190 | Report made to principal and guidance counselor only; no formal investigation followed | No formal investigation; Grace never formally interviewed; Grace received no counseling; story "not taken seriously" |
| Rochelle Vandenlangenberg Otto | Volleyball Staff; Elementary School Teacher | Yes | As a member of the volleyball staff, would have | 2013-2014 | ¶ 81(b) | No known report | Larsen's abuse of Brooke continued |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | observed Larsen's improper relationship with Brooke | | | | without intervention |
| Katie Strelow-Ripley | Volleyball Staff | School employee | As a member of the volleyball staff, would have observed improprieties in Larsen's relationship with Brooke | 2013-2014 | ¶ 81(c) | No known report | Larsen's abuse of Brooke continued without intervention |
| Multiple Teachers (Bursa, Paulson, Beschta, Staff Member C, Staff Member A, Gander, Braisers, Carla Nielsen, janitors Bob and John, school secretary) | Various Teaching and Staff Roles | Yes—school teachers and staff, mandated reporters | Observed Amanda and Heisel together in off-hours in his office and classroom on multiple occasions over a three-year period; school secretary permitted Amanda to be signed in with Heisel during non-class hours | 2010-2013 | ¶¶ 50(a), 50(f), 50(g), 50(h), 50(i), 50(j) | No known reports | Heisel's grooming and abuse of Amanda continued; Amanda was sexually assaulted at Skills USA in Spring 2012 |

# APPENDIX D

## FIVE PRINCIPLES OF FEDERAL ACCRUAL IN INSTITUTIONAL SEXUAL ABUSE CASES

### Principle 1: Federal Law Controls Accrual

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| While state law supplies the limitations period, federal law exclusively governs when a federal civil rights claim accrues | While state law establishes the statute of limitations and any applicable tolling provisions, federal law determines the accrual of her claims. | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1375 (N.D. Ill. 1993) |
| Same rule confirmed by the Seventh Circuit for § 1983 and § 1985 claims | "While state law supplies the statute of limitations, federal law governs the accrual of § 1983 and § 1985 claims." | *Cielak v. Nicolet Union High School District* | 112 F.4th 472, 477 (7th Cir. 2024) |
| Same rule applies to Title IX claims | "Even where the limitations period and related tolling provisions for a federal claim are borrowed from state law, the time for accrual of an action will be a question of federal law." | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *6 (S.D. Ill. 2023) |
| Federal accrual standard: claim accrues when plaintiff knows the fact and cause of injury | "Such claims accrue 'when a plaintiff knows the fact and the cause of an injury.'" | *Cielak v. Nicolet Union High School District* | 112 F.4th 472, 477 (7th Cir. 2024) (quoting *Amin Ijbara Equity Corp. v. Village of Oak Lawn,* 860 F.3d 489, 493 (7th Cir. 2017)) |

### Principle 2: Institutional Accrual Is Separate and Later Than Individual Abuser Accrual

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| A claim accrues when plaintiff knows of injury AND its cause—not merely when the wrong occurs | "Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date—often the same, but sometimes later—on which the plaintiff discovers that he has been injured." | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *6 (quoting *Cada v. Baxter Healthcare Corp.*, 920 F.2d 446, 450 (7th Cir. 1990)) |

