**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN**

| | |
|---|---|
| AMANDA WATZKA, BROOKE LA COUNT, GRACE WILLIAMS, BRIANNA KAIN, and KAYLA KASPER, | ) ) ) |
| | ) Case No. 26-cv-00392 |
| Plaintiffs, | ) |
| | ) The Hon. Judge Byron B. Conway |
| v. | ) |
| | ) Magistrate Judge Joseph |
| THE BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT, | ) ) |
| | ) |
| Defendant. | ) JURY TRIAL DEMANDED |

**FIRST AMENDED COMPLAINT**

AMANDA WATZKA (Amanda), BROOKE LA COUNT (Brooke), GRACE WILLIAMS (Grace), BRIANNA KAIN (Brianna), and KAYLA KASPER (Kasper) (collectively, Plaintiffs), by and through their undersigned counsel, Cass T. Casper, Esq., DISPARTI LAW GROUP, P.A., submit the following First Amended Complaint against THE BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT (Board) (Defendant).

**INTRODUCTION**

For over two decades, the Board of Education of Oconto Falls Public School District looked the other way as teachers and coaches sexually groomed and abused students on its watch. At least nine staff members preyed upon at least fourteen identified victims between 2005 and 2025 — and the Board knew. Reports were made, complaints were filed, and evidence was placed directly in the Board's hands. Nothing was done.

Powerful evidence of the Board's deliberate choice has come to light and it involves what happened at Washington Middle School. When Tania Jersey, Bridget Thomas, and their colleagues came forward, they did not merely report harassment of themselves — they presented the Board with evidence that the same employee was engaging in inappropriate conduct with a student. They

delivered it directly to the Board. A Board member personally told Jersey the evidence was credible. The Board's response was to table the vote — then approve a promotion for that same staff member quietly, at a summer meeting posted only at school buildings, where virtually no one would see the notice. That was not an institutional failure. It was an affirmative choice.

It was not until 2025 and 2026 that the Plaintiffs — former students Amanda, Brooke, Grace, Brianna, and Kayla — learned the full scope of what had been happening, and that the Board's choices had made it possible. Witnesses Alexis, Amara, Madison, Tania, and Bridget came forward, each with their own account of a system that protected perpetrators and silenced victims. Together, their stories form a twenty-year pattern that was entirely within the Board's control and wholly hidden from those it harmed. This action, now timely brought, seeks to hold the Board accountable for what it chose to enable.

## TABLE OF CONTENTS

**INTRODUCTION** ................................................................................................................ ¶¶1-18

**JURISDICTION AND VENUE** ........................................................................................ ¶¶19-20

**PARTIES** .......................................................................................................................... ¶¶21-28

**FACTS COMMON TO ALL COUNTS**

    I. Facts Pertaining to Plaintiff Amanda Watzka ........................................................ ¶¶29-53

    II. The Board's Knowledge and Failure to Act (Amanda) ........................................ ¶¶54-68

    III. Facts Pertaining to Plaintiff Brianna Kain ......................................................... ¶¶69-75

    IV. Brianna's Discovery of the Board's Institutional Conduct ................................. ¶¶76-79

    V. Facts Pertaining to Alexis Neeley ....................................................................... ¶¶80-91

    VI. Alexis's Discovery of the Board's Institutional Conduct .................................. ¶¶92-96

    VII. Facts Pertaining to Plaintiff Kayla Kasper ....................................................... ¶¶97-110

    VIII. Kayla's Discovery of the Board's Institutional Conduct ................................ ¶¶106-110

    IX. Facts Pertaining to Plaintiff Brooke La Count .................................................. ¶¶111-132

2

X. The Board's Knowledge and Failure to Act (Brooke) ...................................... ¶¶133-140

XI. Facts Pertaining to Plaintiff Grace Williams ...................................... ¶¶141-161

XII. Grace's Discovery of the Board's Receipt of Prior Reports and Failure to Protect Her
...................................................................................................... ¶¶162-165

XIII. Facts Pertaining to the Board's Pattern and Practice of Deliberate Indifference to Sexual
Misconduct — Teacher-Student Abuse, Student-Student Abuse, and Teacher-Teacher Harassment
...................................................................................................... ¶¶166-268

    A. Staff Member A (Teacher) ...................................... ¶¶167-172

    B. Staff Member B (Teacher) ...................................... ¶¶173-177

    C. Staff Member A and Staff Member B — Joint Misconduct ...................................... ¶178

    D. Staff Member C (Teacher) ...................................... ¶¶179-181

    E. Lucas Cromell (Teacher) ...................................... ¶¶182-187

    F. Gayle Gander (Staff Member) — Recent Criminal Arrest ...................................... ¶¶188-197

    G. Additional Incidents Involving Tracy Tate ...................................... ¶¶198-199

    H. Additional Pattern and Practice of Institutional Deliberate Indifference — Board and
Superintendent Knowledge of Teacher Sexual Harassment and Deliberate Indifference
...................................................................................................... ¶¶200-214

    I. Amara Calmes — Witness to Athletic Trainer Misconduct, Brynn Marie Larsen, Staff
Member A, and Systemic Failure to Report ...................................... ¶¶215-226

    J. Madison Pecha — Additional Witness to Gander's Grooming and Staff Member C's Sexual
Misconduct ...................................................................................................... ¶¶227-237

    K. Summary of Pattern and Practice Victims ...................................... ¶¶238-240

    L. School Officials' Knowledge and Failure to Act ...................................... ¶¶241-247

    M. Summary of Pattern and Practice ...................................... ¶¶248-256

    N. Alexis Neeley — Student-on-Student Sexual Assault and Board's Deliberate Indifference
...................................................................................................... ¶¶257-263

    O. Tania Jersey — Corroboration of Board's Direct Knowledge and Affirmative Choice to
Promote Accused Harasser ...................................... ¶¶264-268

**STATUTE OF LIMITATIONS AND ACCRUAL** ...................................... ¶¶269-284

    A. Amanda's Federal Claims Accrued in 2025 ...................................... ¶¶274-275

3

B. Brooke's Federal Claims Accrued in 2025 ................................................................. ¶276

C. Grace's Federal Claims Accrued in 2025 .................................................................. ¶277

D. Brianna's Federal Claims Accrued in 2025 .............................................................. ¶278

E. Kayla's Federal Claims Accrued in 2025 ........................................................... ¶¶279-281

F. Continuing Violation ......................................................................................... ¶¶282-284

**COUNT 1** — Violation of Title IX, 20 U.S.C. § 1681(a)
*(Plaintiff Amanda v. Defendant Board)* ................................................................. ¶¶285-294

**COUNT 2** — Violation of Title IX, 20 U.S.C. § 1681(a)
*(Plaintiff Grace v. Defendant Board)* .................................................................... ¶¶295-306

**COUNT 3** — Violation of Title IX, 20 U.S.C. § 1681(a)
*(Plaintiff Brooke v. Defendant Board)* .................................................................. ¶¶307-317

**COUNT 4** — Violation of Title IX, 20 U.S.C. § 1681(a)
*(Plaintiff Brianna v. Defendant Board)* ................................................................. ¶¶318-326

**COUNT 5** — Violation of Title IX, 20 U.S.C. § 1681(a)
*(Plaintiff Kayla v. Defendant Board)* .................................................................... ¶¶327-334

**COUNT 6** — Monell Claim, Deprivation of Right to Bodily Integrity Under the Fourteenth
Amendment via 42 U.S.C. § 1983
*(Plaintiffs Amanda, Brooke, Grace, Brianna, and Kayla v. Defendant Board)* .................................... ¶¶335-350

**JURY DEMAND**

**APPENDIX A** — Pattern of Abuse: Victims, Perpetrators, Conduct, Board Knowledge

**APPENDIX B** — Actual Notice Timeline: Reports to the Board, Board Response

**APPENDIX C** — Mandated Reporter and School Official Failures to Report

**APPENDIX D** — Five Principles of Federal Accrual in Institutional Sexual Abuse Cases

## <u>INTRODUCTION</u>

1. This is a civil rights action arising from the sexual grooming and abuse of students at

Oconto Falls High School by teachers, coaches, and staff, under circumstances created by the

Board's pervasive custom and policy of deliberate indifference to sexual misconduct of all kinds.

4

2. Plaintiff Amanda was groomed and sexually abused by her Tech Education Teacher, David Heisel, while she was a student at Oconto Falls High School from approximately 2010 to 2013, when she was between the ages of 16 and 18.

3. Plaintiff Brooke was groomed and sexually abused by assistant volleyball coach Brynn Marie Larsen while Brooke was a 15-year-old sophomore at Oconto Falls High School during the 2013-2014 school year.

4. Plaintiff Grace was groomed and sexually abused by substitute teacher Brynn Marie Larsen while Grace was a 17-year-old junior at Oconto Falls High School in February through April 2018.

5. Plaintiff Brianna was subjected to sexual misconduct by the school's male athletic trainer, Staff Member E, while she was a student at Oconto Falls High School from approximately 2010 through 2012.

6. Alexis (not now named as a Plaintiff, but having provided a sworn declaration) was sexually assaulted by a classmate, identified herein as "X.," while she was a 17-year-old student at Oconto Falls High School in October 2013. Alexis reported the assault to Principal Bruce Russell and Athletic Director Jerry Moynihan, both of whom dismissed her report, took no corrective action against X., and provided no support or counseling to Alexis — conduct consistent with and reflective of the Board's pervasive custom and practice of deliberate indifference to reports of sexual misconduct by or against students.

7. Plaintiff Kayla was subjected to repeated sexual misconduct by her teacher, Staff Member B, while she was a student at Oconto Falls High School during approximately 2009 through 2011, when she was approximately 15 and 16 years old. Staff Member B's conduct — which included daily self-touching in the presence of students, repeated unwanted physical contact with Kayla at her desk, and sexual comments about her appearance and body — was so open and pervasive that it was

5

known throughout the student body, yet no school official intervened or reported it. Kayla did not report the conduct because she did not believe anyone would act, a belief that was consistent with, and reflective of, the Board's pervasive custom and practice of deliberate indifference to teacher-student sexual misconduct.

8. Throughout the periods of their abuse, Plaintiffs were minors who did not understand that the conduct they experienced was predatory, criminal, or constituted actionable civil wrongs. Each Plaintiff always remembered the facts of what occurred, but did not understand until 2025 that those facts reflected criminal conduct and constitutional violations, or that the Board's institutional conduct had created the conditions enabling such violations.

9. The theory of Plaintiffs' case against the Board is not simply that they were sexually abused, but that they were abused by teachers and coaches under circumstances created by the Board through its pervasive custom and policy of knowing about teacher-student sexual abuse and failing to act.[1] While Plaintiffs were aware of their abuse, they had no knowledge, and no reason to know, of the Board's unwritten policies, customs, and practices tolerating sexual abuse and grooming across many teachers and students, and the Board's deliberate indifference to such conduct until Fall 2025, when they learned of the full scope of teacher-student sexual abuse at Oconto Falls High School and the Board's decades-long pattern of ignoring it. The Board's conduct

---

[1] Federal civil rights claims accrue "when the alleged constitutional violation was complete, and [when the plaintiff] knew of her injury **_and its cause_**," *Greene v. Woodlawn Unit Sch. Dist. #209*, 2023 WL 6216943, at *7 (S.D. Ill. 2023) (emphasis added); *accord Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (claim accrues "when a plaintiff knows the fact **_and the cause_** of an injury") (emphasis added); *Doe v. Bd. of Educ. of Hononegah Cmty. High Sch. Dist. No. 207*, 833 F. Supp. 1366, 1375 (N.D. Ill. 1993); *Doe v. Paukstat*, 863 F. Supp. 884, 892 (E.D. Wis. 1994) ("Ms. Doe's cause of action against the School District accrued only when she realized, or a reasonable person exercising due diligence in the same circumstances would have realized, that she was injured by the School District's alleged unconstitutional conduct of promulgating policies that fostered child abuse.").

in maintaining such unwritten policies, customs, and practices was entirely within the Board's own control, and wholly unknown to Plaintiffs prior to 2025.

10. In Fall 2025, Plaintiffs discovered for the first time that the Board had such unwritten policies, customs, and practices of fostering and condoning sexual misconduct by discovering that: (a) at least nine different teachers, including their own abusers, had engaged in grooming and/or sexual abuse as to at least fourteen identified victims spanning a period of at least twenty years (2005-2025); (b) the Board had responded to a student-on-student sexual assault report by dismissing the victim and taking no corrective action; and (c) the Board had received substantial evidence of sexual harassment of female staff members — as well as teacher-student abuse by the same staff member — and responded by promoting him. The Board had consistently failed to investigate, discipline, or otherwise act across all three categories of misconduct.

11. The following chart summarizes the known pattern of teacher-student grooming, sexual conduct, and sexual abuse at Oconto Falls High School that Plaintiffs discovered in 2025:

| Victim | Description of Conduct | Date Range | Perpetrator |
|---|---|---|---|
| Amanda Watzka | Grooming, inappropriate touching, hand-holding, sexual assault in the hotel stairway at Skills USA competition in Wisconsin Dells when Amanda was 17 | 2010-2013 | David Heisel |
| Brooke La Count | Grooming via Snapchat; sending nude photographs; sexual activity in vehicle at first meeting when Brooke was 15; repeated overnight stays with sexual conduct; isolation from family | 2013-2014 | Brynn Marie Larsen |
| Grace Williams | Grooming, sexual assault (kissing/making out in bedroom) | Feb-Apr 2018 | Brynn Marie Larsen |
| K.F. | Alleged sexual relationship | Approx. 2011 | Staff Member A |
| K.Ki. | Alleged sexual conduct in ice shack | Approx. 2011 | Staff Member A |
| J.M. | Alleged grooming ("hottest girls list"), inappropriate comments about appearance and body | 2011-2013 | Staff Member B & Staff Member A |

7

| Victim | Description of Conduct | Date Range | Perpetrator |
|---|---|---|---|
| A.R. | Alleged inappropriate conduct, required to grab keys from front pocket in sexualized manner | 2011-2013 | Staff Member B |
| Kayla Kasper | Staff Member B: repeated unwanted physical contact (caressing shoulder/neck at desk); daily self-touching by teacher in front of class; sexual comments; sexualized quid pro quo (offer of study materials in exchange for after-class visit). Staff Member C: sex-based favoritism, unwarranted favorable grades. Note: Staff Member B and Staff Member C were frequently seen together and reported as friends. | Approx. 2009-2011 | Staff Member B and Staff Member C |
| R.E. | Alleged sexualized quid pro quo for grades | R.E.'s senior year (specific year TBD — confirm and add) | Staff Member B |
| S.P. | Alleged verbal harassment on multiple occasions, propositioned to be "sugar baby" after graduation, inappropriate social media messages | 2011-2015, 2017 | Lucas Cromell and Staff Member C |
| J.D. | Alleged sexual misconduct | (Date not supported by body — confirm and add, or remove) | Gayle Gander |
| M.D./R. | Alleged sexual misconduct | 2005 | Gayle Gander |
| Brianna Kain | Alleged sexual misconduct | 2010-2012 | Staff Member E |
| Unknown Students (5) | Alleged sexual misconduct (led to criminal arrest) | 2025 | Gayle Gander |
| Witness A | Alleged sexual misconduct | 2018-2019 | Gayle Gander |
| Alexis Neeley | Student-on-student sexual assault; victim reported to Principal Russell and A.D. Moynihan; no corrective action taken | October 2013 | X. |
| Female Staff Members (Tania Jersey; Bridget Thomas; K.; other teachers) | Sexual harassment by Lucas Cromell; evidence presented directly to the Board; Lucas Cromell promoted to Associate Principal | 2012-2015 | Lucas Cromell (Spanish Teacher / Dean of Students / Associate Principal) |

8

12. Amanda brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment of the United States Constitution via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

13. Brooke brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

14. Grace brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

15. Brianna brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and sexual abuse.

16. Alexis states facts related to the Board based on the Board's deliberate indifference to her report of student-on-student sexual assault and the Board's systemic pattern and practice of deliberate indifference to sexual misconduct of all kinds. Alexis is not now a Plaintiff, but has submitted a sworn declaration and consents to its inclusion.

17. Kayla brings claims under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), and under the Fourteenth Amendment via 42 U.S.C. § 1983 against the Board based on the Board's systemic pattern and practice of deliberate indifference to teacher-student grooming and

sexual misconduct, which enabled and emboldened Staff Member B's open and pervasive sexual misconduct toward Kayla and other female students.

18. Plaintiffs seek compensatory damages and all other available appropriate relief.

## JURISDICTION AND VENUE

19. This Court has jurisdiction over Plaintiffs' claims pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a), 42 U.S.C. § 1983, and the Fourteenth Amendment of the United States Constitution.

20. Venue is proper in this Court because Defendant Board has its principal place of operation in Oconto Falls, Wisconsin, within this judicial district, and the acts and omissions giving rise to Plaintiffs' claims occurred in this judicial district.

## PARTIES

21. Plaintiff Amanda Watzka is an adult resident of this judicial district and was a high school student at Oconto Falls High School during the time of Heisel's grooming and abuse as alleged herein.

22. Plaintiff Brooke La Count is an adult resident of Chicago, Illinois, and was a high school student at Oconto Falls High School during the time of Brynn Marie Larsen's grooming and abuse as alleged herein.

23. Plaintiff Grace Williams is an adult resident of this judicial district and was a high school student at Oconto Falls High School during the time of Brynn Marie Larsen's grooming and abuse in 2018 as alleged herein.

24. Plaintiff Brianna Kain is an adult female resident of this judicial district and was a high school student at Oconto Falls High School during the time of Staff Member E's sexual misconduct as alleged herein.

25. Alexis Neeley, not now named as a Plaintiff but having spoken out and included a sworn declaration, is an adult resident of St. Paul, Minnesota. She graduated from Oconto Falls High School in 2014. During the 2013-2014 school year, when she was 17 years old, she was a member of the school's cheer team and was sexually assaulted by a classmate, identified herein as "X.," in October 2013. Alexis' factual allegations are included with her express consent.

26. Plaintiff Kayla Kasper is an adult resident of Sturgeon Bay, Wisconsin. She graduated from Oconto Falls High School in 2012. During the 2009-2011 school years, when she was approximately 15 and 16 years old, she was a student at Oconto Falls High School and was subjected to repeated sexual misconduct by her social studies teacher, Staff Member B.

27. Defendant Board of Education of Oconto Falls Public School District is a governmental body and school district operating within this judicial district. Four schools fall within the Board's jurisdiction, including Oconto Falls High School, where the abuse alleged herein primarily occurred, and Washington Middle School, also known as Oconto Falls Middle School, among others.

28. Defendant Board is a recipient of federal funds.

## FACTS COMMON TO ALL COUNTS

### I. Facts Pertaining to Plaintiff Amanda Watzka

29. During Amanda's sophomore year at Oconto Falls High School, she first met Defendant Heisel, who was her Tech Education Teacher.

30. Amanda was interested in drafting and architecture and aspired to become a tech ed teacher.

31. During her sophomore year, Heisel initially treated Amanda like other students, but became increasingly attentive as her interest in tech ed subjects became apparent. He nominated her for student of the month and gave her the special privilege of competing in Skills USA as a sophomore.

11

32. In her sophomore and junior years, Amanda continued to take Heisel's tech ed courses, during which time Heisel began grooming her.

33. Heisel began discussing personal subjects with Amanda, including his personal life, interests, and hobbies, while asking Amanda about her personal interests, home life, and hobbies.