55

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| A claim against an institution accrues when plaintiff knows of both the injury and the institutional cause—not when the abuse occurred | "A federal civil rights claim accrues 'when the alleged constitutional violation was complete, and [when the plaintiff] knew of her injury and its cause.'" | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *6 (quoting *Watson v. Metro. Enf't Grp. of S. Illinois*, 2023 WL 5276607, at *2 (7th Cir. 2023)) |
| A claim against the abuser and a claim against the institution accrue at different times | "I find that Ms. Doe's claim against the School District of Slinger may have accrued after the accrual of her claim against Mr. Paukstat." | *Doe v. Paukstat* | 863 F. Supp. 884, 892 (E.D. Wis. 1994) |
| The institutional claim accrues only when plaintiff discovers the institutional conduct that caused her injury | "Ms. Doe's cause of action against the School District accrued only when she realized ... that she was injured by the School District's alleged unconstitutional conduct of promulgating policies that fostered child abuse." | *Doe v. Paukstat* | 863 F. Supp. 884, 892 (E.D. Wis. 1994) |
| The Monell claim requires both knowledge of injury and knowledge that municipal action was the cause | The constitutional violation is the fact of the injury, the municipal action is the cause, and a plaintiff must know (or have reason to know) of both for his claim to accrue. Simply put, because they proceed under Monell, the statute of limitations does not begin to run until plaintiffs knew or had reason to know both that they were harmed by Johnson and that municipal action caused their harm. | *Cielak v. Nicolet Union High School District* | 112 F.4th 472, 478 (7th Cir. 2024) |
| Claim against the district accrues when plaintiff learns the district failed to act—not when abuse occurred | "Plaintiff's claim accrued when she learned that the School District injured her, i.e., when Plaintiff learned that the School District failed to act in response to reports about Defendant Mark Richardson's alleged misconduct." | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *9 (S.D. Ill. 2023) |
| Title IX deliberate indifference claim against institution does not accrue until plaintiff knows of institution's failure to act | "A Title IX claim for deliberate indifference 'is against a school based on the school's actions or inactions, not the actions of the person who abused the plaintiff.' Therefore, such a claim 'does not accrue until the plaintiff knows or has reason to know that the defendant institution injured them.'" | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *8 (quoting *Snyder-Hill v. Ohio State Univ.*, 48 F.4th 686, 702-04 (6th Cir. 2022)) |

56

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| Knowledge of abuse alone is not enough to start the institutional clock | "A 'plaintiff's knowledge that he was abused is not enough to start the clock [against the institution].'" | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *9 (quoting *Snyder-Hill*, 48 F.4th at 705) |

**Principle 3: Concealment of the Institutional Cause May Delay Accrual**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| Where administrators concealed their conduct, plaintiff had no reason to know her constitutional rights had been violated by the institution | "While she may have known she was abused, there is nothing in the complaint to remotely suggest that she knew or should have known of the alleged acts or omissions on the part of defendants. On the contrary, the fourth amended complaint alleges that defendants took action to conceal or cover-up the teacher's sexual misconduct. Under such alleged circumstances, it is not at all reasonable to expect a minor student to have effectively discovered such efforts by defendants. She certainly would have no reason to know that her constitutional rights had been violated." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1376 (N.D. Ill. 1993) |
| Federal notice must be of governmental harm—not merely of the harm itself | "The cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1376 (quoting *Drazan v. United States*, 762 F.2d 56, 59 (7th Cir. 1985)) |
| A plaintiff experiencing institutional concealment may not have discovered the deliberate indifference that gave rise to the claim until well after it occurred | "Unlike a plaintiff who alleges an institution mishandled her own reports of misconduct, Plaintiff may not have discovered her injury when it occurred. Instead, like the plaintiffs in Snyder-Hill, plaintiff may not have discovered the alleged deliberate indifference that gave rise to her Title IX claim until well after it occurred." | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *9 (S.D. Ill. 2023) |
| A plaintiff may have no reason to know of a school's deliberate | "A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to | *Greene v. Woodlawn Unit* | 2023 WL 6216943, at *9 (quoting |

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| indifference that gave rise to a heightened-risk claim | the time of the school's inadequate response. The same plaintiff, however, 'may have no reason to know of a school's deliberate indifference that gave rise to their heightened-risk claim.'" | *School District #209* | Snyder-Hill, 48 F.4th at 704) |
| District actively concealing known abuse by holding perpetrator out as upstanding employee may prevent accrual | District "turned a blind eye" by choosing not to "document any of these complaints, intervene, investigate, or otherwise act in response to these complaints" while holding Miller out "to be an upstanding teacher"—allegations sufficient to prevent dismissal on limitations grounds | *Wolfgram v. Miller* | 2023 WL 6388729, at *2, *8 (N.D. Ill. 2023) |