34. Heisel started inviting Amanda on drives during her sophomore year, continuing through her senior year.

35. During these drives, they would go to Heisel's job sites, go out to eat, and sit in his vehicle and talk for hours. Amanda does not have an exact count but avers these drives occurred at least weekly, sometimes multiple times per week, over approximately three years, including her junior and senior years. Destinations included his construction sites, Green Bay, his house, and his grandmother's house.

36. During these drives, Heisel discussed his sex life with Amanda, inquired about her sexual history and experiences, and discussed his home life, his marriage, and his children while alone with Amanda. Amanda was 16 and a sophomore when these drives began.

37. Heisel told Amanda about his Christian upbringing and explained that he could take good care of her as a Christian family man.

38. Heisel told Amanda about his wife, including that his wife had cheated on him, and described what life would be like for him and Amanda after he left his wife.

39. During drives, Heisel held Amanda's hand and made soft, intimate, and affectionate physical contact with her. These acts caused Amanda to begin perceiving herself as being in a romantic relationship with Heisel.

40. During tech ed class, students' tools were marked for identification. Amanda's tools were marked "Amanda Boulanger." Heisel engraved his own initials after hers, as follows:

12



41. Heisel sang to Amanda during drives and made romantic comments, including drawing attention to his blue eyes and saying, "baby blues so deep you could swim in them."

42. Heisel spoke to Amanda about his family's wealth and connections, suggesting he could marry her and take care of all of her problems, and stated that he did his teaching job only for community service and insurance, not for the money.

43. Heisel frequently brought up another teacher and his wife from Oconto Falls who had met while the wife was a student there and later married.

44. Amanda frequently babysat Heisel's oldest child at school during after-school hours. Heisel did not pay Amanda for this babysitting.

45. Amanda began to perceive herself as being in a relationship with Heisel while she was a sophomore. As a result of Heisel's grooming, she turned down a male student who had expressed romantic interest in her because she believed she was in a relationship with Heisel.

46. Heisel became defensive whenever Amanda interacted with other boys, as can be seen in this photograph:

13



47. In or about Spring 2012, Amanda attended a Skills USA competition at Chula Vista Resort in Wisconsin Dells.

48. During this trip, Heisel entered Amanda's hotel room and scoped out the room and bathrooms for other students. Amanda immediately felt threatened and fearful.

49. As Heisel attempted to engage Amanda in sexual activity, she was able to leave the room and return to the common hallway. Heisel followed her into the hotel stairway.

50. In the stairway, Heisel coerced Amanda by asking her if she was "just a tease." Amanda, feeling defeated and cornered, allowed Heisel to place her sitting on a window rail. He inserted himself between her legs and began undressing her top. With her top removed, Heisel groped her breasts and kissed her repeatedly. Heisel unbuttoned her belt and pulled her pants down around her ankles. He stood between her legs with his erection felt against her body. His own belt was unbuckled and his pants were unzipped. He sexually assaulted her during this incident.

51. At the most escalated point, Amanda found the courage to tell Heisel that what they were doing was wrong because he was a married man. She told him to stop and expressed that she was not ready for sexual activity. Heisel stopped, but not before having repeatedly touched her, undressed her, kissed her multiple times, and attempted to engage in further sexual activity.

52. Amanda avers that she was 17 years old at the time of this assault.

53. When Amanda graduated in May 2013, Heisel attended her graduation with his child and took a photograph with Amanda and the child that made it appear as though they were a family, as follows:



## II. The Board's Knowledge and Failure to Act

54. Throughout the period of Heisel's grooming and abuse (2010-2013), Amanda was a minor between the ages of 16 and 18.

55. During this time, Amanda believed she was in a romantic relationship with Heisel and did not understand that his conduct constituted criminal grooming and sexual abuse.

56. Amanda always remembered the facts of what occurred between her and Heisel. However, due to her youth, Heisel's manipulation, and the grooming process, she did not understand until March and April 2025 that Heisel's conduct was predatory, criminal, and constituted actionable civil wrongs.

57. In or about March and April 2025, Amanda first realized that what Heisel did to her while she was a student and a minor constituted grooming and sexual abuse.

58. As Amanda began to investigate and discuss her experiences with others, she learned for the first time that numerous other students had experienced teacher-on-student sexual abuse at Oconto Falls High School, and that the Board had created an environment in which such abuse was enabled and empowered to occur.

59. Amanda learned in 2025 that multiple school officials had observed, received reports about, or had actual knowledge of Heisel's inappropriate relationship with her, but the Board failed to act to protect her. Specifically, Amanda learned in 2025 that:

a. Multiple teachers and administrators — including Tracy Tate, John Bursa, Mr. Karbon, Art Paulson, Matt Beschta, Staff Member C, Dave Braiser, Mrs. Jill Braiser, Staff Member A, Mr. Gayle Gander, Carla Nielsen, administrators Bruce Russell and Lou Hobyan, and former janitors Bob and John — observed Amanda and Heisel together in off-hours in his office and classroom on multiple occasions over a three-year period;

b. Amanda had confided in teacher Tracy Tate (Business Education) about aspects of her relationship with Heisel, and Tate was aware that Amanda and Heisel spent extensive time together and that Amanda parked in the teachers' area for quick access to Heisel;

c. Amanda wrote a disturbing paper in her senior year that described how broken she was and mentioned a teacher who shared details about his personal home life with her; this paper was submitted to Christine Glover;

16

d. Administrator Bruce Russell appeared near Heisel's shop area on many occasions and observed Amanda and Heisel together;

e. Staff Member A gave Heisel a conspicuous grin when encountering Heisel and Amanda walking the hallway together;

f. The school secretary knew that Amanda was signed in with Heisel during non-class hours and permitted it to continue;

g. Other students regularly referred to Amanda as Heisel's "teacher's pet";

h. Amanda was placed on an adults-only wrestling list along with Heisel, which school officials had to approve;

i. Amanda posted pictures of Heisel's child on her social media pages, where she was connected with other school adults; and

j. Other tech education teachers frequently encountered Amanda and Heisel together in circumstances that should have prompted concern.

60. Prior to 2025, Amanda did not know that these school officials had failed to act as part of a larger unwritten policy, practice, and custom of condoning grooming and sexual abuse pervading the school.

61. Amanda also learned in 2025 for the first time that the Board had knowledge of a pervasive pattern and practice of teacher-student sexual abuse at Oconto Falls High School involving multiple teachers and multiple victims spanning multiple years, including during the same time period as her own abuse.

62. Amanda learned in 2025 that school officials had knowledge of abuse by numerous other teachers — including Staff Member A, Staff Member B, Staff Member C, Lucas Cromell, Gander, Staff Member E, and Brynn Marie Larsen — yet failed to take adequate action to protect students.

17

63. Amanda learned in 2025 that Athletic Director Jerry Moynihan had actual knowledge of Brynn Marie Larsen's abuse of Brooke in 2013-2014 because people complained to him about seeing Brynn and Brooke together, but Moynihan merely had "a discussion with Brynn about boundaries" and allowed her to continue as assistant coach.

64. Amanda learned in 2025 that a police investigation of Brynn Marie Larsen's abuse of Brooke occurred in May-June 2014, yet the Board failed to properly report, flag, or discipline Larsen, allowing her to be hired at another school district and later return to Oconto Falls, where she abused Grace Williams in 2018.

65. Amanda learned in 2025 that the Board's pattern of knowledge of teacher-student abuse and failing to act spanned at least twenty years (2005-2025), involved at least nine different teachers, and affected at least fourteen identified victims.

66. Prior to 2025, Amanda did not know that the Board had a pervasive problem with other teachers engaging in abuse and grooming and failed to act, or that the Board's systemic failures had created a culture in which teachers like Heisel could abuse students without consequence.

67. Amanda did not learn that the Board injured her through its own institutional conduct until 2025.

68. Amanda's high school experience with Heisel caused her severe mental and emotional harm, including complex PTSD, depression, anxiety, hypervigilance, and low self-esteem, all ongoing.

## III. Facts Pertaining to Plaintiff Brianna Kain

69. Brianna Kain (Brianna) was a female student at Oconto Falls High School during the period of approximately 2010 through 2012.

70. During her time as a student at Oconto Falls High School, Brianna was subjected to sexual misconduct by the school's male athletic trainer, identified herein as Staff Member E, who

18

was employed by the Board and acted under color of state law in his capacity as athletic trainer to students. Staff Member E's conduct included pressing his pelvis against Brianna in a sexually inappropriate manner.

71. At the time of Staff Member E's conduct, Brianna was a minor student under the supervision and care of the Board. Staff Member E occupied a position of authority over Brianna as a school-employed athletic trainer with professional access to students' bodies.

72. Brianna always remembered the facts of what occurred between her and Staff Member E. However, due to her youth, the power differential inherent in the coach-student relationship, and the broader culture of normalized teacher misconduct at Oconto Falls High School, she did not understand until 2025 that Staff Member E's conduct was predatory and constituted actionable civil wrongs.

73. In or about Fall 2025, upon learning of the widespread pattern of teacher-student sexual abuse at Oconto Falls High School through Amanda Watzka's public disclosures and the broader community response, Brianna first came to understand that she had been victimized and that the Board's deliberate indifference had created the conditions for her abuse.

74. At that time, Brianna confirmed to Amanda Watzka the accuracy of her account of Staff Member E's misconduct, including his pressing his pelvis against her and the other details of his inappropriate physical conduct toward her during her time as a student.

75. Brianna did not know until 2025 that the Board had maintained an unwritten policy, practice, and custom of ignoring, minimizing, and failing to act on reports of teacher and staff sexual misconduct — including reports and observations of Staff Member E's inappropriate conduct with female students — and that this institutional failure was the cause of her injury. The Board's liability to Brianna rests on conduct entirely within the Board's own control and wholly unknown to Brianna before 2025.

19

## IV. Brianna's Discovery of the Board's Institutional Conduct

76. Brianna's federal claims against the Board are based on the Board's knowledge of Staff Member E's sexual misconduct with female students and its deliberate failure to investigate, discipline, or take protective action. Prior to 2025, Brianna had no knowledge, and no reason to know, that the Board had knowledge and failed to act, nor about the widespread pattern of teacher-student abuse and grooming alleged herein.

77. Through her contact with Amanda Watzka in Fall 2025 and subsequent investigation, Brianna learned for the first time that:

a. Staff Member E's misconduct with female students — including Brianna — was known within the school community, yet the Board took no meaningful protective action during the period of his employment;

b. Amara Calmes, a fellow student at Oconto Falls High School, had personally observed Staff Member E alone with a female classmate in the athletic training room in circumstances that prompted concern, and had reported those observations to Dawn Larsen, a mandated reporter and Board employee — who dismissed the report without investigation, escalation, or referral to authorities;

c. The Board was later informed, through at least one parent or staff member, that Staff Member E had been asked to leave his position because of sexual conduct with students, yet no formal disciplinary process, licensing report, or law enforcement referral was made; and

d. The Board had knowledge of a pervasive pattern and practice of teacher-student sexual abuse involving at least nine different staff members over twenty years, yet consistently failed to investigate, discipline, or otherwise act on reports of abuse.

78. Brianna did not learn that the Board injured her through its own institutional conduct until 2025. Brianna's claims, filed in 2026, are timely.

20

79. Brianna's experience with Staff Member E caused her harm and damages, the full extent of which will be proven at trial.

**V. Facts Pertaining to Alexis Neeley**

80. Alexis Morgan Neeley (Alexis) was born on June 25, 1996, and was a student at Oconto Falls High School during the 2013-2014 school year, when she was 17 years old. She was a member of the school's cheer team.

81. In October 2013, Alexis attended an overnight sleepover and movie marathon. Approximately four to five people were present, including a classmate, identified herein as "X." No alcohol or drugs were present or consumed.

82. During that overnight, Alexis fell asleep fully clothed on a bed alongside X. Other attendees were asleep on the floor in the same room. In the early morning hours — approximately 6:00 or 7:00 a.m. — Alexis was awakened when X. began cuddling with her and then asked her to lay on top of him. She told him no and that she was comfortable where she was. She repeated herself several times. Despite her objections, X. pulled Alexis on top of him and sexually assaulted her for approximately 10 to 15 minutes. Alexis did not consent to this conduct.

83. Alexis was deeply distressed by what occurred. When she went home, she attempted to shower off what she was feeling.

84. Shortly after the incident, Alexis wrote about what had happened in a creative writing assignment for her English class, taught by Christine Glover. She wrote about the experience and how she felt afterward, and cried or was visibly upset while reading the paper aloud to the class. After class, Mrs. Glover held Alexis back and told her she needed to report what Alexis had described. Alexis agreed.

85. Mrs. Glover reported the incident to Principal Bruce Russell. Alexis was subsequently called to Principal Russell's office, where she recounted what had happened. Principal Russell told

21

Alexis, in substance, that because the incident had not occurred on school grounds, there was nothing the school could do, and that while she could press charges, X. and Alexis were both minors. He also told her, at some point, that X. was receiving help. That was the effective end of Alexis's conversation with Principal Russell.

86. To Alexis's knowledge, neither Principal Russell nor any other school official reported the incident to Child Protective Services or any other authorities.

87. Because the assault had occurred within the context of the cheer team — X. was a classmate — Alexis wanted to speak with Athletic Director Jerry Moynihan. Mrs. Glover arranged that meeting, which took place in Mrs. Glover's classroom with Mrs. Glover present. Alexis told Mr. Moynihan what had happened and made two specific requests: that X. be limited in certain student activities and sports.

88. Mr. Moynihan responded, in substance, that Alexis clearly had more healing to do, and implied that there was nothing he could do. He did not implement either of Alexis's recommendations. X. remained in sports and in other activities. Alexis began to cry during that conversation. Mrs. Glover was also frustrated with how the conversation concluded, as she believed Mr. Moynihan was in a position to act and chose not to.

89. To Alexis's knowledge, X. did not face any formal consequences at school. Alexis's relationships with mutual friends — including other athletes who were close with X. — deteriorated, as they told her "that doesn't sound like him" when she disclosed what had happened. Her relationship with her best friend was also never the same.

90. The school provided Alexis with no counseling, no supportive measures, and no other assistance to help her process what had happened. Mrs. Glover was the only school employee Alexis felt safe around after the incident. Alexis was very depressed and angry. Although she had always been a serious and engaged student, she found it difficult to focus on her schoolwork for the

22

remainder of the year. Her experience of school was marked by distraction, depression, and a desire to graduate and leave.

91. The experience has had a lasting impact on Alexis into adulthood, affecting her romantic and sexual relationships. As recently as February 2026, Alexis was called as a prospective juror on a rape case and broke down during the juror interview and was dismissed. The emotional impact of X.'s assault remains significant.

## VI. Alexis's Discovery of the Board's Institutional Conduct

92. Alexis's facts are based not only on Principal Russell's and Athletic Director Moynihan's direct and contemporaneous deliberate indifference to her specific report, but on the Board's pervasive unwritten policy, practice, and custom of deliberate indifference to all forms of sexual misconduct — teacher-student, student-student, and teacher-teacher — that Alexis did not fully discover until 2026.

93. Although Alexis always remembered both the assault and the school's inadequate response, she did not know until 2026 that Russell's and Moynihan's failure to act on her report was part of a broader institutional pattern — one that encompassed at least nine teachers engaged in sexual misconduct with students, the harassment of female staff members, and the Board's deliberate promotion of a known harasser — that reflected the Board's pervasive custom and practice of deliberate indifference to sexual misconduct of all kinds.

94. Through her contact with Plaintiffs and others in 2026, Alexis learned for the first time that:

a. Principal Bruce Russell and Athletic Director Jerry Moynihan — the same two officials who dismissed her report of X.'s assault in 2013 — had also received reports, made observations, or otherwise had knowledge of teacher-student sexual misconduct involving multiple teachers during the same period, and similarly failed to take meaningful action;

23

b. Jerry Moynihan, specifically, had received complaints about Brynn Marie Larsen's sexual abuse of Brooke La Count in 2013 — the same year he dismissed Alexis's report — and responded only by having "a discussion with Brynn about boundaries";

c. The Board had received substantial documented evidence of Lucas Cromell's sexual harassment of female staff members and had responded by promoting him to Associate Principal, over the direct objections of the employees who had been harassed;

d. The Board had knowledge of a pervasive pattern and practice of sexual misconduct involving at least nine different teachers and staff members over twenty years (2005-2025), yet consistently failed to investigate, discipline, or otherwise act on reports of abuse; and

e. The Board's deliberate indifference to Alexis's report in 2013 was not an isolated failure but a manifestation of the Board's institutional custom and practice of dismissing, minimizing, and failing to investigate reports of sexual misconduct across all categories.

95. Alexis did not learn that the Board injured her through its own institutional conduct until 2026.

96. Alexis's experience of X.'s assault, Principal Russell's and Athletic Director Moynihan's responses, has caused Alexis lasting harm.

**VII. Facts Pertaining to Plaintiff Kayla Kasper**

97. Kayla Marie Kasper (Kayla) grew up in Oconto Falls, Wisconsin, and graduated from Oconto Falls High School in 2012 at the age of 18. During her sophomore and junior years at Oconto Falls High School — when she was approximately 15 and 16 years old — Kayla was a student in the social studies classes of Staff Member B, a teacher at Oconto Falls High School. She was enrolled in his class for two consecutive years. She also participated in basketball and track during her time at Oconto Falls High School.

24

98. From the beginning of her time in Staff Member B class, he made Kayla deeply uncomfortable through a persistent pattern of conduct that she understood to be sexual in nature. He regularly stood at the front of the class or at a podium during lectures with one hand in his pocket, where he would touch himself. This occurred on a daily basis. This conduct was so well-known among students at Oconto Falls High School that students had a nickname for him based on the fact that he would touch himself in class. Kayla later saw comments from former students on social media, following the public disclosure of teacher misconduct at Oconto Falls, referencing the same conduct — that there was a teacher who "used to play with himself in the front of the class" — confirming that what she observed was widely witnessed by other students and was known throughout the student body.

99. Beyond his conduct at the front of the classroom, Staff Member B engaged in repeated, unwanted physical contact with Kayla personally during class. On multiple occasions when she was seated at her desk, he would approach her, lean down, place his hand on her shoulder, and move it back and forth between her arm, shoulder, and neck in a manner she can only describe as a caress. He would breathe down the back of her neck during these interactions. He consistently had one hand in his pocket while doing so. On one occasion during a movie screening, he squatted down behind Kayla, placed his hand on her shoulder and rubbed it back and forth from her arm toward her neck, whispered to her that she was sexy, and then told her that if she came to see him after class, he could give her additional study materials to help her on an upcoming quiz. Kayla did not go to see him after class. She never went to see him after class.

100. Staff Member B also told Kayla that she was pretty and commented on how good her body looked. He told her she should be more confident and that she should not be so shy. He made these comments while Kayla was a minor student in his class and he was an adult teacher. He attended pep rallies and school sporting events where he saw Kayla in her athletic uniform. Kayla

always felt that his comments and conduct toward her were wrong and that his attention was not the attention of a teacher toward a student.

101. As a result of Staff Member B's conduct, Kayla avoided all one-on-one interaction with him at all times. She would deliberately leave quiz and worksheet questions blank and accept the loss of points rather than raise her hand and risk having him approach her. She would get answers from classmates rather than ask him. During a lockdown drill during her sophomore year — when the lights were turned off and students were required to get down on the floor — Kayla was trapped in his classroom and positioned herself in a corner surrounded by friends so that he could not get close to her. She dreaded going to his class every single day. When he would walk in her direction during a classroom activity, she was consumed by anxiety about whether he was going to stop at her desk, touch her, or try to get her alone.

102. Kayla lost educational opportunity as a result of Staff Member B's conduct. She avoided engaging with the subject matter of his classes because engaging meant risking proximity to him. She would skip questions, accept failing scores on individual assignments, and do the minimum necessary to pass — not because she lacked interest in the subject, but because she could not focus on learning in an environment in which she was afraid of her teacher.