**Principle 4: Accrual Timing Is a Question of Fact—Not Law—at the Pleading Stage**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| The timing of plaintiff's discovery of the institutional cause is a question of fact for the jury | "Thus, the timing of Ms. Doe's second discovery is a question of fact which can only be properly determined by a jury. It is not appropriate for me to decide this point on a motion for summary judgment." | *Doe v. Paukstat* | 863 F. Supp. 884, 892 (E.D. Wis. 1994) |
| The question of whether plaintiff knew of institutional injury cannot be resolved at the pleading stage | "Moreover, whether any knowledge Plaintiff possessed regarding the alleged sexual abuse would 'point a reasonable person to inquire as to the District's' liability, is a question of fact that cannot be resolved at the motion-to-dismiss stage." | *Greene v. Woodlawn Unit School District #209* | 2023 WL 6216943, at *9 (S.D. Ill. 2023) |
| Dismissal on limitations grounds is improper unless the complaint unambiguously establishes all elements of the defense | "Dismissal on statute of limitations grounds 'is appropriate only when the factual allegations in the complaint unambiguously establish all the elements of the defense.'" | *Cielak v. Nicolet Union High School District* | 112 F.4th 472, 479 (7th Cir. 2024) (quoting *Hyson USA, Inc. v. Hyson 2U, Ltd.*, 821 F.3d 935, 939 (7th Cir. 2016)) |
| Dismissal on limitations grounds is "irregular" in the Seventh Circuit because it is an affirmative defense for which defendant bears the burden | "Dismissal under Rule 12(b)(6) based on the statute of limitations is 'irregular' in the Seventh Circuit because it is an affirmative defense for which the defendant bears the burden of proof." | *Wolfgram v. Miller* | 2023 WL 6388729, at *3 (N.D. Ill. 2023) |

58

**Principle 5: The Stoneking Framework: Institutional Policy, Climate, and Direct Causation**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| A school district may be held liable under § 1983 for maintaining a policy or custom of deliberate indifference to known or suspected abuse that fostered a climate of abuse | "She has also alleged that defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused her constitutional harm." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1379 (quoting *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir. 1989)) |
| The policy can be established through inaction, not just affirmative acts; policymakers need not desire abuse—deliberate indifference to an obvious need is sufficient | "It is unnecessary for a plaintiff to claim that there was a policy or custom based upon a desire by policymakers to have students abused. Rather ... if the need for more or a different policy is so obvious and the inadequacy so likely to result in a violation of constitutional rights, the policymakers can reasonably be said to have been deliberately indifferent to the need." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1379 (quoting *Stoneking*, 882 F.2d at 725) |
| The Stoneking claim requires: policy/practice/custom; deliberate or reckless indifference; fostered a climate facilitating abuse; directly caused constitutional harm | "To properly plead a cause of action under Stoneking, this court believes a plaintiff must allege the following: (1) that defendants established, through action or inaction, a policy, practice or custom; (2) that such policy, practice or custom was established with deliberate or reckless indifference to the consequences; (3) that such policy, practice or custom fostered a climate which facilitated sexual abuse of minor students by school employees; and (4) that the policy, practice or custom directly caused constitutional harm." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1379 (N.D. Ill. 1993) |
| A Stoneking policy claim survives even where the district concealed abuse and prevented reports | "Failing to report instances of suspected teacher sexual misconduct against minor students was the practice and | *Doe v. Board of Educ. of Hononegah Community* | 833 F. Supp. 1366, 1371 (N.D. Ill. 1993) |

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| from reaching licensing authorities | standard operating procedure of the school district." | *High School Dist. No. 207* | |
| A plaintiff's claim under Stoneking includes the argument that these policies created a causal relationship between institutional conduct and the constitutional harm to the plaintiff | Plaintiff argued "that these practices, customs or policies created a climate which, at a minimum, facilitated sexual abuse by teachers in general, and that there was a causal relationship between these practices, customs or policies and the repeated sexual assaults against her." | *Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207* | 833 F. Supp. 1366, 1379 (quoting *Stoneking*, 882 F.2d at 725) |