103. Kayla also had Staff Member C as her English teacher during her senior year. Staff Member C granted Kayla special privileges and favorable treatment that he did not extend to other students. She repeatedly refused to read aloud during class reading exercises, and Staff Member C accepted her refusal and moved on to the next student — a response he did not offer to other students. She submitted papers that she knew did not meet the requirements of the assignment and received grades of A or B, with Staff Member C complimenting her and smiling when he returned them. She felt she was receiving unwarranted favorable treatment that she did not earn. Staff Member C and Staff Member B were close colleagues, frequently seen socializing together during

26

school hours. There were widespread rumors among students that Staff Member B, Staff Member C, and at least one other teacher attended parties with underclassmen and socialized with students outside of school.

104. Kayla never reported Staff Member B's conduct to any school official while she was a student. She did not report it because she did not believe anyone would act on it or believe her. As a shy teenager who respected authority and was conditioned to believe that teachers were people students were supposed to look up to and feel safe around, she did not feel she had a path to make a report. She also buried what had happened to her so deeply that, when Amanda Watzka first contacted her about this matter, Kayla initially declined to participate and wanted no part of the litigation. As she learned the full scope of what had been happening across multiple teachers and over many years at Oconto Falls High School, she came to understand that she needed to speak up — both for herself and to make clear to others that it was safe to come forward.

105. Kayla's experience of Staff Member B's conduct has caused lasting harm into adulthood, contributing to ongoing mental health challenges, including depression, anxiety, and suicidal ideation. She has a young daughter, and the prospect of her daughter beginning school causes Kayla significant fear and distress because of what she experienced at Oconto Falls High School.

## VIII. Kayla's Discovery of the Board's Institutional Conduct

106. Kayla's federal claims against the Board are based not only on the Board's failure to act on Staff Member B's openly visible and pervasive sexual misconduct — which was known throughout the student body and which any school official present in or near his classroom could have observed — but on the Board's pervasive unwritten policy, practice, and custom of deliberate indifference to teacher-student sexual misconduct of all kinds that Kayla did not discover until 2025.

27

107. Although Kayla always remembered what Staff Member B did to her, she did not know until 2025 that his conduct was part of a broader institutional pattern — one that encompassed at least nine teachers engaged in sexual misconduct with students over twenty years, student-on-student sexual assault reports that were dismissed, and the Board's affirmative promotion of a known harasser over documented evidence of his misconduct — that reflected the Board's pervasive custom and practice of deliberate indifference to sexual misconduct of all kinds.

108. Through her contact with Amanda Watzka in Fall 2025 and subsequent investigation, Kayla learned for the first time that:

a. The pervasive and open nature of Staff Member B's conduct — including daily self-touching in front of students that was known throughout the student body under a student-given nickname — was consistent with, and reflective of, the Board's broader custom and practice in which teachers engaged in sexual misconduct openly and without consequence, because they understood the Board would not act;

b. Staff Member B's close colleague, Staff Member C, was similarly identified among the pattern of teachers at Oconto Falls High School engaging in favoritism and inappropriate conduct toward female students;

c. The Board had knowledge of a pervasive pattern and practice of teacher-student sexual abuse and misconduct involving at least nine different staff members over twenty years (2005-2025), yet consistently failed to investigate, discipline, or otherwise act on reports of abuse; and

d. The Board's deliberate indifference to Kayla's abuse — including its failure to investigate conduct that was openly observable to any teacher or administrator who entered or passed Staff Member B's classroom, and its failure to create a reporting environment in which students like Kayla felt safe coming forward — was not an isolated institutional failure, but a manifestation of the Board's pervasive custom and practice.

28

109. Kayla did not learn that the Board injured her through its own institutional conduct until 2025. Kayla's claims, filed in 2026, are timely.

110. Kayla's experience with Staff Member B and Staff Member C has caused her harm and damages, the full extent of which will be proven at trial.

## IX. Facts Pertaining to Plaintiff Brooke La Count

111. In the summer before her sophomore year, Brooke participated in summer volleyball camp at Oconto Falls High School.

112. The head coach of the volleyball team was Dawn Larsen, a health education teacher at Oconto Falls and head varsity coach for volleyball and softball. Dawn Larsen was at all times relevant a mandated reporter for child abuse under Wisconsin law.

113. Dawn Larsen's daughter, Brynn Marie Larsen, was an assistant volleyball coach and substitute teacher at Oconto Falls High School.

114. Around August 2013, Brynn Marie Larsen began sending Snapchat messages to Brooke, often late at night.

115. Brynn Marie Larsen began sending Brooke photographs of her naked body and asking Brooke to reciprocate. Brooke had just turned 15 years old and felt uncertain, confused, and pressured because Brynn was one of her volleyball coaches.

116. Brynn Marie Larsen quickly escalated the grooming by asking Brooke to go out. Their first meeting took place at a Panera in Green Bay, after which they drove to a Target parking lot.

117. Brynn Marie Larsen had an SUV with fold-down backseats. At their first meeting, she asked Brooke to get into the backseat and then engaged Brooke in sexual activity. Brooke had just turned 15 years old and was a student on Larsen's volleyball team.

118. Brooke did not know what sex between women was and was not interested in sexual activity with women, but she felt obligated to comply because of the power differential between her and Brynn Marie Larsen and because of her youth and inexperience.

119. Around the same time, Brynn Marie Larsen told Brooke she could turn her into a college athlete.

120. Brynn Marie Larsen also began attempting to separate Brooke from her family by telling her that her family did not come to enough games and did not care about her, but that Brooke could always rely on Brynn.

121. That fall 2013, Brynn Marie Larsen began asking Brooke to come to her house. Brooke would oblige and end up staying the night.

122. Brynn Marie Larsen had Brooke sleep in her bed, where Larsen would sleep nude and engage or attempt to engage Brooke in sexual acts. Larsen also played pornography on her television.

123. When Brooke stayed overnight, Dawn Larsen (health education teacher, head coach, and mandated reporter) was present in the home and aware of Brooke's presence. Dawn Larsen observed Brooke and Brynn Marie Larsen snuggling on the couch and had to have been aware that they were sleeping in the same bed.

124. Brynn Marie Larsen's grooming and sexual abuse of Brooke continued throughout Brooke's sophomore year until police intervened in or around May or June 2014.

125. During the police investigation, an officer threatened to put Brooke in handcuffs unless she cooperated, placing Brooke in a state of terror. Brooke was taken to a child protective services agency called Willow Tree in Green Bay, where she denied that anything was happening with Brynn because she was terrified and confused, and because she was still 15 years old and did not understand that Brynn had done anything wrong.

126. Despite the police investigation, nothing was done to stop Brynn Marie Larsen's contact with Brooke. Larsen subsequently showed up at Brooke's mother's workplace, sent Brooke flowers, and continued engaging with her online.

127. That summer of 2014, Brynn Marie Larsen engaged Brooke in sexual activity again when Larsen asked Brooke to help her move.

128. In fall 2014, Brooke transferred out of Oconto Falls High School because other students were calling her "lesbian" and making her life miserable as a result of Larsen's grooming and abuse.

129. Also in fall 2014, Brynn Marie Larsen was hired by the School District of Waupaca.

130. In 2013, a report was made to Athletic Director Jerry Moynihan about Brynn Marie Larsen's improper conduct with Brooke and/or other students. In response, Moynihan merely pulled Larsen aside and told her to be more careful, and permitted her to continue interacting with students as assistant coach.

131. In the police report from the 2014 investigation, the investigating officer recounted the following regarding his conversation with Moynihan: "I did speak with Jerry Moynihan, the Oconto Falls High School Athletic Director. Jerry said that he remembered people complaining to him about seeing Brynn and Brooke together but that he wasn't really able to substantiate anything. Jerry said that he did have a discussion with Brynn about boundaries."

132. Other Board employees had knowledge of Brynn Marie Larsen's abuse of Brooke, including:

a. Brooke's guidance counselor and driver's education teacher, Lee Kournaus, who saw Brooke and Brynn Marie Larsen together on numerous occasions outside of school, including once at his own girlfriend's house, but failed to inquire or report;

b. Rochelle Vandenlangenberg Otto, a staff member on the volleyball team and elementary school teacher with the Board, who would have observed improprieties in the relationship;

c. Katie Strelow-Ripley, also part of the volleyball team staff, who would have observed improprieties in the relationship; and

d. Joy Bielinski, Dawn Larsen's sister and Brynn's aunt, who was also a teacher at DePere High School and had knowledge of the relationship.

## X. The Board's Knowledge and Failure to Act

133. Throughout the period of Brynn Marie Larsen's grooming and abuse (2013-2014), Brooke was 15 years old and a minor.

134. During this time, Brooke did not fully understand that Larsen's conduct was predatory, criminal, or constituted actionable civil wrongs, particularly given the coercive nature of the relationship and the power differential between them.

135. Brooke was aware of the 2014 police investigation because she was interviewed as part of it, and she knew that Larsen left Oconto Falls High School in fall 2014.

136. Brooke did not know until 2025 about the massive extent of teacher-student grooming and sex abuse pervading the school environment while she was there and before.

137. In 2025, Amanda contacted Brooke about Amanda's own experiences of abuse at Oconto Falls High School. Through this contact and subsequent investigation in 2025, Brooke learned for the first time that:

a. Despite the 2014 police investigation, the Board permitted Larsen to return to Oconto Falls as a substitute teacher in 2018, where she victimized Grace Williams in substantially the same manner;

32

b. Heisel's abuse of Amanda was occurring during substantially the same time period (2010-2013) as Larsen's abuse of Brooke (2013-2014), and school officials would have been aware of Heisel's inappropriate relationship with Amanda but failed to act;

c. The Board had knowledge of widespread teacher-student sexual abuse involving at least nine different teachers and at least fourteen victims over a twenty-year period (2005-2025), with school officials receiving reports or having knowledge about this abuse but failing to take adequate protective action; and

d. The Board's pattern of having knowledge and failing to act was the moving force that enabled both her abuse and the abuse of other victims.

138. Prior to 2025, Brooke did not know about the massive extent of teacher-student sex abuse and grooming while she was there and before, nor was she aware of policies or procedures requiring reporting of such conduct while she was a student.

139. Prior to 2025, Brooke did not know about the volume and number of other incidents of teacher-student grooming and abuse that occurred around the time of her own injuries.

140. Brooke did not learn that the Board injured her through its own institutional conduct — to wit, its unwritten policies, practices, and custom of failing to act to prevent teacher-student sexual abuse and grooming, and the massive extent of student-teacher pervasive sexual misconduct and grooming — until 2025.

## XI. Facts Pertaining to Plaintiff Grace Williams

141. Grace Williams was a junior at Oconto Falls High School during the 2017-2018 school year and had just turned 17 years old.

142. Brynn Marie Larsen returned to Oconto Falls School District as a substitute teacher for physical education and other classes during this time period.

143. Larsen was known as a popular substitute teacher whom "all the kids loved."

33

144. In or about February 2018, Brynn Marie Larsen added Grace on Snapchat. Grace accepted because she knew Larsen was adding popular students.

145. Larsen was aware that Grace had come out as bisexual.

146. All of Grace's friends communicated with Larsen, and Larsen initiated contact with Grace, eventually telling Grace that she had feelings for her.

147. Larsen told Grace that she loved her and wanted to leave her girlfriend for Grace.

148. Larsen began sending flowers to Grace in class and started substituting into Grace's classes.

149. Larsen invited Grace to her house along with other students, including T.F. and M.K.

150. When Grace went to Larsen's house, Larsen asked Grace to come to the bedroom with her and began making out with Grace in her room. Grace tried to stop it so she could leave peacefully.

151. Grace then saw Dawn Larsen, who was present in the home at the time. Grace and Dawn locked eyes, and Dawn walked away. This occurred in or about March 2018. Dawn Larsen was at all times relevant a mandated reporter for child abuse under Wisconsin law and was employed by the Board as a health education teacher and head varsity coach.

152. After the bedroom incident, Grace told her mother what had happened. Grace's mother wanted to go to the police, but Grace did not want to because she was scared of being bullied or harassed by other students.

153. Grace eventually disclosed the abuse to her friend T.F., who went to the School Resource Officer and reported it. The School Resource Officer spoke with Grace and had her explain what had happened.

154. Grace believes the school principal and guidance counselor were also notified.

34

155. Despite these reports, the Board conducted no formal investigation, and Grace was never formally interviewed by school officials.

156. Grace was not given any emotional support, counseling, or other supportive measures.

157. Students began blaming Grace for Brynn and Dawn's departure.

158. Grace's story "was not taken seriously" by school officials, and for her, "no one really cared."

159. Years later, after Grace graduated, she saw an anonymous post from Brooke stating that Larsen had abused her as well. Grace felt "it felt like a pattern and like Brynn was very strategic about it."

160. Brooke reached out to Grace through Facebook Messenger in 2025.

161. Grace's abuse by Larsen in 2018 occurred because the Board had previously received reports about Larsen's abuse of Brooke in 2013-2014 and had failed to properly report, flag, or discipline Larsen, thereby allowing her to obtain a position at another school district and later return to Oconto Falls with access to students.

## XII. Grace's Discovery of the Board's Receipt of Prior Reports and Failure to Protect Her

162. Although Grace always remembered Larsen's abuse, she did not know until 2025 that the Board had received prior reports about Larsen abusing Brooke and had failed to act on those reports, thereby enabling Larsen's abuse of Grace.

163. Grace did not learn until 2025 that the Board had received complaints and reports about Larsen's abuse of Brooke in 2013-2014 and had failed to act in response. Through Brooke's contact and subsequent investigation in 2025, Grace learned for the first time that:

a. Athletic Director Moynihan had received complaints in 2013 about seeing Brynn Marie Larsen and Brooke together, but Moynihan merely had "a discussion with Brynn about boundaries" and failed to take protective action;

35

b. Multiple school staff — including Dawn Larsen, Lee Kournaus, Rochelle Vandenlangenberg Otto, Katie Strelow-Ripley, and Joy Bielinski — observed or had knowledge of Larsen's conduct with Brooke in 2013-2014 but failed to intervene;

c. A police investigation of Larsen's abuse of Brooke occurred in May-June 2014, four years before Grace's abuse;

d. Despite the complaints to Moynihan and the 2014 police investigation, the Board failed to properly flag, report, or discipline Larsen, allowing her to be hired at Waupaca School District;

e. The Board's failure to act in response to those prior reports was what enabled Larsen to return to Oconto Falls as a substitute teacher in 2018 with access to Grace; and

f. The Board had knowledge of widespread teacher-student sexual abuse involving at least nine different teachers over a twenty-year period (2005-2025), with school officials having knowledge but failing to take adequate action.

164. Prior to 2025, Grace did not know that the Board had received complaints about Larsen in 2013, that a police investigation had occurred in 2014, or that the Board had failed to act on those reports.

165. Grace did not learn that the Board injured her through its own institutional conduct — its receipt of prior reports about Larsen and its deliberate failure to flag, report, or discipline Larsen in response — until 2025. The Board's liability to Grace rests on conduct entirely within the Board's own control and wholly unknown to Grace before 2025.

## XIII. Facts Pertaining to the Board's Pattern and Practice of Deliberate Indifference to Sexual Misconduct — Teacher-Student Abuse, Student-Student Abuse, and Teacher-Teacher Harassment

166. The sexual abuse and grooming of Amanda, Brooke, Grace, Brianna, Alexis, and Kayla did not occur in isolation, but rather within a pervasive culture at Oconto Falls School District in which sexual misconduct of all kinds — teacher-student sexual abuse and grooming, student-on-

36

student sexual assault, and sexual harassment of female staff members by District employees — was widespread, known to school officials through reports and/or direct observations, and tolerated without meaningful consequence across all schools within the Board's jurisdiction.

## A. Staff Member A (Teacher)

167. Staff Member A was a teacher at Oconto Falls High School. As noted above, Staff Member A gave Heisel a conspicuous grin when encountering Heisel and Amanda walking the hallway together.

168. Students have reported that Staff Member A engaged in sexual conduct with a female student. Specifically, it has been reported that a student named K.Ki. "used to give [Staff Member A] blow jobs in his ice shack."

169. During student J.M.'s time at Oconto Falls High School (graduating approximately mid-2013), Staff Member A engaged in inappropriate conduct with her beginning when she was a freshman, approximately 14 years old. Staff Member A asked J.M. to stay after class and, after shutting the door, told her that he and junior and senior boys put together a "top 5 hottest girls" list and that she was at the top of it.

170. Staff Member A made inappropriate comments about J.M.'s appearance and body throughout her high school years.

171. Staff Member A had an inappropriate sexual relationship with a student named K.F. When K.F. was a senior and J.M. was a sophomore, K.F. told J.M. that Staff Member A had taken her virginity. K.F. and another friend used to go to Staff Member A's house to meet him, and K.F. showed J.M. texts from Staff Member A.

172. J.M. believes Staff Member A may still be employed as a teacher.

## B. Staff Member B (Teacher)

37

173. Staff Member B was a teacher at Oconto Falls High School who taught J.M. during her sophomore and junior years, when she was 15-16 years old.

174. Staff Member B would permit J.M. to leave class if she flirted with him, and told J.M. she could go to another classroom if she grabbed keys out of his front pocket. J.M. observed another student, A.R., having the same interaction with Staff Member B.

175. Student R.E. experienced an incident with Staff Member B during her senior year. R.E. had not turned in a paper for Staff Member B's class. Later, Staff Member B called R.E. back to his desk, told her "not to worry about writing the paper," stated that she was "a good student and deserved a break," and gave her an A without her completing the assignment. At the time, R.E. was wearing "a black bodycon dress with a deep scoop neck, denim jacket, floral leggings." R.E. stated: "I remember feeling so exposed and creeped out when it happened."

176. Kayla stated that Staff Member B touched her inappropriately while she was a student, and that because of this conduct, "she was able to do whatever she wanted" — indicating that teachers were providing special privileges in exchange for tolerating sexual misconduct. She also states that Staff Member C would given her unwarranted attention and favoritism, and Staff Member C and Staff Member B were close friends, frequently together in the school.

177. Staff Member B is believed to still be employed as a teacher.

## C. Staff Member A and Staff Member B — Joint Misconduct

178. Staff Member A and Staff Member B were friends and colleagues. When J.M. was 15 years old, she attended a graduation party where Staff Member A and Staff Member B, who were in their 30s, brought alcohol for students. It was known that Staff Member A and Staff Member B regularly attended high school parties. This conduct was so prevalent that it felt normal to students.

## D. Staff Member C (Teacher)

38

179. Staff Member C was a teacher and coach at Oconto Falls High School and is believed to still be a teacher.

180. Kayla stated that Staff Member B touched her inappropriately while she was a student, and such conduct occurred during class in circumstances so obvious that Kayla wondered how other students didn't see or say anything. Kayla never told her friends at the time because "I always kept my mouth shut about that stuff because I felt embarrassed." Kayla stated that she had "buried so deep" the trauma of Staff Member B's abuse, and that she avoided any chance of having to deal with either of them alone because their conduct made her super uncomfortable.

181. In 2016, Staff Member C proposed that S.P. babysit for him and his wife during the entire summer. In 2017, while Staff Member C was married, he engaged in inappropriate social media communications with S.P., demonstrating an unusually close relationship.

## E. Lucas Cromell (Teacher and Other Titles)

182. Lucas Cromell was a substitute teacher at Oconto Falls High School.

183. Lucas Cromell was verbally inappropriate with student S.P. on multiple occasions while substituting in classes.

184. After S.P. graduated from Oconto Falls High School (approximately 2015), Lucas Cromell propositioned her about being his sugar baby.

185. In 2017, Lucas Cromell engaged in inappropriate social media communications with S.P., attempting to meet with her privately and making persistent requests for her time despite her reluctance, including statements such as "I'm pretty important u know" and "I'll be holding my breath."

186. Despite this history of inappropriate conduct with students at Oconto Falls, Lucas Cromell still works in education.

39

187. Lucas Cromell also has an alleged history with a former teachers Tania Jersey and Bridget Thomas, as discussed further herein.

**F. Gayle Gander (Staff Member) — Recent Criminal Arrest**

188. Gayle Gander was a staff member at Oconto Falls High School who engaged in sexual misconduct with male students.

189. On or about December 15, 2025, Gander was arrested on criminal charges for allegations of misconduct during his employment with the District. The arrest relates to allegations from five student victims whose allegations are sufficiently recent to fall within the applicable statute of limitations.

190. An additional victim of Gander's misconduct, known as M.D., has come forward stating: "I wish I had the courage to speak up about Gander back in 05 but I didn't." M.D.'s statement indicates that Gander was engaging in sexual misconduct with students as early as 2005 — meaning the Board allowed Gander's abuse to continue for at least twenty years.

191. An additional former student, identified herein solely as Witness A to protect identity and privacy, has provided information to Plaintiffs' counsel about Gander's predatory conduct during at the District. Witness A was a student at Oconto Falls High School, when a minor.

192. Witness A reports that on approximately three occasions during time as a student, Gander removed Witness A from public areas and took Witness A alone to a back room within the school. During these encounters, Gander directed Witness A to remove Witness A's shirt and provided what Witness A describes as "very sensual massages" to Witness A's chest, back, and lower hips. Gander also had Witness A lie face-down on the floor and walk on Witness A's back, during which Gander was audibly moaning. Gander specifically told Witness A that Witness A could not tell anyone that Witness A had been in the back room with Gander.

40

193. Witness A was a minor during these incidents. Witness A trusted Gander as a teacher. Witness A has stated that when Gander's misconduct became public in 2025, Witness A felt guilty for not having come forward sooner.

194. Witness A's account is fully consistent with, and corroborates, the pattern of predatory grooming and physical contact described by other known victims of Gander's misconduct, including J.D. and M.D., and the five victims whose reports led to Gander's criminal arrest in December 2025. Gander's method of isolating students, using the private spaces of the school, and employing physical contact under the guise of innocent pretexts is a recurring pattern across multiple victims and multiple years.

195. Witness A's account extends Gander's known pattern of predatory conduct to more recent years, demonstrating that the Board's deliberate indifference permitted Gander's abuse to continue for years after the earliest known victim (M.D., 2005) and through the period of Grace Williams' abuse by Brynn Marie Larsen in 2018.

196. Following Gander's arrest in or about December 2025, Superintendent Stuart Russ[2] sent an official communication to "Staff and Families of the Oconto Falls Public School District" stating: "A staff member of Oconto Falls High School has been arrested on allegations of misconduct during his employment with the District. We are deeply disappointed by the nature of the allegations. The District has been and will continue to coordinate fully with law enforcement. As soon as the allegations were communicated to school officials, the staff member was immediately removed from school and relieved of his responsibilities."

197. The Board's response to Gander's arrest in 2025 — immediately removing a staff member upon receiving a report — demonstrates that the Board possessed both the authority and

---

[2] Plaintiffs in this case notified Superintendent Russ of this pending lawsuit in Fall 2025, before Gander's arrest.

capability to take immediate protective action when allegations were communicated to school officials.

**G. Additional Incidents Involving Tracy Tate**

198. Student R.E. experienced an incident with teacher Tracy Tate during R.E.'s freshman year. Tate "sort of cornered" R.E. in the student bathroom to talk about FBLA. At the time, R.E. "was actively bleeding through [her] clothing and had just snagged a pad from someone," and Tate "was washing her breast pump." R.E. "dropped FBLA after that encounter" and stated that it "always felt like [Tate] was flirting with every boy in class" and that Tate "held everyone to different standards based on how much she liked you."

199. Tate is significant to this case because she was one of the teachers identified as having observed Amanda and Heisel spending time together, and Amanda had confided in Tate about her relationship with Heisel.

**H. Additional Pattern and Practice of Institutional Deliberate Indifference — Board and Superintendent Knowledge of Teacher Sexual Harassment and Deliberate Indifference**

200. The Board's custom and practice of deliberate indifference to reported sexual misconduct by employees extended beyond Oconto Falls High School. Washington Middle School, also known as Oconto Falls Middle School, is one of the schools within the Board's jurisdiction and operated under the same Board throughout the period described below.

201. Bridget Thomas was employed as a teacher at Washington Middle School from approximately 2008 to 2016, teaching 6th grade Character Quest, 7th grade Personal Finance, and 8th grade World Geography, among other courses.

202. Around the 2012-2013 school year, Lucas Cromell, then a Spanish teacher and district-wide ESL instructor at the school, made repeated sexually harassing comments to Thomas on approximately ten occasions, including asking her how to perform sexual acts and requesting that

she provide demonstrations of those acts, including oral sex and French kissing. Thomas rebuffed his advances each time.

203. Shortly thereafter, Cromell was promoted to Dean of Students, becoming Thomas's direct supervisor. Once in that role, Cromell undermined Thomas's classroom authority by returning disciplined students to her classroom with candy and implying that classroom disruptions were her fault rather than addressing student behavior. Thomas believed this conduct was retaliation for her refusal to engage with his prior sexual harassment.

204. Thomas reported Cromell's conduct to her principal, Lou Hobyan, accompanied by her union representative, Christine Sherman. Thomas informed Hobyan of Cromell's prior requests for sexual demonstrations and of Cromell's failure to support her as a teacher. After asking Sherman to step out of the meeting, Hobyan told Thomas: "Bridget, I gotta back my Dean of Students. If you want, I'll write you a letter of recommendation, and you can go somewhere else." No remedial action was taken.

205. During the 2014-2015 school year, at least four other teachers — including Tania Jersey and K. — presented evidence of Cromell's misconduct directly to the Board, including emails and text messages of a sexually inappropriate nature that Cromell had sent to them. The Board took no disciplinary action against Cromell in response to this evidence. Instead, the following year, Cromell was promoted to Associate Principal.

206. Because of the Board's inaction, those teachers left the school. By the 2015-2016 school year — Thomas's final year of employment — she was the only remaining teacher who had experienced and reported Cromell's harassment.

207. Prior to the 2015-2016 school year, Thomas met personally with Superintendent Dean Hess and reported the ongoing harassment, the history of prior complaints made by multiple teachers, and the Board's failure to issue any discipline. Hess asked whether Thomas wished to file a

43

formal complaint. Thomas declined, stating she feared the complaint would invite greater retaliation, but made clear that she needed to be taken seriously if further issues arose.

208. During the 2015-2016 school year, Thomas observed Cromell interacting with a student, C.K., in the hallways in a manner that made her uncomfortable and raised her concern that something was wrong. Thomas also observed C.K. receiving candy from Cromell's office and telling Thomas she did not have to follow classroom rules.

209. Toward the end of the 2015-2016 school year, C.K.'s friend, F.T., approached Thomas after school and disclosed that C.K. had shown her C.K.'s phone, which contained explicit sexting text messages between Cromell and C.K. F.T. stated that she had read the messages and found them "disgusting." Thomas immediately consulted with her union representative and arranged an urgent meeting with Superintendent Hess.

210. The following day, Thomas met with Superintendent Hess and others at Washington Middle School and reported that there were explicit sexting messages between Cromell and a student and that the matter required investigation. Superintendent Hess responded that he had looked at Cromell's phone and found nothing, accused Thomas of "spreading drama," and told her to "get herself in line."

211. Shortly after that meeting, Thomas was informed that she would not be renewed for the following school year. The school cited budgetary reasons. Thomas did not believe this was the true reason, as she taught multiple required courses for grades 6 through 8 and had received positive performance evaluations.

212. Principal Hobyan, identified in paragraph 59(a) above as one of the administrators who observed Amanda Watzka and David Heisel together in circumstances that should have prompted concern, responded to Thomas's complaint about Cromell by prioritizing loyalty to the accused

employee over the safety of students and staff — conduct consistent with the Board's broader custom and practice of deliberate indifference to reports of employee sexual misconduct.

213. The Board's promotion of Cromell to Associate Principal following the direct presentation of evidence of his misconduct by multiple teachers to the Board itself demonstrates that the Board's deliberate indifference was not a passive institutional failure but an affirmative choice that shielded perpetrators from accountability and reinforced the culture of misconduct that pervaded the District across both its middle and high schools.

214. The conduct of Principal Hobyan, Superintendent Hess, and the Board itself in response to repeated, evidence-backed complaints of sexual misconduct at Washington Middle School reflects the same custom and practice of deliberate indifference that operated at Oconto Falls High School during the same period: in each instance, officials with decision-making authority received credible reports of employee sexual misconduct, took no meaningful action, and in some instances took adverse action against those who came forward.

## I. Amara Calmes — Witness to Athletic Trainer Misconduct, Brynn Marie Larsen, Staff Member A, and Systemic Failure to Report

215. Amara Calmes attended Oconto Falls High School from approximately 2013 through 2017. The facts set forth in this section are based on events she personally witnessed or experienced during her time as a student there.

216. During either her freshman or sophomore year, Calmes walked into the athletic training room and observed the male athletic trainer, Staff Member E, alone with a female classmate, identified herein as Student A. Upon entering, Staff Member E was positioned over Student A, and both appeared startled and moved quickly from each other.

217. Calmes found the situation concerning and reported what she had witnessed to Dawn Larsen, a teacher and coach at the school. Larsen responded that they were "probably not doing

anything." No further action was taken. Calmes subsequently heard rumors among students that Staff Member E and Student A were engaged in an ongoing relationship.

218. Dawn Larsen's dismissal of Calmes's report — without investigation, without escalation, and without any referral to administration or law enforcement — exemplifies the Board's practice of discouraging and minimizing reports of suspected sexual misconduct. As a mandatory reporter under Wisconsin law, Larsen was legally required to report Calmes's disclosure to authorities; she failed to do so.

219. During Health class at Oconto Falls High School, Dawn Larsen — the same teacher who had dismissed Calmes's report about Staff Member E — frequently spoke about her daughter Brynne Larsen in class. It was through these classroom discussions, and subsequent peer conversations, that Calmes became aware that Brynne Larsen had been involved in an inappropriate relationship with a student. Calmes states that she did not know why Brynn Larsen continued to be present at the school.

220. Dawn Larsen's in-class discussions about her daughter's conduct placed the District on notice that staff had knowledge of Brynn Larsen's inappropriate relationship with a student. Despite this, the Board took no meaningful protective action, and Brynn Larsen continued to have access to students.

221. Beginning in her freshman year and continuing throughout all four years of high school, Calmes was subjected to sexual touching at home by adult men — including an individual named Nathan and others — whom her mother had allowed to move into the home. These individuals were drug-addicted acquaintances of her mother. The conduct included touching her over her clothes, grabbing her breasts, hugging her inappropriately, and leering at her. Calmes was frightened and did not feel safe at home.

222. Over the course of four years, Calmes reported her home situation and the sexual touching she was experiencing to at least eight Oconto Falls High School employees. She told each of them, in substance, that there were drug deals occurring at her home, that she was being touched inappropriately, and that she was scared.

223. Of the eight school employees Calmes informed, only one — Mr. Burish — took meaningful action. He reported her disclosure to Anne Shallow and followed up with Calmes after school to check on her wellbeing. To Calmes's knowledge, no other employee contacted authorities, referred her to services, or followed up with her in any way.

224. Despite Calmes's repeated disclosures to school counseling and teaching staff over multiple years, no one at Oconto Falls High School — other than Mr. Burish — filed a report with law enforcement or child protective services, or otherwise connected her to any outside assistance. The abuse at home continued through her senior year.

225. At least seven school employees who received Calmes's disclosures of ongoing sexual abuse at home were mandatory reporters under Wisconsin Statutes § 48.981. Their collective failure to report — spanning four years and multiple disclosures — reflects and corroborates the Board's policy, practice, or custom of failing to ensure compliance with Wisconsin's mandatory reporting laws that ultimately contributed to the Plaintiffs' abuse in this case.

226. Calmes also personally observed Staff Member A — identified elsewhere in this Complaint as having given Defendant Heisel a "conspicuous grin" while Heisel and Amanda walked the hallway — give massages to female students in the classroom. This conduct was visible and open, occurring in a classroom setting before other students, yet no school employee intervened or reported it.

**J. Madison Pecha — Additional Witness to Gander's Grooming and Staff Member C's Sexual Misconduct**

227. Madison Pecha attended Oconto Falls High School and graduated in 2018. The facts set forth in this section are based on events she personally witnessed or experienced during her time as a student there.

228. During her time at Oconto Falls High School, Pecha was involved in theater and performing arts. Gayle Gander was a teacher and theater director at the school. Throughout Pecha's high school years, Gander regularly told her she was one of his favorite students. In theater productions, musicals, and other performing arts activities, Gander consistently cast Pecha as the love interest.

229. During the 2017-2018 school year — her senior year — Pecha wished to take senior photographs inside the Performing Arts Center ("PAC") because of her involvement in theater. She texted Gander to ask if she could obtain keys to access the PAC. Rather than providing the keys at the door, Gander invited her to come inside his home to retrieve them.

230. Once inside Gander's home, Gander positioned himself between Pecha and the door and told her that his wife was not home. Pecha became concerned that he intended to take advantage of her. In order to leave, she told him she was running late and used her body to physically maneuver around him. Gander did not physically restrain her and reacted quietly. She retrieved the keys and left.

231. Pecha later had to return the keys to Gander at his home. She felt that she had to pretend the incident had not happened, and the relationship between them returned to normal. She did not report the incident to anyone at the school. She felt she was at fault for having gone into his home, and she did not want to get him in trouble because he had given her the master key to the school.

232. Pecha's silence reflects the same climate of self-blame and fear of consequences that silenced other victims throughout the District. The Board's failure to create any safe reporting

48

mechanism or to provide students with information about reporting abuse directly contributed to Pecha's decision not to report Gander's conduct.

233. Gander's conduct toward Pecha — grooming her as his "favorite" student over multiple years, consistently casting her as a love interest in school productions, and then isolating her in his home under false pretenses — is consistent with the grooming pattern described by other victims of Gander's abuse and further demonstrates that Gander engaged in a sustained and escalating course of predatory conduct toward students during his employment at the District. In this incident, Gander was testing his boundaries with Pecha: he did not have to require her to go in his house, he did not have to announce his wife's absence, he did not have to obstruct Pecha's access to the doorway, and, clearly, Gander was expecting something more to come of the situation.

234. Separately, during her time at Oconto Falls High School, Pecha personally observed Staff Member C engage in a pattern of sexually inappropriate physical conduct directed exclusively at female students during class. Specifically, when a female student raised her hand or asked a question, Staff Member C would approach her desk, lean over it, and rub his genitals against the edge of the desk while answering her question. He stood approximately one foot from the student, and the contact lasted a matter of seconds per occurrence. Pecha never observed him engage in this conduct with male students.

235. Pecha personally observed Staff Member C engage in this conduct approximately twenty times across his classes, including toward her. During these incidents, his genitals were visible through his pants.

236. Staff Member C's conduct was directed at female students during ordinary classroom instruction and occurred repeatedly over the course of Pecha's time in his classes. This conduct was visible to anyone present in the classroom, yet no school employee intervened or reported it to administration or law enforcement.

49

237. Staff Member C was also associated with the school's wrestling program. Through that program, to Pecha's knowledge, male staff members sought out attractive female students to serve as team assistants — a practice that provided additional unsupervised access to female students and further illustrates the culture of exploitation the Board's indifference permitted to flourish.

## K. Summary of Pattern and Practice Victims

238. Additional victims and witnesses who have come forward include:

a. Kayla Kasper — Plaintiff herein; subjected to repeated unwanted physical contact and sexual misconduct and sex-based favoritism by Staff Member B and Staff Member C during class, as described in Sections VII, VIII, and XIII(B), (D) above;

b. R.E. — alleged experienced Staff Member B's sexualized quid pro quo for grades and an inappropriate bathroom encounter with Tate;

c. S.P. — alleged verbally harassed by Lucas Cromell on multiple occasions, propositioned after graduation, and received inappropriate social media messages from Staff Member C while he was married;

d. K.Ki. — alleged sexual conduct in ice shack with Staff Member A;

e. Brianna Kain — Plaintiff herein; subjected to sexual misconduct by Staff Member E (Athletic Trainer) during her time as a student at Oconto Falls High School, including Staff Member E pressing his pelvis against her;

f. M.D. — alleged victim of Gander in 2005;

g. J.D. — alleged victim of Gander;

h. Five current or recent student victims whose reports led to Gander's arrest in 2025; and

i. Witness A — a former student who has provided information to Plaintiffs' counsel about Gander's physical misconduct with him during his enrollment at Oconto Falls High School, including sexual touching and grooming in isolated spaces.

50

239. There is believed to be at least one additional victim of Brynn Marie Larsen's misconduct involving touching, though that person does not wish to participate in litigation.

240. As recently as 2025, a liaison officer stated concerns about a teacher's conduct crossing the line, which led to an internal investigation.

## L. School Officials' Knowledge and Failure to Act

241. The pattern and practice of teacher-student sexual abuse, grooming, harassment, and misconduct described above was known to school officials through reports, or direct observations, yet was tolerated without meaningful investigation, discipline, or preventive measures.

242. Students and staff observed Staff Member B inappropriately touching Kayla "during class" in conduct so obvious that Kayla herself wondered "how other students didn't see or say anything," yet no staff member intervened or reported.

243. Lucas Cromell was "verbally inappropriate" with S.P. "on multiple occasions" while serving as a teacher — conduct observable to students and staff — yet Lucas Cromell was permitted to continue teaching and later was hired at another school district, indicating the Board never flagged or reported his conduct.

244. Gander engaged in sexual misconduct with students beginning no later than 2005, with at least five known victims, over a period of approximately twenty years without the Board taking meaningful action until his arrest in 2025.

245. Despite observing and/or receiving reports and rumors about Gander's conduct spanning two decades, the Board failed to act. When Gander was finally arrested in 2025, the Superintendent stated that "as soon as the allegations were communicated to school officials, the staff member was immediately removed," demonstrating that the Board possessed the authority and capability to act swiftly when it chose to do so.

246. Despite multiple teachers engaging in grooming, sexual conduct with students, providing alcohol to minors, and attending student parties — conduct that was reported or observed by, or known to school officials — the Board failed to implement or enforce adequate policies to protect students.

247. This widespread practice created an environment in which teachers understood they could engage in inappropriate conduct with students without meaningful consequence.

**M. Summary of Pattern and Practice**

248. At least nine teachers or staff members engaged in sexual abuse, grooming, harassment, or severe misconduct with students at Oconto Falls High School, including: Heisel, Brynn Marie Larsen, Staff Member A, Staff Member B, Staff Member C, Lucas Cromell, Staff Member E, and Gander.

249. Multiple victims have been identified: Amanda Watzka, Brooke La Count, Grace Williams, Brianna Kain, Alexis Neeley, Kayla Kasper, K.F., J.M., A.R., Kayla Kasper, R.E., S.P., K.Ki., J.D., M.D., the recent students who reported Gander, and a boy touched inappropriately by a different teacher.

250. The abuse spans from at least 2005 through 2025, a period of at least twenty continuous years of teacher-student sexual abuse at Oconto Falls High School.

251. The abuse affected both male and female students and involved teachers from multiple departments — Tech Education, History, English, Spanish, Math, Health, and others — as well as coaches and substitute teachers.

252. The Board's response to Gander's arrest in 2025 demonstrates that it possessed both the authority and capability to take immediate protective action when allegations were communicated to school officials.

253. The Board's swift action in 2025 contrasts sharply with its decades-long failure to act on substantially similar reports and allegations involving Heisel, Brynn Marie Larsen (multiple occasions in 2013-2014 and 2018), Staff Member A, Staff Member B, Staff Member C, Lucas Cromell, Staff Member E, and Gander himself (since at least 2005).

254. Victims like Kayla "kept [their] mouth shut" because they "felt embarrassed" and had "buried so deep" the trauma of their abuse that they temporarily forgot about it.

255. The prevalence of teacher misconduct at Oconto Falls was so widespread that students perceived it as normal.

256. Grace's experience is emblematic of the Board's failures: her story "was not taken seriously" and "no one really cared," despite a report to the School Resource Officer and notification of the principal and guidance counselor.

## N. Alexis Neeley — Student-on-Student Sexual Assault and Board's Deliberate Indifference

*(Facts pertaining to Alexis's assault are set forth in paragraphs 80-91 above and are incorporated herein by reference.)*

257. The Board's response to Alexis Neeley's report of sexual assault in October 2013 demonstrates that the Board's custom and practice of deliberate indifference encompassed not only teacher-student sexual abuse and grooming, but also student-on-student sexual assault.

258. Principal Bruce Russell, a school official with decision-making authority, received Alexis's report that she had been sexually assaulted by a fellow student and responded by telling her there was nothing the school could do because the assault occurred off school grounds. Russell took no formal protective action, conducted no formal investigation, made no referral to Child Protective Services or law enforcement, and provided Alexis with no counseling or other supportive measures.

259. Athletic Director Jerry Moynihan, a school official with decision-making authority over sports and over student athlete eligibility, received Alexis's specific requests that X. be removed

from certain activities following the assault. Moynihan responded that Alexis "had more healing to do" and took no action. X. remained on those activities without consequence.

260. The same Athletic Director Moynihan who dismissed Alexis's report of sexual assault in October 2013 is the same official who, in 2013, received complaints about Brynn Marie Larsen's sexual abuse of Brooke La Count and responded only by having "a discussion with Brynn about boundaries." This parallel conduct by the same official, in the same school year, as to two different reports of student sexual misconduct — one student-on-student, one teacher-on-student — reflects a consistent personal practice of dismissing reports of sexual misconduct that was consistent with, and an expression of, the Board's institutional custom.

261. The same Principal Russell who dismissed Alexis's report in 2013 is the same administrator identified in paragraphs 59(a) and 59(d) above as having observed Amanda Watzka and David Heisel together in circumstances that should have prompted concern during the same time period, yet similarly failed to act.

262. Christine Glover — the teacher who received Alexis's written account of her assault and appropriately reported it to Principal Russell — is the same teacher to whom Amanda submitted a disturbing senior paper describing her experience with Heisel, as set forth in paragraph 59(c) above. Despite reporting Alexis's assault to Russell, Glover is not known to have reported Amanda's paper to authorities. The school's system permitted individual staff members to make reports into a structure that then failed to act, and individual initiative by a single teacher could not overcome the Board's institutional indifference.

263. The Board's deliberate indifference to Alexis's report of sexual assault — despite receiving a written account from a student, verified by a teacher who found it credible enough to report — demonstrates that the Board's policy of non-response to sexual misconduct reports extended beyond the teacher-student context and reflected a categorical institutional failure.

54

**O. Tania Jersey — Corroboration of Board's Direct Knowledge and Affirmative Choice to Promote Accused Harasser**

*(Facts pertaining to the Board's receipt of evidence regarding Cromell are set forth in paragraphs 200-214 above and are incorporated herein by reference.)*

264. As set forth in Section XIII(H) above, the Board of Education of Oconto Falls Public School District received direct, documented, evidence-backed presentations of Lucas Cromell's sexual harassment of female staff members — including Tania Jersey, K., Bridget Thomas, and other teachers — and responded by promoting Cromell to Associate Principal.

265. The same Board of Education that governs Oconto Falls High School, where all five Plaintiffs were students, also governs Washington Middle School, where Cromell's conduct occurred. The Board is a single governing body exercising oversight and policymaking authority over all schools within the District, including both Oconto Falls High School and Washington Middle School. The Board's promotion of Cromell in the face of substantial evidence of his misconduct is an act of the same policymaking authority that is responsible for the policies, customs, and practices that enabled the abuse of Plaintiffs at Oconto Falls High School.

266. Before Cromell was hired at Washington Middle School, he had served as a long-term substitute Spanish teacher at Oconto Falls High School. While at the high school, Cromell received poor reviews and there were reports of inappropriate conduct, including during a school trip abroad to Spain, that were reported to high school principal Bruce Russell — the same principal who later dismissed Alexis Neeley's report of sexual assault. Despite these reviews and concerns, Cromell was given a full-time position at Washington Middle School.

267. At the June 2015 Board meeting, community members filled the District office beyond capacity, including the hallways and entryway, to bear witness to Tania Jersey's and K.'s presentation of evidence of Cromell's harassment to the Board. The Board itself received the evidence directly in closed session. The Board's subsequent approval of Cromell's promotion to Associate Principal —

55

arranged at a summer meeting posted only at school buildings, where virtually no one would see the notice — was not an oversight or institutional failure. It was an affirmative choice.

268. This affirmative choice — promoting an accused harasser over documented, evidence-backed objections presented directly to the Board itself — demonstrates that the Board's deliberate indifference was not passive neglect but an active institutional decision to shield perpetrators from accountability. This conduct is fully consistent with, and further evidence of, the Board's broader custom and practice that enabled the abuse of each Plaintiff in this case.

**STATUTE OF LIMITATIONS AND ACCRUAL[3]**

269. Federal civil rights claims accrue, and the statute of limitations begins to run, when a plaintiff discovers both the fact of her injury and its cause. A plaintiff must know, or have reason to know, not only that she was harmed, but also who or what caused that harm.

270. The theory of Plaintiffs' case against the Board is not simply that they were sexually abused, but that they were abused by teachers and coaches under circumstances created by the Board through its unwritten policies, practices, and customs of allowing teacher-student sexual conduct and grooming to flourish, and failing to act. Knowing they were abused did not give Plaintiffs knowledge, or reason to know, that the Board had such unwritten policies, customs, and practices about groomers and abusers and failed to act, because that information resided entirely within the Board's own possession and control.

271. The Board's liability to each Plaintiff rests on conduct separate and distinct from that of the individual abuser: it rests on the Board's own unwritten policies, practices, and customs, and its

---

[3] "The theory of plaintiff's case, however, is not simply that she was sexually abused but that she was abused by a teacher under circumstances created by defendants. In other words, had it not been for defendants' alleged failure to properly take action to prevent abuse by the teacher, plaintiff would not have been abused by him." *Doe v. Bd. of Education of Hononegah Community High School District #207*, 833 F.Supp. 1366, 1376 (N.D. Ill. 1993).

56

deliberate failure to investigate, discipline, or otherwise act on those reports. These are different acts, directed at different rights, from those of the individual abuser. A plaintiff cannot discover this cause of injury until she learns that such unwritten policies and practices existed and that the Board failed to respond to rectify such abuse, allowing a culture of abuse and toleration of such conduct to flourish.

272. Whether each Plaintiff knew or reasonably should have known of the Board's unwritten policies and practices, and failure to act at an earlier date, is a question of fact that cannot be resolved at the pleadings stage.

273. Each Plaintiff avers that she did not discover, and had no reason to discover, the Board's role in causing her injuries until Fall 2025, when she first learned of the full scope of teacher-student sexual abuse at Oconto Falls High School and the Board's decades-long pattern of maintaining unwritten policies and practices and allowing abuse and grooming to go unchecked.

## A. Amanda's Federal Claims Accrued in 2025

274. Amanda's federal claims against the Board are based on the Board's knowledge and observations about Heisel's conduct and the Board's deliberate failure to investigate or take protective action as to a wide range of teacher-student sex abuse and grooming outlined herein. Prior to 2025, Amanda had no knowledge, and no reason to know, that the Board had knowledge and failed to act, nor about the widespread pattern of teacher-student abuse and grooming alleged herein. That information was entirely within the Board's own control.

275. Amanda's federal claims against the Board accrued in 2025, when she first discovered both that she had been injured and that the Board's institutional conduct was the cause.

## B. Brooke's Federal Claims Accrued in 2025

276. Brooke's federal claims against the Board are based on the Board's knowledge about Brynn Marie Larsen's conduct with Brooke and the Board's deliberate failure to investigate, flag,

report, or discipline Larsen in response, as well as the widespread custom and pattern of abuse that Brooke learned about in Fall 2025. Brooke's claims, filed in 2026, are timely.

## C. Grace's Federal Claims Accrued in 2025

277. Grace's federal claims against the Board are based on the Board's receipt of prior reports about Larsen's abuse of Brooke in 2013-2014 and its deliberate failure to act on those reports — failures that directly enabled Larsen to return to Oconto Falls and abuse Grace in 2018 — as well as the widespread custom and pattern of abuse that Grace learned about in Fall 2025. Although Grace always remembered Larsen's abuse and it was reported to the School Resource Officer, she did not know until 2025 that the Board had previously received reports about Larsen's abuse of Brooke, or that the Board's failure to act on those prior reports was what enabled Larsen to return and abuse Grace. That information was entirely within the Board's own control. Grace's claims against the Board accrued in 2025, when she first discovered both that she had been injured by the Board's institutional conduct and the nature of the Board's role in enabling Larsen's access to Grace, as well as the widespread, tolerant custom and practice that the Board had with respect to teacher-student sex abuse and grooming. Grace's claims, filed in 2026, are timely.

## D. Brianna's Federal Claims Accrued in 2025

278. Brianna's federal claims against the Board are based on the Board's knowledge of Staff Member E's sexual misconduct with female students and its deliberate failure to investigate, discipline, or take protective action, as well as the widespread custom and pattern of abuse that Brianna learned about in Fall 2025. Prior to 2025, Brianna had no knowledge, and no reason to know, that the Board had such knowledge and failed to act, or that a pervasive institutional practice of deliberate indifference was the cause of her injury. That information was entirely within the Board's own control. Brianna's claims, filed in 2026, are timely.

## E. Kayla's Federal Claims Accrued in 2025

58

279. Kayla's federal claims against the Board are based on the Board's failure to investigate or take protective action against open and pervasive sexual misconduct toward female students — conduct that was visible to any school official who entered or passed his classroom and that was known throughout the student body — and on the Board's pervasive unwritten policy, practice, and custom of deliberate indifference to sexual misconduct that Kayla did not discover until 2025. Prior to 2025, Kayla had no knowledge, and no reason to know, that the Board had knowledge and failed to act, or that the Board's institutional custom was the moving force behind her injury. That information was entirely within the Board's own control.

280. Kayla did not know until 2025 that the Board had knowledge of pervasive teacher-student sexual misconduct involving at least nine different teachers spanning twenty years, or that the Board's systemic failures had created a culture in which teachers like Staff Member B understood they could engage in open and daily sexual misconduct toward students without consequence.

281. Kayla's claims against the Board accrued in 2025, when she first discovered that the Board's institutional conduct — its pervasive custom and practice of deliberate indifference to teacher-student sexual misconduct — was the cause of her injury. Kayla's claims, filed in 2026, are timely.

## F. Continuing Violation

282. Grace's abuse in 2018 further demonstrates that the Board's unconstitutional custom and practice of maintaining unwritten policies, customs, and practices allowing a climate of abuse and grooming to flourish, and failing to act, continued to operate as the moving force behind constitutional violations occurring within the applicable limitations period.

283. Grace would not have been victimized in 2018 if the Board had properly acted on the complaints to Moynihan in 2013 and the 2014 police investigation of Larsen's abuse of Brooke.

284. The Board's response in December 2025 — immediately removing Gander from his position upon receiving a report of his arrest — demonstrates that the Board's unconstitutional policy of deliberate indifference continued to operate throughout the limitations period and up to the date of this filing.

## COUNT 1 — VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
*(Plaintiff Amanda v. Defendant Board)*

285. Amanda restates, realleges, and incorporates by reference paragraphs 1-68, 166-268, and 269-275 as if fully stated herein.

286. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

287. Amanda is female and was a student at Oconto Falls High School.

288. From approximately 2010 through 2013, Defendant Heisel, acting as Amanda's Tech Education Teacher and in a position of authority over Amanda, subjected Amanda to ongoing grooming and sexual abuse because of her sex, female, including: repeated personal and sexual conversations while she was a minor; repeated intimate physical contact, including hand-holding and groping; a sexual assault at the Skills USA competition in Wisconsin Dells when Amanda was 17; and the three-year grooming campaign described in the facts above.

289. Heisel's sex-based harassment and abuse was so severe and pervasive that it altered the conditions of Amanda's education, including by causing her to form a false belief that she was in a romantic relationship with Heisel, causing her to reject healthy peer relationships, stunting her normal social and emotional development, and causing her to graduate early.

290. The Board had actual knowledge of Heisel's conduct through its observations and direct knowledge of school officials as set forth in paragraphs 59(a)-(j) above.

291. Despite this actual knowledge, the Board was deliberately indifferent to Heisel's conduct and failed to investigate or take protective action.

292. The Board's deliberate indifference is further demonstrated by its knowledge about teacher-student sexual abuse by multiple other teachers during the same period — including reports to Moynihan about Larsen's abuse of Brooke in 2013, the 2014 police investigation of Larsen, and the Board's knowledge of abuse by Staff Member A, Staff Member B, Staff Member C, Lucas Cromell, Gander, and others as set forth in Section XIII above — yet the Board consistently failed to investigate, discipline, or otherwise act.

293. The Board's custom and practice of failing to act created an environment in which teachers understood they could abuse students without consequence, thereby enabling Heisel's ongoing abuse of Amanda.

294. As a result of Heisel's grooming and abuse and the Board's deliberate indifference, Amanda suffered and continues to suffer damages, including loss of equal educational opportunity, emotional distress, complex PTSD, depression, anxiety, hypervigilance, low self-esteem, and substance abuse issues.

**WHEREFORE**, Plaintiff Amanda respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

## COUNT 2 — VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
### *(Plaintiff Grace v. Defendant Board)*

295. Grace restates, realleges, and incorporates by reference paragraphs 141-165, 166-268, 269-273, and 277 as if fully stated herein.

61

296. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

297. Grace is female and was a student at Oconto Falls High School.

298. From approximately February through April 2018, Brynn Marie Larsen, acting as Grace's substitute teacher and in a position of authority over Grace, subjected Grace to ongoing grooming and sexual abuse because of her sex and sexual orientation, including: initiating a romantic relationship with Grace through Snapchat; sending flowers to Grace in class; substituting into Grace's classes to gain access to her; and sexually assaulting Grace by making out with her in Larsen's bedroom while Grace was a 17-year-old minor student.

299. Larsen's harassment and abuse was so severe and pervasive that it altered the conditions of Grace's education, including by causing emotional distress, fear of reporting, loss of peer relationships due to being blamed for Larsen's departure, and ongoing discomfort when encountering Larsen in public.

300. The Board had actual knowledge of Larsen's abuse of Grace through reports made to school officials with decision-making authority: Grace's friend T.F. reported the abuse to the School Resource Officer; the School Resource Officer spoke with Grace directly about the abuse; and the school principal and guidance counselor were notified. Following these reports, Larsen and Dawn Larsen were removed from the school almost immediately, demonstrating that school officials with decision-making authority had received the report and understood it warranted action.

301. Despite receiving these reports, the Board was deliberately indifferent to Grace's abuse: it conducted no formal investigation; it never formally interviewed Grace; and Grace's story "was not taken seriously" and "no one really cared."

302. Dawn Larsen, a mandated reporter and Board employee who was present in the home when Grace fled Larsen's bedroom after being kissed, observed what happened and failed to report it.

303. Most significantly, the Board had received prior reports about Larsen's abuse of Brooke through complaints to Athletic Director Moynihan in 2013 and through the 2014 police investigation, yet failed to properly flag, report, or discipline Larsen. This failure is what enabled Larsen to be hired at Waupaca School District and later return to Oconto Falls with access to Grace.

304. The Board's pattern of knowledge about teacher-student sexual abuse involving at least nine teachers over twenty years and consistently failing to take adequate action demonstrates that the Board's deliberate indifference to Grace's abuse was a continuation of its established custom and practice.

305. The Board's swift removal of Gander upon receiving a report of his arrest in 2025, contrasted with its failure to act on reports about Larsen in 2013-2014 and on Grace's report in 2018, demonstrates that the Board had the authority and capability to protect Grace and deliberately chose not to exercise it.

306. As a result of Larsen's grooming and abuse and the Board's deliberate indifference, Grace suffered and continues to suffer damages, including loss of equal educational opportunity, emotional distress, fear of reporting, harm caused by being blamed for Larsen's departure, and ongoing discomfort when encountering Larsen in public.

**WHEREFORE**, Plaintiff Grace respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

63

## COUNT 3 — VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
*(Plaintiff Brooke v. Defendant Board)*

307. Brooke restates, realleges, and incorporates by reference paragraphs 111-140, 166-268, and 276 as if fully stated herein.

308. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

309. Brooke is female and was a student at Oconto Falls High School.

310. From approximately August 2013 through the summer of 2014, Brynn Marie Larsen, acting as Brooke's assistant volleyball coach and substitute teacher and in a position of authority over Brooke, subjected Brooke to ongoing grooming and sexual abuse because of her sex, female, including: initiating a romantic and sexual relationship with Brooke through Snapchat while Brooke was a 15-year-old minor; sending Brooke photographs of her naked body and pressuring Brooke to reciprocate; engaging Brooke in sexual activity in the backseat of her vehicle at their first in-person meeting; requiring Brooke to sleep in her bed and engaging or attempting to engage Brooke in sexual acts on multiple occasions; exploiting the coach-athlete power differential to isolate Brooke from her family; and continuing contact and sexual conduct with Brooke even after a police investigation began in May-June 2014.

311. Larsen's sex-based harassment and abuse was so severe and pervasive that it altered the conditions of Brooke's education, including by causing her to become isolated from her family and peers, causing her to feel obligated to submit to sexual conduct she did not desire, and ultimately forcing her to transfer out of Oconto Falls High School in fall 2014 because other students were calling her "lesbian" and making her life miserable as a direct result of Larsen's grooming and abuse.

312. The Board had actual knowledge of Larsen's conduct through school officials with decision-making authority. Specifically: in 2013, Athletic Director Jerry Moynihan received

64

complaints from multiple people about seeing Brynn Marie Larsen and Brooke together and responded only by having "a discussion with Brynn about boundaries," permitting Larsen to continue as assistant coach with full access to Brooke; Dawn Larsen, a mandated reporter and Board employee, was present in the home on multiple occasions when Larsen and Brooke slept in the same bed and snuggled on the couch, yet failed to report; guidance counselor and driver's education teacher Lee Kournaus observed Brooke and Larsen together outside of school on multiple occasions, including at his own girlfriend's house, yet failed to inquire or report; and a police investigation into Larsen's abuse of Brooke was conducted in May-June 2014, of which the Board was or should have been aware.

313. Despite this actual knowledge, the Board was deliberately indifferent to Larsen's conduct and failed to meaningfully investigate, discipline, flag, or report Larsen in response to any of these reports. Moynihan's response — a single conversation with Larsen about "boundaries" — was clearly unreasonable in light of the known risk of ongoing abuse to a 15-year-old student.

314. The Board's deliberate indifference is further demonstrated by its failure to take any action following the 2014 police investigation: the Board did not discipline Larsen, did not flag her conduct to licensing authorities, and did not prevent her from being hired by the Waupaca School District. The Board subsequently allowed Larsen to return to Oconto Falls as a substitute teacher in 2018, where she abused Grace Williams in substantially the same manner.

315. The Board's pattern of receiving reports about teacher-student sexual abuse involving at least nine teachers over twenty years and consistently failing to take adequate action demonstrates that the Board's deliberate indifference to Brooke's abuse was not an isolated failure, but a continuation of an established custom and practice.

316. The Board's swift removal of Gander upon receiving a report of his arrest in December 2025, contrasted with its failure to act on multiple reports about Larsen in 2013-2014, demonstrates

65

that the Board had the authority and capability to protect Brooke and deliberately chose not to exercise it.

317. As a result of Larsen's grooming and abuse and the Board's deliberate indifference, Brooke suffered and continues to suffer damages, including loss of equal educational opportunity, forced transfer from her high school, emotional distress, and other ongoing harm.

**WHEREFORE**, Plaintiff Brooke respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

### COUNT 4 — VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
*(Plaintiff Brianna v. Defendant Board)*

318. Brianna restates, realleges, and incorporates by reference paragraphs 1-28, 69-79, 166-268, 269-273, and 278 as if fully stated herein.

319. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

320. Brianna is female and was a student at Oconto Falls High School.

321. During approximately 2010 through 2012, Staff Member E, acting as Oconto Falls High School's athletic trainer and in a position of authority and professional trust over Brianna as a student, subjected Brianna to sexual misconduct because of her sex, female, including by making repeated inappropriate physical contact with Brianna — pressing his pelvis against her body — during the course of his duties as athletic trainer.

66

322. Staff Member E's sex-based misconduct altered the conditions of Brianna's education by subjecting her to unwanted sexual contact within the school environment by a school employee in a position of authority, creating a hostile and harmful educational environment.

323. The Board had actual knowledge of Staff Member E's inappropriate conduct with female students through, among other things: Amara Calmes's report to Dawn Larsen — a Board employee and mandated reporter — of having observed Staff Member E alone with a female student in the athletic training room in suspicious circumstances, which Larsen dismissed without investigation or escalation; information circulating within the school community that Staff Member E was engaged in sexual conduct with students; and the Board's broader receipt of reports and observations about the pattern of teacher-student sexual misconduct described throughout this Complaint.

324. Despite this actual knowledge, the Board was deliberately indifferent to Staff Member E's conduct and failed to investigate or take protective action. The Board's deliberate indifference is further demonstrated by its knowledge of pervasive teacher-student sexual abuse by multiple other staff members during the same period — including Heisel's abuse of Amanda, Larsen's abuse of Brooke, and the misconduct of Staff Members A, B, C, D, and Gander — yet the Board consistently failed to investigate, discipline, or otherwise act.

325. The Board's custom and practice of failing to act created an environment in which staff members understood they could engage in sexual misconduct with students without consequence, thereby enabling Staff Member E's ongoing misconduct toward Brianna and other female students.

326. As a result of Staff Member E's misconduct and the Board's deliberate indifference, Brianna suffered and continues to suffer damages, including loss of equal educational opportunity, emotional distress, and other compensatory damages.

**WHEREFORE**, Plaintiff Brianna Kain respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher and staff sexual misconduct, and grant such other relief as the Court deems just and proper.

## COUNT 5 — VIOLATION OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972, 20 U.S.C. § 1681(a)
### *(Plaintiff Kayla v. Defendant Board)*

327. Kayla restates, realleges, and incorporates by reference paragraphs 1-28, 97-110, 166-268, 269-273, and 279-281 as if fully stated herein.

328. The Board is a recipient of federal financial assistance and subject to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a).

329. Kayla is female and was a student at Oconto Falls High School.

330. During approximately 2009 through 2011, Staff Member B, acting as Kayla's social studies teacher and in a position of authority over Kayla, subjected Kayla to ongoing sexual misconduct because of her sex, female, including: daily self-touching in the presence of students; repeated unwanted physical contact consisting of caressing Kayla's shoulder, arm, and neck at her desk while breathing on her; whispering to her that she was sexy; offering study materials in exchange for an after-class private visit; and making repeated comments about her appearance and body. This conduct occurred across two consecutive school years while Kayla was a minor student of approximately 15 and 16 years old.

331. Staff Member B's sex-based misconduct was so severe and pervasive that it substantially altered the conditions of Kayla's education: she deliberately left quiz and worksheet questions blank to avoid interaction with him; she accepted failing scores on individual assignments to avoid raising her hand; she was unable to focus on the subject matter of his courses; she positioned herself during

68

a lockdown drill to avoid physical proximity to him; and she dreaded attending his class every day across two school years.

332. The Board had actual knowledge of Staff Member B's conduct, or at a minimum constructive knowledge sufficient to constitute deliberate indifference. Staff Member B's daily self-touching at the front of his classroom was visible to students and any school official who entered or passed the classroom. His conduct was so pervasive that students throughout the school assigned him a nickname based on it. The Board's deliberate indifference is also demonstrated by its knowledge of pervasive teacher-student sexual misconduct by multiple other staff members during the same period — including Heisel's abuse of Amanda, Larsen's abuse of Brooke, and the misconduct of Staff Members A, B, C, D, E, and Gander — yet the Board consistently failed to investigate, discipline, or otherwise act.

333. The Board's custom and practice of failing to act created an environment in which teachers understood they could engage in sexual misconduct toward students openly and without consequence, enabling Staff Member B's open and daily misconduct toward Kayla across two consecutive school years, and creating a school culture in which students like Kayla did not believe they had a safe or effective path to reporting what was being done to them.

334. As a result of Staff Member B's misconduct and the Board's deliberate indifference, Kayla suffered and continues to suffer damages, including loss of equal educational opportunity, ongoing depression, anxiety, suicidal ideation, and other lasting harm into adulthood.

**WHEREFORE**, Plaintiff Kayla Kasper respectfully requests that this Court enter judgment in her favor and against the Board, award compensatory damages in an amount to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student sexual misconduct, and grant such other relief as the Court deems just and proper.

69

## COUNT 6 — *MONELL* CLAIM, DEPRIVATION OF RIGHT TO BODILY INTEGRITY UNDER THE FOURTEENTH AMENDMENT VIA 42 U.S.C. § 1983
*(Plaintiffs Amanda, Brooke, Grace, Brianna, and Kayla v. Defendant Board)*

335. Amanda, Brooke, Grace, Brianna, and Kayla restate, reallege, and incorporate by reference paragraphs 1 through 284 as if fully stated herein.

336. Students have a constitutional right to bodily integrity under the substantive due process protections of the Fourteenth Amendment. A student who is sexually abused by a public school official acting under color of state law has a cognizable claim under the Fourteenth Amendment.

337. Amanda was deprived of her right to bodily integrity by Heisel's grooming and sexual assault as described in paragraphs 29-53 above.

338. Brooke was deprived of her right to bodily integrity by Brynn Marie Larsen's repeated grooming and sexual assaults as described in paragraphs 111-132 above.

339. Grace was deprived of her right to bodily integrity by Brynn Marie Larsen's grooming and sexual assault in February through April 2018, as described in paragraphs 141-161 above.

340. Brianna was deprived of her right to bodily integrity by Staff Member E's sexual misconduct, including his pressing his pelvis against her body during his duties as athletic trainer, as described in paragraphs 69-75 above.

341. Alexis (not named as a Plaintiff at this time, but included as part of the pattern and practice) was deprived of her right to bodily integrity by X.'s sexual assault of her in October 2013, as described in paragraphs 80-91 above, and by the Board's deliberate indifference — through Principal Russell's and Athletic Director Moynihan's refusal to take corrective action — which denied her the protection to which she was entitled and left her forced to remain in proximity to her assailant as a cheer team member without any institutional protection.

70

342. Kayla was deprived of her right to bodily integrity by Staff Member B's repeated sexual misconduct — including his repeated unwanted physical caressing of her shoulder, arm, and neck at her desk, his daily self-touching in her presence, and his sexual comments about her body — as described in paragraphs 97-105 above. Staff Member B's conduct occurred in a Board-controlled environment, during Board-supervised instructional time, while Kayla was a minor student under the Board's care, across two consecutive school years.

343. Heisel's abuse of Amanda (2010-2013) and Larsen's abuse of Brooke (2013-2014) occurred during substantially the same time period at Oconto Falls High School. Larsen's subsequent abuse of Grace in 2018, as well as Staff Member E's abuse of Brianna during the same period (approximately 2010-2012), demonstrates that the Board's custom and practice of maintaining unwritten policies, practices, and customs allowing sexual abuse and grooming of students to flourish, and failing to act, continued beyond the initial abuse of Amanda and Brooke, causing additional constitutional violations.

344. The sexual abuse of Amanda, Brooke, Brianna, Grace, and Kayla did not occur in isolation, but within a pervasive culture of teacher-student sexual abuse at Oconto Falls School District spanning from at least 2005 through 2025, a period of at least twenty years involving at least nine different teachers and at least fourteen identified victims.

345. School officials received reports about, observed, or had actual knowledge of this pattern of abuse as set forth in Section XIII above, yet consistently failed to investigate, discipline, or take protective action.

346. The Board maintained a custom and practice as set forth above of teacher-student sexual abuse and responding with deliberate indifference, specifically:

a. Heisel's conduct with Amanda was known by multiple teachers and administrators as set forth in paragraphs 59(a)-(j) above, yet the Board failed to investigate or intervene;

71

b. In 2013, Athletic Director Moynihan received complaints from multiple people about seeing Brynn Marie Larsen and Brooke together but responded only by having "a discussion with Brynn about boundaries" and allowed Larsen to continue as assistant coach with full access to Brooke;

c. Dawn Larsen, a mandated reporter and Board employee, was present in the home on multiple occasions when Larsen and Brooke slept in the same bed and snuggled on the couch, yet failed to report;

d. Despite the 2014 police investigation of Larsen, the Board failed to flag, report, or discipline Larsen, allowing her to be hired at another school district and later return to Oconto Falls, where she abused Grace in 2018;

e. In early 2018, Grace's friend reported Larsen's abuse of Grace to the School Resource Officer, the principal was notified, and the guidance counselor was notified, yet the Board conducted no formal investigation and never formally interviewed Grace;

f. Staff Member B inappropriately touched Kayla "during class" in conduct Kayla Kasper said was so obvious she wondered "how other students didn't see or say anything," yet no school official intervened;

g. Lucas Cromell was "verbally inappropriate" with S.P. "on multiple occasions" while serving as a substitute teacher, yet the Board permitted him to continue substituting and never flagged his conduct;

h. Gander engaged in sexual misconduct with students from at least 2005 through 2025 — with at least five known victims — for two decades without the Board taking action;

i. Staff Member E engaged in sexual misconduct with female students, including Brianna Kain, during his employment as athletic trainer at Oconto Falls High School, conduct that was reported to and observed by Board employees — including Dawn Larsen, who dismissed the report

72

of a student who witnessed suspicious circumstances in the athletic training room without investigation, escalation, or referral to authorities, in violation of her mandatory reporting obligations;

j. When Alexis Neeley reported to Principal Russell that she had been sexually assaulted by a fellow student, Russell told her there was nothing the school could do and made no report to authorities, conducted no investigation, and provided no support; when Alexis made specific corrective requests to Athletic Director Moynihan — the same official who failed to act on reports about Larsen's abuse of Brooke in the same year — Moynihan told her she "had more healing to do" and took no action, leaving X. in his positions on those activities without consequence;

k. When at least four female teachers presented the Board directly with documented evidence of Lucas Cromell's sexual harassment of female staff members in June 2015, the Board received the evidence in closed session, acknowledged it was credible, and subsequently promoted Cromell to Associate Principal — the same Board of Education, exercising the same policymaking authority, that governed Oconto Falls High School during the period of each Plaintiff's abuse — thereby affirmatively communicating to District employees and students that sexual misconduct would be shielded from accountability rather than disciplined; and

l. Staff Member B engaged in daily, open self-touching in the presence of students — conduct so pervasive that the student body assigned him a nickname based on it — and repeatedly subjected Kayla Kasper and other female students to unwanted physical contact and sexual comments during class across two consecutive school years; this conduct was observable to any school official who entered or passed his classroom, yet no school official intervened, investigated, or reported it, and Staff Member B continued to teach at Oconto Falls High School without consequence.

347. The contrast between the Board's decades of inaction despite receiving these reports and its immediate removal of Gander from employment in December 2025 upon receiving a report of his arrest demonstrates that the Board has always possessed the authority and capability to act promptly when it chose to do so, and that its prior failures were the result of an affirmative custom and policy of deliberate indifference rather than institutional inability.

348. The Board failed to adopt and enforce adequate policies, including policies requiring formal investigations of reports of teacher-student sexual misconduct; mandating reporting of accused teachers to licensing authorities and other school districts; prohibiting accused abusers from returning to positions with student access; training staff on recognizing and reporting grooming behavior; establishing consequences for staff who fail to report suspected abuse; and creating a safe reporting system for students.

349. The Board's custom and practice set forth above, and its failure to adopt adequate policies, was the moving force behind all five Plaintiffs' constitutional injuries:

a. The Board received complaints about Larsen and Brooke through Moynihan in 2013, but Moynihan's minimal response allowed the abuse to continue;

b. The Board received a report through the 2014 police investigation of Larsen, but failed to flag, report, or discipline Larsen, which directly enabled Larsen to return to Oconto Falls and abuse Grace in 2018;

c. If the Board had properly acted on the complaints to Moynihan and the 2014 police investigation, Larsen would not have been permitted to return to Oconto Falls, and Grace would not have been victimized;

d. The Board knew about Heisel's conduct with Amanda over three years, through teachers, administrators, Amanda's own disclosures, and observable conduct, yet failed to investigate or intervene;

74

e. The Board's decades-long unwritten policies, practices, and customs, and failing to act on knowledge of teacher-student abuse and grooming, created an environment in which teachers like Heisel and Larsen understood they could engage in abuse without consequence, enabling and emboldening their conduct toward each Plaintiff, and generally allowing teacher-student sexual abuse and grooming to flourish;

f. The Board's deliberate indifference to Alexis Neeley's report of sexual assault in October 2013 — through the same officials (Russell and Moynihan) who failed to act on reports about other students during the same period — enabled X. to remain in sports and around Alexis without consequence, and denied Alexis corrective action to which she was entitled; and

g. The Board's failure to investigate or take any action in response to Staff Member B's open, daily, and pervasive sexual misconduct toward female students — conduct that was visible and known throughout the student body and that any administrator or teacher could have observed — directly enabled Staff Member B to continue subjecting Kayla and other female students to sexual misconduct across two full school years, and was the moving force behind Kayla's deprivation of her right to bodily integrity and equal educational opportunity.

350. All five Plaintiffs suffered substantial damages, including loss of equal educational opportunities, emotional distress, and other compensatory damages.

**WHEREFORE**, Amanda, Brooke, Grace, Brianna, and Kayla respectfully request that this Court enter judgment in their favor and against the Board, award compensatory damages in amounts to be determined at trial, enter injunctive relief requiring the Board to institute adequate policies and procedures to prevent teacher-student grooming and sexual abuse, and grant such other relief as the Court deems just and proper.

**JURY DEMANDED AS TO ALL COUNTS**

Respectfully submitted,

Case 1:26-cv-00392-BBC    Filed 03/16/26    Page 75 of 107    Document 7

AMANDA WATZKA
BROOKE LA COUNT
GRACE WILLIAMS
BRIANNA KAIN
KAYLA KASPER

By: *s/ Cass T. Casper*

_____
Attorney for Plaintiffs

Cass T. Casper, Esq.
WIED Bar Number 6303022
DISPARTI LAW GROUP, P.A.
121 West Wacker Drive, Suite 2300
Chicago, Illinois 60601
P: (312) 506-5511 ext. 331
E: cass.casper@dispartilaw.com

# APPENDIX A — PATTERN OF ABUSE: VICTIMS, PERPETRATORS, CONDUCT, BOARD KNOWLEDGE

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| Amanda Watzka — Plaintiff | David Heisel (Tech Ed Teacher) | 2010-2013 | ¶¶29-53, 59(a)-59(j), 274-275, 285-294, 337, 346(a), 349(d), 349(e) | Grooming over three years; intimate personal conversations; hand-holding; sexual discussions with a minor; sexual assault at Skills USA competition in Wisconsin Dells when Amanda was 17 | Tracy Tate; John Bursa; Art Paulson; Matt Beschta; Staff Member C; Dave and Jill Braiser; Staff Member A; Gayle Gander; Carla Nielsen; Administrators Bruce Russell and Lou Hobyan; school janitors Bob and John; school secretary; Christine Glover | No investigation; no disciplinary action; Heisel continued employing Amanda as unpaid babysitter and taking her on drives throughout her three-year enrollment |
| Brooke La Count — Plaintiff | Brynn Marie Larsen (Asst. Volleyball Coach / Substitute Teacher) | 2013-2014 | ¶¶111-132, 276, 307-317, 338, 346(b)-(d), 349(a)-(c) | Grooming via Snapchat; sending nude photographs; sexual activity in vehicle at first meeting when Brooke was 15; repeated overnight stays with sexual conduct; isolation from family | Jerry Moynihan (Athletic Director); Dawn Larsen (mandated reporter, Board health teacher); Lee Kournaus (guidance counselor); Rochelle Vandenlangenberg Otto; Katie Strelow-Ripley; 2014 police investigation | Moynihan's only response: "a discussion with Brynn about boundaries"; Larsen permitted to continue as assistant coach; Dawn Larsen never reported; no formal investigation after 2014 police investigation; Larsen not disciplined or flagged to licensing authorities |

77

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| Grace Williams — Plaintiff | Brynn Marie Larsen (Substitute Teacher) | Feb-Apr 2018 | ¶¶141-165, 277, 295-306, 339, 346(d)-(e), 349(b)-(c) | Grooming via Snapchat; sending flowers to class; substituting into Grace's classes; sexual assault (making out) in Larsen's bedroom when Grace was 17 | T.F. reported to School Resource Officer; SRO spoke with Grace; principal notified; guidance counselor notified; Dawn Larsen present in home and observed | No formal investigation; Grace never formally interviewed; no counseling or support provided; story "not taken seriously" and "no one really cared"; Larsen and Dawn Larsen removed but no further action |
| K.F. | Staff Member A (Teacher) | Approx. 2011 | ¶¶171, 238 | Sexual relationship; Staff Member A took her virginity; K.F. and a friend visited Staff Member A's house; K.F. showed classmates texts from Staff Member A | Classmates including J.M. were aware; K.F. disclosed directly to J.M. | No known Board action |
| K.Ki. | Staff Member A (Teacher) | Approx. 2011 | ¶¶168, 238(d) | Sexual conduct in ice shack ("used to give [Staff Member A] blow jobs in his ice shack") | Reported by students | No known Board action |
| J.M. | Staff Member B & Staff Member A (Teachers) | 2011-2013 | ¶¶169-170, 173-174, 178 | Staff Member A told J.M. she was on a "top 5 hottest girls" list when she was a 14-year-old freshman; Staff | Other teachers and staff; conduct occurred in classrooms and at off-school social events involving | No known Board action; conduct described as so prevalent students |

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | | | | Member B allowed J.M. to leave class if she flirted with him; Staff Member B and Staff Member A (in their 30s) provided alcohol to students and attended high school parties | faculty and students | perceived it as normal |
| A.R. | Staff Member B (Teacher) | 2011-2013 | ¶174 | Required to grab keys from Staff Member B's front pocket in a sexualized manner; same pattern as J.M. | J.M. directly observed the conduct; other students present | No known Board action |
| Kayla Kasper — Plaintiff | Staff Member B and Staff Member C (Teachers) | Approx. 2009-2011 | ¶¶97-110, 173, 176, 179-180, 238(a), 279-281, 327-334, 342, 346(f), 346(l), 349(g) | Staff Member B: repeated unwanted physical contact (caressing shoulder/neck at desk); daily self-touching by teacher in front of class; sexual comments ("you're sexy," comments on her body and appearance); sexualized quid pro quo (offer of study materials in exchange for after-class visit). Staff Member C: sex-based favoritism, | Any teacher or school official who entered or passed his classroom during instructional time over two school years; student body at large | No investigation; no disciplinary action; no report to law enforcement or licensing authorities; he continued teaching without consequence; Board's culture of inaction left students without a safe reporting path |

79

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | | | | unwarranted favorable grades. Staff Member B and C were frequently seen together and reported as friends. | | |
| R.E. | Staff Member B (Teacher) | Approx. 2012-2015 | ¶¶175, 238(b) | Sexualized quid pro quo for grades: gave R.E. an A without completing paper while commenting on her appearance; R.E. stated she felt "so exposed and creeped out" | Unknown | No known Board action; Staff Member B believed to be employed as a teacher |
| S.P. | Lucas Cromell and Staff Member C (Teachers) | 2011-2015 (in school); 2017 (post-graduation) | ¶¶181, 183-185, 238(c) | Lucas Cromell verbally inappropriate with S.P. on multiple occasions while substituting; Staff Member C proposed S.P. babysit for entire summer (2016); both engaged in inappropriate social media communications with S.P. in 2017; Lucas Cromell propositioned S.P. to be his | Board staff aware of Lucas Cromell substituting in classes | No action; Lucas Cromell later hired as staff person at another school; no flagging of conduct to other districts |

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | | | | "sugar baby" after graduation | | |
| J.D. | Gayle Gander (Staff Member) | Approx. 2011-2012 | ¶¶188, 238(g) | Sexual misconduct | Unknown | No known action |
| M.D./R. | Gayle Gander (Staff Member) | 2005 | ¶¶190, 238(f), 244 | Sexual misconduct; M.D. stated: "I wish I had the courage to speak up about Gander back in 05 but I didn't" | Unknown (M.D. did not report at the time) | No action; abuse continued for approximately twenty years |
| Brianna Kain — Plaintiff | Staff Member E (Athletic Trainer) | Approx. 2010-2012 | ¶¶69-79, 238(e), 278, 318-326, 340, 346(i) | Sexual misconduct; pressing pelvis against student during athletic training duties | Amara Calmes reported suspicious observations to Dawn Larsen (mandated reporter, Board employee); circulating student community knowledge | Dawn Larsen dismissed report without investigation; no formal investigation; no disciplinary action; no report to law enforcement or licensing authorities |
| Unknown Students (5) | Gayle Gander (Staff Member) | 2025 | ¶¶189, 196-197, 240, 252, 284, 347 | Sexual misconduct (five victims; reports led to criminal arrest December 2025) | Board officials received report of arrest | Gander immediately removed from school and relieved of all responsibilities upon arrest |
| Witness A (anonymou) | Gayle Gander (Staff Member) | Approx. 2018-2019 | ¶¶191-195, 238(i) | Sexual misconduct; isolated student in back room; sensual massages to chest, back, and lower hips; had student walk on his back while | Unknown to Board — Gander instructed student to maintain secrecy | No action; Gander remained employed through 2025 |

81

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|---|---|---|---|---|---|---|
| | | | | moaning; directed student not to tell anyone; student was 16-17 years old | | |
| Alexis Neeley (sworn declaration; not currently named Plaintiff) | X. | October 2013 | ¶¶80-96, 257-263, 341, 346(j), 349(f) | Student-on-student sexual assault during off-campus cheer team sleepover; victim was 17 years old | Christine Glover (reported to Russell); Principal Bruce Russell (received report directly from Alexis); Athletic Director Jerry Moynihan (received report directly from Alexis) | Russell: "nothing the school could do"; no investigation, no CPS report, no law enforcement referral, no counseling; Moynihan: told Alexis she "had more healing to do"; X. remained in sports and in activities with no consequence |
| Female Staff Members (Tania Jersey; K.; Bridget Thomas; others) | Lucas Cromell (Spanish Teacher / Dean of Students / Associate Principal) | 2012-2015 | ¶¶200-214, 264-268, 346(k) | Repeated sexual harassment of female staff including sexual comments and requests, retaliation, intimidation; harassment of female middle school student (Student A); evidence submitted directly to the Board in closed session | Board of Education (direct presentation in closed session June 2015); Superintendent Polashek (actively suppressed); Principal Hobyan (received reports; took no action; stated "I had to support my dean") | Board tabled promotion in June 2015 then approved it at a July 2015 summer meeting with minimal public notice; Cromell promoted to Associate Principal; Bridget Thomas non-renewed; female teachers who complained |

| Victim | Perpetrator | Timeframe | Comp. ¶ | Conduct | Who Had Knowledge | Board Response |
|--------|-------------|-----------|---------|---------|-------------------|----------------|
|        |             |           |         |         |                   | left the District |

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| 2005 | M.D. victimized by Gander; M.D. did not report at the time out of fear | None (disclosed in 2025) | ¶¶190, 238(f), 244 | None | Gander remained employed; abuse continued for approximately twenty more years |
| Approx. 2009-2011 | Staff Member B engaged in daily self-touching at the front of his classroom in the presence of students across multiple school years; conduct visible to any teacher or administrator entering or passing the classroom; student body assigned him a nickname based on the conduct; Staff Member B also made repeated sexual comments to and engaged in repeated unwanted physical contact with Kayla Kasper | Any school official who entered or passed the classroom; student body at large | ¶¶97-105, 173, 176, 180, 346(l), 349(g) | No investigation; no disciplinary action; no report to authorities; Staff Member B continued teaching | Staff Member B continued to engage in open sexual misconduct toward students across multiple school years; Kayla Kasper lost educational opportunity, avoided classroom engagement, and suffered lasting psychological harm |
| 2010-2013 | Multiple teachers and administrators observe Amanda and Heisel together in his office and classroom during off-hours over a three-year period; | Tracy Tate; John Bursa; Art Paulson; Matt Beschta; Staff Member C; Dave and Jill Braiser; Staff Member A; Gayle Gander; Carla Nielsen; | ¶¶59(a)-59(j), 198-199, 290, 346(a) | None | Heisel continued grooming and ultimately sexually assaulting Amanda at Skills USA in Spring |

84

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| | Amanda signed into Heisel's classroom during non-class hours by the school secretary; Amanda placed on an adults-only wrestling list with Heisel; Amanda posted pictures of Heisel's child on social media visible to school adults; Amanda confided in Tracy Tate about her relationship with Heisel; Amanda submitted a disturbing senior paper describing her situation to teacher Christine Glover | Administrators Bruce Russell and Lou Hobyan; school janitors Bob and John; school secretary; Christine Glover | | | 2012; abuse continued through Amanda's graduation in May 2013 |
| Approx. 2010-2012 | Staff Member E engages in sexual misconduct with female students including Brianna Kain during his duties as athletic trainer | Amara Calmes (reported to Dawn Larsen); school community knowledge | ¶¶69-79, 216-218, 346(i) | Dawn Larsen dismissed report without investigation, escalation, or mandatory report | Staff Member E continued in his role; Brianna Kain and other female students were not protected |
| 2011-2013 | Lucas Cromell verbally inappropriate with S.P. on multiple occasions while substituting in classes; conduct observable to other students and staff during substituting | Board staff and students present during substituting | ¶¶183, 243, 346(g) | None | Lucas Cromell later hired at another school without any flag from the Board |

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| Approx. 2011 | Students aware of Staff Member A's sexual conduct with K.F. (virginity) and K.Ki. (ice shack); K.F. showed classmates texts from Staff Member A | Classmates including J.M. aware; conduct at Staff Member A's home known to students | ¶¶168, 171, 238(d) | None | Staff Member A believed still employed at time of filing |
| 2011-2013 | Staff Member B and Staff Member A (in their 30s) provide alcohol to students and attend high school parties; Staff Member B permits students to leave class in exchange for flirting; Staff Member A puts together "hottest girls" list with junior and senior boys | Other teachers and staff; conduct so prevalent students perceived it as normal | ¶¶169-170, 173-174, 178, 255 | None | Both teachers continued employment; conduct escalated with additional victims |
| October 2013 | Alexis Neeley reported to Principal Bruce Russell that she was sexually assaulted by fellow student X. during an off-campus overnight; Christine Glover also reported the incident to Russell; Alexis made specific corrective requests to Athletic Director Jerry Moynihan | Principal Bruce Russell (received report from Glover and from Alexis); Athletic Director Jerry Moynihan (received report directly from Alexis with specific corrective recommendations) | ¶¶84-89, 257-263, 346(j) | Russell: told Alexis "nothing the school could do" off-campus; no investigation; no CPS referral; no law enforcement contact; no counseling; Moynihan: told Alexis she "had more healing to do"; declined to remove X. | X. faced no consequences; Alexis was forced to remain on the cheer team with her assailant; Alexis suffered depression, academic difficulty, and lasting trauma |

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| 2013 | Multiple people complained to Athletic Director Jerry Moynihan about seeing Brynn Marie Larsen and Brooke together | Jerry Moynihan (Athletic Director) | ¶¶63, 130-131, 260, 346(b) | Moynihan had "a discussion with Brynn about boundaries" only; permitted Larsen to continue as assistant coach with full access to Brooke | Larsen's grooming and sexual abuse of Brooke continued throughout the 2013-2014 school year |
| 2013-2014 | Dawn Larsen (mandated reporter, Board health teacher, head varsity coach) observed Brooke and Brynn Marie Larsen sleeping in the same bed and snuggling on the couch in the Larsen home on multiple occasions | Dawn Larsen | ¶¶112, 123, 312, 346(c) | Dawn Larsen never filed a mandated reporter report | Larsen's abuse of Brooke continued; Dawn Larsen was later present when Larsen assaulted Grace in 2018 and again failed to report |
| 2013-2014 | Lee Kournaus (guidance counselor and driver's education teacher) observed Brooke and Larsen together outside school on multiple occasions, including at his own girlfriend's house | Lee Kournaus | ¶¶132(a), 312 | No report made; no inquiry made | Larsen's abuse of Brooke continued through June 2014 |
| May-June 2014 | Police investigation of Larsen's abuse of Brooke; officer spoke with Jerry Moynihan, who confirmed people had complained to him about seeing | Board was or should have been aware of the police investigation; Moynihan confirmed prior complaints to police | ¶¶124-125, 131, 312, 313, 346(d) | No disciplinary action; Larsen not flagged to licensing authorities; no report made to prevent future employment | Larsen hired by Waupaca School District in fall 2014; Board later permitted Larsen to return to Oconto Falls as substitute teacher in 2018 |

87

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| | Larsen and Brooke together | | | | |
| Fall 2014 | Larsen hired by Waupaca School District | Board had opportunity to flag conduct to licensing authorities or Waupaca; failed to do so | ¶¶128-129, 314 | No action | Larsen gained access to new student population; returned to Oconto Falls in 2018 |
| 2012-2015 | Multiple female teachers, including Tania Jersey, K., Bridget Thomas, and others, reported Lucas Cromell's sexual harassment to Principal Hobyan, Superintendent Polashek, and ultimately to the Board of Education directly in June 2015 closed session, with a substantial packet of documentary evidence | Principal Lou Hobyan; Superintendent Polashek (actively suppressed); Board of Education (received evidence directly in closed session) | ¶¶200-214, 264-268, 346(k) | Hobyan: "I had to back my dean"; Polashek: suppressed evidence from reaching Board, threatened complainants with job loss; Board: tabled Cromell's promotion in June 2015 then approved it at a July 2015 summer meeting with minimal public notice | Cromell promoted to Associate Principal; retaliatory non-renewal of Bridget Thomas; all complaining teachers left the District; female students and staff in the District remained unprotected |
| 2016-2017 | Staff Member C proposes S.P. babysit for entire summer (2016); engages in inappropriate social media communications with S.P. while married (2017) | Unknown Board officials | ¶¶181, 238(c) | None | Staff Member C continued employment |
| 2017 | Lucas Cromell propositions S.P. to be his "sugar baby" after her graduation; engages | Unknown Board officials | ¶¶184-185, 238(c) | None | Lucas Cromell later hired at another school without any flag from the Board |

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| | in persistent inappropriate social media communications | | | | |
| March 2018 | Dawn Larsen (mandated reporter, Board employee) present in home when Larsen and Grace are alone in bedroom; makes direct eye contact with Grace as Grace flees the bedroom after being assaulted | Dawn Larsen | ¶¶151, 302 | Dawn Larsen does not report | Larsen's contact with Grace continued |
| Early 2018 (post-incident) | T.F. (Grace's friend) reports Larsen's abuse of Grace to School Resource Officer; SRO speaks with Grace; principal and guidance counselor notified | School Resource Officer; principal; guidance counselor | ¶¶153-155, 158, 300-301, 346(e) | Larsen and Dawn Larsen removed from school; no formal investigation; Grace never formally interviewed; no counseling or support provided | Grace's story "was not taken seriously" and "no one really cared"; Grace blamed by other students for Larsen's departure; no licensing report or flag made against Larsen |
| Approx. 2018-2019 | Gander isolated student (Witness A) in back room on approximately three occasions; engaged in sexual touching and grooming; directed student not to disclose | No report made — Gander instructed student to maintain secrecy | ¶¶191-195, 238(i) | None | Gander remained employed; abuse of Witness A and others continued; Gander arrested twenty years after earliest known victim (M.D., 2005) |
| Approx. 2025 | Liaison officer expresses concern that a teacher's | Board officials | ¶240 | Internal investigation | Pending |

| Date | Report / Observation | Reported To / Who Had Knowledge | Comp. ¶ | Board Response | Consequence of Inaction |
|---|---|---|---|---|---|
| | conduct was crossing the line; internal investigation initiated | | | outcome unknown | |
| December 15, 2025 | Gander arrested on criminal charges for sexual misconduct with five student victims during his employment with the District | Board officials; Superintendent notified | ¶¶189, 196-197, 240, 252, 284, 347 | Gander immediately removed from school and relieved of all responsibilities; Superintendent sent official communication to staff and families | First instance of prompt Board action in response to a report across the entire twenty-year pattern; demonstrates Board always had authority and capability to act swiftly |

# APPENDIX C — MANDATED REPORTER AND SCHOOL OFFICIAL FAILURES TO REPORT

Under Wis. Stat. § 48.981, teachers, school counselors, administrators, and other school personnel are mandated reporters required to immediately report to child protective services or law enforcement any reasonable suspicion of child abuse or neglect, including sexual abuse. Every Board employee listed below had an independent legal obligation to report — the failure of one does not excuse the failure of others.

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| Dawn Larsen | Health Education Teacher; Head Varsity Volleyball & Softball Coach | Yes | Observed Brooke and Brynn Marie Larsen sleeping in the same bed and snuggling on the couch on multiple occasions in the Larsen home | 2013-2014 | ¶¶112, 123, 312, 346(c) | No | Larsen's abuse of Brooke continued; Larsen was never flagged or disciplined; Larsen later returned to Oconto Falls and abused Grace |
| Dawn Larsen | Health Education Teacher; Head Varsity Volleyball & Softball Coach | Yes | Present in the home when Grace fled Larsen's bedroom after being kissed; made direct eye contact with Grace as she fled | March 2018 | ¶¶151, 302 | No | Grace received no support; no formal investigation was triggered; Larsen continued contact with Grace |
| Dawn Larsen | Health Education Teacher; Head Varsity | Yes | Received Amara Calmes's report that she had | Approx. 2013-2016 | ¶¶216-218, 77(b), 346(i) | No — dismissed with "they were probably | No investigation triggered; Staff Member E |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | Volleyball & Softball Coach | | observed Staff Member E alone with a female classmate in the athletic training room in suspicious circumstances; Calmes stated she believed something inappropriate was happening | | | not doing anything" | continued employment; Brianna Kain and other female students remained unprotected; Calmes's report corroborates the Board's broader pattern of mandatory reporters failing to act |
| Jerry Moynihan | Athletic Director | School official with decision-making authority | Received complaints from multiple people about seeing Brynn Marie Larsen and Brooke together; confirmed this to police during 2014 investigation | 2013 | ¶¶63, 130-131, 260, 312, 346(b) | No formal report; responded only with "a discussion with Brynn about boundaries" | Larsen permitted to continue as assistant coach with full access to Brooke; abuse continued through 2014; Larsen never flagged to licensing authorities |
| Jerry Moynihan | Athletic Director | School official with | Received Alexis Neeley's | October 2013 (Alexis); 2013 | ¶¶87-88, 130- | No — told Alexis she | X. remained in activities; |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | decision-making authority | specific requests to remove X. from activities following sexual assault; received complaints about Brynn Marie Larsen and Brooke in same school year | (Larsen/Brooke) | 131, 259-260 | "had more healing to do"; took no action; re: Larsen had only "a discussion with Brynn about boundaries" | Larsen's abuse of Brooke continued; same official failed to act across two separate reports of student sexual misconduct in the same year |
| Lee Kournaus | Guidance Counselor; Driver's Education Teacher | Yes | Observed Brooke and Brynn Marie Larsen together outside of school on numerous occasions, including at his own girlfriend's house | 2013-2014 | ¶¶132(a), 312 | No | Larsen's abuse of Brooke continued without intervention |
| Tracy Tate | Business Education Teacher | Yes | Amanda confided in Tate about her relationship with Heisel; Tate was aware that Amanda spent | 2010-2013 | ¶¶59(a), 59(b), 198-199 | No | Heisel's grooming and abuse of Amanda continued for three years; Amanda was sexually assaulted at |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | extensive time alone with Heisel and parked in the teachers' area for quick access to him | | | | Skills USA in Spring 2012 |
| Christine Glover | Teacher | Yes | Received Amanda's senior paper describing how broken she was and referencing a teacher who shared personal home life details with her; separately reported Alexis Neeley's assault to Principal Russell | 2013 | ¶¶59(c), 84-85, 261-262 | Reported Alexis's assault to Russell; no known report re: Amanda's paper | No investigation triggered as to Heisel; Russell's response to Alexis's assault was inadequate; the school's system permitted individual reports to be made into a structure that then failed to act |
| Bruce Russell | Principal, Oconto Falls High School | Yes | Received Christine Glover's report and Alexis Neeley's direct account of sexual assault by | 2013 (Alexis); 2013 (Amanda's paper); 2010-2013 (Heisel/Amanda); pre-hire (Cromell) | ¶¶59(a), 59(d), 85-86, 258, 261, 266 | No — told Alexis "nothing the school could do"; no CPS referral; no formal investigati | X. faced no consequences; Heisel's abuse of Amanda continued; Cromell was given a full-time District |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | classmate X.; received Amanda Watzka's senior paper describing her relationship with Heisel; observed Amanda and Heisel together; received Cromell conduct concerns from Tania Jersey while Cromell was at the high school | | | on; no report re: Cromell despite receiving concerns; no report re: Heisel | position despite Russell's awareness of concerns |
| Lou Hobyan | Administrator / Principal, Washington Middle School | Yes | Observed Amanda Watzka and David Heisel together in circumstances that should have prompted concern; received repeated complaints from | 2010-2013 (Amanda/Heisel); 2012-2016 (Cromell) | ¶¶59(a), 204, 212 | No known report | Heisel's grooming of Amanda continued; Cromell's harassment of multiple teachers continued without consequence |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | Yes | Bridget Thomas and others about Cromell's sexual harassment; responded to Thomas: "Bridget, I gotta back my Dean of Students" | | | | |
| School Resource Officer | Law Enforcement / School Official | Yes | Received T.F.'s report of Larsen's abuse of Grace; spoke with Grace directly and had her explain what happened | Early 2018 | ¶¶153-154, 300 | Report made to principal and guidance counselor only; no formal investigation followed | No formal investigation; Grace never formally interviewed; Grace received no counseling; story "not taken seriously" |
| Rochelle Vandenlangenberg Otto | Volleyball Staff; Elementary School Teacher | Yes | As a member of the volleyball staff, would have observed Larsen's improper relationship with Brooke | 2013-2014 | ¶132(b) | No known report | Larsen's abuse of Brooke continued without intervention |
| Katie Strelow-Ripley | Volleyball Staff | School employee | As a member of the | 2013-2014 | ¶132(c) | No known report | Larsen's abuse of Brooke |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | volleyball staff, would have observed improprieties in Larsen's relationship with Brooke | | | | continued without intervention |
| Multiple Teachers (Bursa, Paulson, Beschta, Staff Member C, Staff Member A, Gander, Braisers, Carla Nielsen, janitors Bob and John, school secretary) | Various Teaching and Staff Roles | Yes — school teachers and staff, mandated reporters | Observed Amanda and Heisel together in off-hours in his office and classroom on multiple occasions over a three-year period; school secretary permitted Amanda to be signed in with Heisel during non-class hours | 2010-2013 | ¶¶59(a), 59(f), 59(g), 59(h), 59(i), 59(j) | No known reports | Heisel's grooming and abuse of Amanda continued; Amanda was sexually assaulted at Skills USA in Spring 2012 |
| Board of Education | Governing policymaking body for all District schools | Policymaking authority | Received substantial packet of documentary evidence in June 2015 closed session | June-July 2015 | ¶¶205, 264-268, 346(k) | No meaningful action — approved Cromell's promotion to Associate Principal | Cromell promoted; complaining teachers non-renewed or forced out; students and staff |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | directly from Tania Jersey and K. regarding Cromell's sexual harassment and retaliation; community members filled the meeting venue beyond capacity in support of complainants; a Board member personally told Jersey the evidence was credible | | | at summer meeting with minimal notice, weeks after closing session | left unprotected; Board's affirmative promotion of accused harasser with direct evidence of his misconduct is the clearest possible demonstration of institutional deliberate indifference |
| Staff Member B | Teacher | Yes — school teacher, mandated reporter | Engaged in daily self-touching in the presence of students; repeatedly caressed Kayla Kasper's shoulder, arm, and neck at her desk; whispered | Approx. 2009-2011 | ¶¶97-105, 173, 176, 346(l), 349(g) | No report made — Staff Member B was the perpetrator | Staff Member B continued teaching without consequence; Kayla suffered lasting harm and lost educational opportunity across two school |

| Official | Role | Mand. Reporter? | What They Observed or Knew | When | Comp. ¶ | Did They Report? | Outcome |
|---|---|---|---|---|---|---|---|
| | | | to her that she was sexy; made repeated sexual comments about her appearance; offered study materials in exchange for private after-class visit; conduct known throughout the student body | | | | years; Board's culture of inaction left students without a safe or effective reporting mechanism |

# APPENDIX D — FIVE PRINCIPLES OF FEDERAL ACCRUAL IN INSTITUTIONAL SEXUAL ABUSE CASES

## Principle 1: Federal Law Controls Accrual

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| While state law supplies the limitations period, federal law exclusively governs when a federal civil rights claim accrues | "While state law establishes the statute of limitations and any applicable tolling provisions, federal law determines the accrual of her claims." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1375 (N.D. Ill. 1993) |
| Same rule confirmed by the Seventh Circuit for § 1983 and § 1985 claims | "While state law supplies the statute of limitations, federal law governs the accrual of § 1983 and § 1985 claims." | Cielak v. Nicolet Union High School District | 112 F.4th 472, 477 (7th Cir. 2024) |
| Same rule applies to Title IX claims | "Even where the limitations period and related tolling provisions for a federal claim are borrowed from state law, the time for accrual of an action will be a question of federal law." | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *6 (S.D. Ill. 2023) |
| Federal accrual standard: claim accrues when plaintiff knows the fact and cause of injury | "Such claims accrue 'when a plaintiff knows the fact and the cause of an injury.'" | Cielak v. Nicolet Union High School District | 112 F.4th 472, 477 (7th Cir. 2024) |

## Principle 2: Institutional Accrual Is Separate and Later Than Individual Abuser Accrual

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| A claim accrues when plaintiff knows of injury AND its cause — not merely when the wrong occurs | "Accrual is the date on which the statute of limitations begins to run. It is not the date on which the wrong that injures the plaintiff occurs, but the date — often the same, but sometimes later — on which the plaintiff discovers that he has been injured." | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *6 |
| A claim against an institution accrues when plaintiff knows of both the injury and the institutional cause — not when the abuse occurred | "A federal civil rights claim accrues 'when the alleged constitutional violation was complete, and [when the plaintiff] knew of her injury and its cause.'" | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *6 |
| A claim against the abuser and a claim | "I find that Ms. Doe's claim against the School District of Slinger may have accrued | Doe v. Paukstat | 863 F. Supp. 884, |

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| against the institution accrue at different times | after the accrual of her claim against Mr. Paukstat." | | 892 (E.D. Wis. 1994) |
| The institutional claim accrues only when plaintiff discovers the institutional conduct that caused her injury | "Ms. Doe's cause of action against the School District accrued only when she realized … that she was injured by the School District's alleged unconstitutional conduct of promulgating policies that fostered child abuse." | Doe v. Paukstat | 863 F. Supp. 884, 892 (E.D. Wis. 1994) |
| The Monell claim requires both knowledge of injury and knowledge that municipal action was the cause | "Because they proceed under Monell, the statute of limitations does not begin to run until plaintiffs knew or had reason to know both that they were harmed by Johnson and that municipal action caused their harm." | Cielak v. Nicolet Union High School District | 112 F.4th 472, 478 (7th Cir. 2024) |
| Claim against the district accrues when plaintiff learns the district failed to act — not when abuse occurred | "Plaintiff's claim accrued when she learned that the School District injured her, i.e., when Plaintiff learned that the School District failed to act in response to reports about Defendant Mark Richardson's alleged misconduct." | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *9 |
| Title IX deliberate indifference claim against institution does not accrue until plaintiff knows of institution's failure to act | "A Title IX claim for deliberate indifference 'is against a school based on the school's actions or inactions, not the actions of the person who abused the plaintiff.' Therefore, such a claim 'does not accrue until the plaintiff knows or has reason to know that the defendant institution injured them.'" | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *8 |
| Knowledge of abuse alone is not enough to start the institutional clock | "A 'plaintiff's knowledge that he was abused is not enough to start the clock [against the institution].'" | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *9 |

**Principle 3: Concealment of the Institutional Cause May Delay Accrual**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| Where administrators concealed their conduct, plaintiff had no reason to know her constitutional rights had been violated by the institution | "While she may have known she was abused, there is nothing in the complaint to remotely suggest that she knew or should have known of the alleged acts or omissions on the part of defendants. On the contrary, the fourth amended complaint alleges that defendants took action to conceal or cover-up the teacher's sexual misconduct. Under such | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1376 (N.D. Ill. 1993) |

101

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| | alleged circumstances, it is not at all reasonable to expect a minor student to have effectively discovered such efforts by defendants." | | |
| Federal notice must be of governmental harm — not merely of the harm itself | "The cause of which a federal tort claimant must have notice for the statute of limitations to begin to run is the cause that is in the government's control, not a concurrent but independent cause that would not lead anyone to suspect that the government had been responsible for the injury." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1376 |
| A plaintiff experiencing institutional concealment may not have discovered the deliberate indifference that gave rise to the claim until well after it occurred | "Unlike a plaintiff who alleges an institution mishandled her own reports of misconduct, Plaintiff may not have discovered her injury when it occurred. Instead, like the plaintiffs in Snyder-Hill, plaintiff may not have discovered the alleged deliberate indifference that gave rise to her Title IX claim until well after it occurred." | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *9 |
| A plaintiff may have no reason to know of a school's deliberate indifference that gave rise to a heightened-risk claim | "A plaintiff will typically know or have reason to know that a school mishandles their own report of an assault close to the time of the school's inadequate response. The same plaintiff, however, 'may have no reason to know of a school's deliberate indifference that gave rise to their heightened-risk claim.'" | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *9 |
| District actively concealing known abuse by holding perpetrator out as upstanding may prevent accrual | District "turned a blind eye" by choosing not to "document any of these complaints, intervene, investigate, or otherwise act in response to these complaints" while holding Miller out "to be an upstanding teacher" — allegations sufficient to prevent dismissal on limitations grounds | Wolfgram v. Miller | 2023 WL 6388729, at *2, *8 (N.D. Ill. 2023) |

**Principle 4: Accrual Timing Is a Question of Fact — Not Law — at the Pleading Stage**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| The timing of plaintiff's discovery of the institutional | "Thus, the timing of Ms. Doe's second discovery is a question of fact which can only be properly determined by a | Doe v. Paukstat | 863 F. Supp. 884, |

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| cause is a question of fact for the jury | jury. It is not appropriate for me to decide this point on a motion for summary judgment." | | 892 (E.D. Wis. 1994) |
| The question of whether plaintiff knew of institutional injury cannot be resolved at the pleading stage | "Moreover, whether any knowledge Plaintiff possessed regarding the alleged sexual abuse would 'point a reasonable person to inquire as to the District's' liability, is a question of fact that cannot be resolved at the motion-to-dismiss stage." | Greene v. Woodlawn Unit School District #209 | 2023 WL 6216943, at *9 |
| Dismissal on limitations grounds is improper unless the complaint unambiguously establishes all elements of the defense | "Dismissal on statute of limitations grounds 'is appropriate only when the factual allegations in the complaint unambiguously establish all the elements of the defense.'" | Cielak v. Nicolet Union High School District | 112 F.4th 472, 479 (7th Cir. 2024) |
| Dismissal on limitations grounds is "irregular" in the Seventh Circuit because it is an affirmative defense for which defendant bears the burden | "Dismissal under Rule 12(b)(6) based on the statute of limitations is 'irregular' in the Seventh Circuit because it is an affirmative defense for which the defendant bears the burden of proof." | Wolfgram v. Miller | 2023 WL 6388729, at *3 (N.D. Ill. 2023) |

**Principle 5: The Stoneking Framework: Institutional Policy, Climate, and Direct Causation**

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| A school district may be held liable under § 1983 for maintaining a policy or custom of deliberate indifference to known or suspected abuse that fostered a climate of abuse | "She has also alleged that defendants, with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused her constitutional harm." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1379 |
| The policy can be established through inaction, not just affirmative acts; policymakers need not desire abuse — deliberate indifference to an obvious need is sufficient | "It is unnecessary for a plaintiff to claim that there was a policy or custom based upon a desire by policymakers to have students abused. Rather … if the need for more or a different policy is so obvious and the inadequacy so likely to result in a violation of constitutional rights, the policymakers can reasonably be said to have been deliberately indifferent to the need." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1379 |

| Proposition | Quotation | Case | Citation |
|---|---|---|---|
| The Stoneking claim requires: policy/practice/custom; deliberate or reckless indifference; fostered a climate facilitating abuse; directly caused constitutional harm | "To properly plead a cause of action under Stoneking, this court believes a plaintiff must allege the following: (1) that defendants established, through action or inaction, a policy, practice or custom; (2) that such policy, practice or custom was established with deliberate or reckless indifference to the consequences; (3) that such policy, practice or custom fostered a climate which facilitated sexual abuse of minor students by school employees; and (4) that the policy, practice or custom directly caused constitutional harm." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1379 (N.D. Ill. 1993) |
| A Stoneking policy claim survives even where the district concealed abuse and prevented reports from reaching licensing authorities | "Failing to report instances of suspected teacher sexual misconduct against minor students was the practice and standard operating procedure of the school district." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1371 (N.D. Ill. 1993) |
| A plaintiff's claim under Stoneking includes the argument that these policies created a causal relationship between institutional conduct and the constitutional harm to the plaintiff | Plaintiff argued "that these practices, customs or policies created a climate which, at a minimum, facilitated sexual abuse by teachers in general, and that there was a causal relationship between these practices, customs or policies and the repeated sexual assaults against her." | Doe v. Board of Educ. of Hononegah Community High School Dist. No. 207 | 833 F. Supp. 1366, 1379 |

# APPENDIX E — Unwritten Policies, Practices, and Customs

The following is a list of unwritten policies, practices, and customs that caused Plaintiffs' abuse, discovered in 2025 and 2026:

### 1. Failure to Investigate Reports of Teacher-Student Sexual Misconduct
The Board's consistent response to reports about teacher misconduct was no formal investigation — across Heisel, Larsen, Staff Members A, B, C, D, E, and Gander. When complaints were received, the Board either took no action at all or responded with token gestures (e.g., Moynihan's "discussion with Brynn about boundaries"). No investigation was ever opened as a result of any report during the twenty-year pattern. The 2025 removal of Gander upon his arrest demonstrates the Board always had the capability to act, making the prior inaction an affirmative choice.

### 2. Failure to Report Suspected Abuse Under Wisconsin's Mandatory Reporting Law
Wisconsin Statute § 48.981 required every teacher, counselor, coach, and administrator to immediately report reasonable suspicion of child abuse. The FAC identifies at least **nine mandated reporters** who failed to file a single report across the entire twenty-year period: Dawn Larsen (three separate failures), Moynihan, Lee Kournaus, Tracy Tate, Christine Glover (re: Amanda's paper), Bruce Russell, Lou Hobyan, Rochelle Vandenlangenberg Otto, and Katie Strelow-Ripley. The collective, systematic failure of mandated reporters to report — across different incidents, years, and schools — reflects a Board-wide practice of non-reporting that functioned as an institutional custom.

### 3. Failure to Flag, Discipline, or Report Accused Teachers to Licensing Authorities or Other Districts
When teachers or staff were accused, the Board consistently failed to: (a) flag their conduct to licensing authorities; (b) report to law enforcement; or (c) alert other school districts. The clearest consequences of this custom: Brynn Marie Larsen was not flagged after the 2014 police investigation, was hired by Waupaca School District, and returned to Oconto Falls in 2018 to abuse Grace. Lucas Cromell was permitted to leave for another school without any flag. Staff Member F (Cromell) was promoted to Associate Principal — and is now employed as an administrator at another district — rather than being reported or disciplined.

### 4. Retaliation Against Those Who Report
The Board had a practice of protecting accused employees and retaliating against those who complained. Bridget Thomas was non-renewed shortly after she reported Cromell's sexting with a student to Superintendent Hess. Principal Hobyan told Thomas: *"Bridget, I gotta back my Dean of Students. If you want, I'll write you a letter of recommendation, and you can go somewhere else."* All female teachers who complained about Cromell ultimately left the District. The Superintendent accused Thomas of "spreading drama" and told her to "get herself in line." This retaliation against complainants directly deterred other victims and witnesses from coming forward.

### 5. Affirmative Promotion of Accused Perpetrators
Rather than disciplining accused employees, the Board repeatedly promoted them. Cromell was promoted from Dean of Students to Associate Principal after multiple teachers presented documented evidence of his sexual harassment directly to the Board in closed session in June 2015. The Board tabled the promotion at the June meeting — where the community filled the venue beyond capacity in opposition — then approved it quietly at a summer meeting posted only at

school buildings. The FAC characterizes this as "not an oversight or institutional failure. It was an affirmative choice."

## 6. Tolerance of Open, Observable Teacher Misconduct Without Intervention

Staff Member B engaged in daily self-touching at the front of his classroom — so pervasively that the entire student body assigned him a nickname — for at least two consecutive school years. Any teacher or administrator entering or passing his classroom could have observed it. No one intervened. Similarly, Staff Member C rubbed his genitals against the edge of female students' desks during class, approximately twenty times, in front of other students. No school employee reported either teacher. This pattern reflects an institutional custom of tolerating openly visible misconduct as long as no formal report was filed.

## 7. Permitting Teachers to Socialize With and Provide Alcohol to Students

Staff Members A and B — both in their 30s — regularly attended high school parties and provided alcohol to minor students. This conduct was so prevalent that students perceived it as normal. No school official disciplined or reported it. The FAC notes that the wrestling program also facilitated male staff members selecting attractive female students as team "assistants," providing unsupervised access to students through an officially sanctioned activity.

## 8. Failure to Create a Safe Reporting Environment for Students

The Board never created a reporting mechanism that students trusted or felt safe using. Kayla did not report Staff Member B's conduct because she did not believe anyone would act — a belief the FAC characterizes as "consistent with, and reflective of, the Board's pervasive custom and practice." Pecha did not report Gander's conduct because she felt at fault and feared consequences. Alexis reported and was dismissed. The Board's failure to establish any safe, functional, or trusted reporting system was itself an institutional custom that silenced victims.

## 9. Dismissal of Student-on-Student Sexual Assault Reports

The Board's deliberate indifference extended beyond teacher-student abuse to student-on-student assault. When Alexis reported her sexual assault to Principal Russell, she was told the school "could not do anything" because it occurred off-campus — despite the assailant being a fellow student on Alexis's cheer team. No CPS referral, no investigation, no counseling, and no corrective action were taken. The same official, Moynihan, who dismissed her request also dismissed the Larsen/Brooke complaints in the same school year — establishing a personal practice consistent with the broader institutional custom.

## 10. Failure to Comply with Mandatory Reporting Obligations for Student Abuse at Home

Amara Calmes disclosed ongoing sexual abuse at home to at least eight school employees over four years. Only one — Mr. Burish — took any action. The remaining seven, all mandated reporters, failed to file a single report with law enforcement or child protective services. The FAC characterizes this four-year, multi-employee failure as corroborating the Board's broader policy, practice, or custom of failing to ensure compliance with Wisconsin's mandatory reporting laws.

### Summary Table

| # | Unwritten Policy / Custom | Key Evidence |
|---|---|---|
| 1 | No investigation of misconduct reports | 20-year pattern; zero formal investigations; Gander's 2025 removal shows capability existed |

| # | Unwritten Policy / Custom | Key Evidence |
|---|---|---|
| 2 | Systematic failure to file mandatory reports | 9+ mandated reporters; 4 years of Calmes disclosures; no CPS reports filed |
| 3 | No flagging or reporting to licensing/other districts | Larsen returned; Lucas Cromell transferred; Cromell employed elsewhere |
| 4 | Retaliation against complainants | Thomas non-renewed; Hobyan's "I gotta back my Dean" statement; complaining teachers forced out |
| 5 | Promotion of accused perpetrators | Cromell promoted to Associate Principal after Board received direct evidence |
| 6 | Tolerance of open, observable misconduct | Staff Member B's daily self-touching; Staff Member C's desk rubbing; no staff intervention |
| 7 | Permitting staff to socialize with and provide alcohol to students | Staff Members A and B attending student parties with alcohol |
| 8 | No safe reporting system for students | Students universally believed reporting was futile or would cause harm |
| 9 | Dismissal of student-on-student assault reports | Alexis dismissed by Russell and Moynihan; no CPS referral; no investigation |
| 10 | Failure to ensure mandatory reporting compliance for at-home abuse | 7 mandated reporters failed across 4 years of Calmes's disclosures |