Vinesign Document ID: 2FCED646-7E3E-47A4-B070-5B521C16235F

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| AMANDA WATZKA, BROOKE LA COUNT, GRACE WILLIAMS, and BRIANNA KAIN, <br><br> Plaintiffs, <br><br> v. <br><br> THE BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT, <br><br> Defendant. | ) ) ) ) Case No. 26-cv-00392 ) ) ) The Hon. Judge Byron B. Conway ) ) Magistrate Judge Joseph ) ) ) ) ) ) |

## DECLARATION OF TANIA LYNN JERSEY

Pursuant to 28 U.S.C. § 1746, Declarant, Tania Lynn Jersey, hereby declares that the following statements are true and correct based upon personal knowledge and that, if called to testify, I would testify consistently herewith:

1. I am an adult resident of Menominee, Michigan and am competent to testify to the matters set forth herein based on my personal knowledge. I am 50 years old. I was raised in Oconto Falls, Wisconsin, where my father served as high school principal for approximately twenty years. I graduated from Oconto Falls High School and later returned to the community to teach.

2. I was employed as a Special Education Teacher at Washington Middle School, part of the Oconto Falls Public School District, from 2004 through 2015—a period of eleven years. In addition to my primary teaching responsibilities, I served in a number of additional roles within the District, including Special Education State Testing Coordinator-WMS, WMS Special Education Department Head, District New Teacher Mentor, and District Homebound Program Instructor for students who were medically or otherwise unable to attend school in person.

3. The Oconto Falls Public School District included Washington Middle School, Oconto Falls High School, Oconto Falls Elementary School, and Spruce Charter / Elementary, among others. All of these schools fall within the jurisdiction of, and are governed by, the same single Board of Education of Oconto Falls Public School District. During the period described in this Declaration, the District's Superintendent exercised oversight authority over all of these schools, including both Washington Middle School and Oconto Falls High School.

4. During my early years at Washington Middle School, the District was a positive and professionally well-run environment. That culture began to shift when Lucas Cromell entered the District and when Lou Hobyan became principal of Washington Middle School. In my experience, Principal Hobyan operated within what I would describe as a "good old boy" network.

5. Before Cromell was hired at the middle school, he had served as a long-term substitute Spanish teacher at Oconto Falls High School. While at the high school, Cromell received poor reviews and

Signed by Tania Jersey

I approve this document
3/15/2026 6:51 PM UTC

The signed document can be validated at https://app.vinesign.com/Verify

there were reports of inappropriate conduct, including conduct during a school trip abroad to Spain. Those concerns were reported to the high school principal, Bruce Russell, at that time. Despite these reviews and concerns, rather than ending his engagement with the District, Cromell was given a full-time position as the Spanish teacher at Washington Middle School, where I worked.

6. Superintendent Polashek's decision to bring Cromell into the District and to continue supporting him despite concerns about his conduct was, in my view, not based on Cromell's qualifications or fitness for the role. Cromell's father was a retired superintendent who had become close friends with Superintendent Polashek, and it is my belief, based on my observations and knowledge of the circumstances, that Polashek was doing Cromell's father a personal favor by placing and retaining his son in the District. Polashek was aware of Cromell's background, and proceeded to give him increasing access to students and staff regardless.

7. Shortly after Cromell joined Washington Middle School as a full-time teacher, he began making persistent and unwanted sexual advances toward me. I was a married teacher in my thirties with two children. I had no personal or romantic interest in him whatsoever, and I made that clear to him.

8. Cromell repeatedly pressured me to accompany him as a chaperone on an upcoming school trip to Japan, where the District had a sister school. These requests were not professional requests for a colleague; he made clear through his words and demeanor that his interest was in having time alone with me away from the school. When I asked him directly why it was so important that I join the trip, he stated: "I think you and I would have a lot of fun together." This comment, and the way in which he delivered it—including his facial expressions and physical demeanor—made clear to me that his intentions were personal and sexual in nature.

9. I rebuffed his advances each time. At a certain point, I told him directly and unambiguously that I was not interested in him, that he was making me uncomfortable, and that his behavior needed to stop. He eventually ceased approaching me directly but shifted his behavior. During hallway supervision, when I was having professional conversations with a male colleague and longtime friend, Cromell would approach us and make sexually suggestive comments, implying that we were having an inappropriate relationship. When I told my colleague that Cromell's comments were not acceptable and needed to stop, my colleague spoke with Cromell about it. Cromell was largely unresponsive.

10. When Cromell again pressured me to accompany him on a second Japan trip, I again refused, and again told him directly that his conduct constituted harassment and that he needed to stop.

11. During this same period, Cromell was placed in charge of the District's teacher mentorship program. That role gave him access to every new female teacher who entered the District. It is my view, based on what I observed, that Cromell used that position as an opportunity to pursue and harass younger female teachers who were new to the profession and the District, and who were in a vulnerable position given that Cromell held an administrative role over them.

12. I was assigned as a mentor to a new special education teacher—a first-year teacher who was also a recently hired volleyball coach, a dynamic and highly promising young educator whom the District was fortunate to have recruited. I will refer to her herein as "K." K. was in a committed relationship and had no personal interest in Cromell, which she communicated clearly and repeatedly.

Signed by Tania Jersey
*Tania Jersey* I approve this document
3/15/2026 6:51 PM UTC

13. At the District's first mentorship meeting of the year, held at the District office, Cromell approached me and asked about my new mentee. When I told him about K., he stated: "Well, part of your job as her mentor is you're gonna get me a piece of that." He repeated this statement when I asked him to clarify. I was appalled. This occurred after Cromell had already subjected me to the harassment described above.

14. Cromell then began directing persistent, unwanted attention toward K. He contacted her individually and outside the normal mentorship structure, repeatedly asking her to come in on Saturdays for one-on-one meetings. She declined each time, consistently referenced her boyfriend, and did everything a reasonable person would do to signal that she was not interested and that his conduct was not welcome. The more she refused, the more hostile and controlling his behavior became.

15. Because K. and I had missed a mentorship meeting due to legitimate contractual obligations—she had a volleyball practice and I had an IEP meeting—Cromell entered her classroom before a conference we were attending, and began aggressively berating us about our absence, threatening consequences, and behaving in an intimidating and unprofessional manner. I removed K. from the situation and left for the conference. When we arrived and opened our email, Cromell had already sent a message to Principal Hobyan and to us portraying the classroom incident as entirely professional and friendly. This was a deliberate effort to get ahead of any complaint we might make and to preemptively undermine our credibility.

16. I reported Cromell's conduct to Principal Hobyan. Hobyan did nothing. When formal grievance proceedings eventually began, Cromell screamed at us, pointed, and spit during a mediation meeting that Hobyan was supposed to oversee and control as a neutral administrator. After the meeting, when I asked Hobyan why he had allowed the meeting to become so hostile and had failed to maintain order, he stated: "Well, what did you expect me to do? I had to support my dean." I responded: "May I ask who felt obligated to support us?" He had no answer.

17. During this same period, Cromell had also been promoted from Spanish teacher to Dean of Students, filling a vacancy created by a prior administrator's retirement. He did not yet hold his full administrative licensure at the time of the promotion, but was completing his program. That promotion gave him further authority over other staff members, including K. and me, and gave him access to additional students and staff as part of his administrative role.

18. I was also aware, based on my observations and what was reported to me by other staff members, that Cromell was spending inappropriate amounts of time alone with a female middle school student, identified herein as Student A, who had mental health difficulties and a troubled home situation. Staff concerns about this conduct were reported to Principal Hobyan. Hobyan did nothing. Staff members from the District's elementary school also spoke to me personally about concerns they had regarding Cromell's conduct, but said they could not come forward because they feared for their jobs. After the formal grievance proceedings described below, I also learned that other women in the District had experienced similar harassment from Cromell but felt unable to speak out for the same reason.

19. During this same period, Superintendent Polashek took active steps to prevent the information K. and I were raising about Cromell's conduct from reaching the Board of Education. He did not submit our documentation to the Board as required. He worked to undermine our efforts at every

3

Signed by Tania Jersey
3/15/2026 6:51 PM UTC

turn. We were also warned—repeatedly—by those in positions of authority that if we spoke further about what Cromell was doing, we would lose our jobs. K. and I did not have union representation at that time, which left us without institutional support and made the threats more credible and frightening.

20. We eventually secured the opportunity to present our concerns directly to the Board of Education of Oconto Falls Public School District at a Board meeting held in early June 2015. This was the same Board of Education that governs Washington Middle School, Oconto Falls High School, Abrams Elementary, Spruce Elementary, and all other schools within the District. It is the same Board of Education that is named as the Defendant in this proceeding. Superintendent Polashek was present. Incoming Superintendent Dean Hess was also present, in the beginning stages of his transition into the role.

21. The Board meeting was an extraordinary community event. The District office had no available standing room; community members filled the main meeting area, the kitchenette, the hallways, and the entryway. They were not there because of Superintendent Polashek's retirement. They were there because of what was happening to K. and me, and because of broader concerns about the District's leadership. Multiple community members spoke to the Board on our behalf, making clear that something was seriously wrong and urging the Board to ask hard questions.

22. On the agenda for that meeting was a motion to promote Cromell from Dean of Students to Associate Principal. He had by that time completed his administrative licensure. I asked the Board to table that motion until they had heard what we had to say in closed session. The Board agreed to do so, and the motion to promote Cromell was tabled. Superintendent Polashek and Cromell were both furious.

23. During the closed session, K. and I, along with a another individual who attended as our representative and spoke to our character and professionalism, presented our accounts to the Board. I also submitted a substantial packet of documentation—emails, descriptions of incidents, and other evidence—corroborating the pattern of Cromell's sexual harassment and retaliatory conduct. At every turn, Superintendent Polashek and Board President Ron Leja interrupted, questioned our credibility, and attempted to portray us as overreacting and fabricating our accounts. Principal Hobyan, who was also present, was visibly unwilling to support Cromell but equally unwilling to fully support us, and made only a brief and cowardly statement before falling silent for the remainder of the session. No one came to Cromell's defense during that session except Superintendent Polashek and Board President Leja—the very two individuals who were supposed to be neutral participants.

24. After the closed session, a Board member called me personally while I was waiting in the parking lot. She told me that the Board would not be approving Cromell's promotion to Associate Principal at that time, and that there was more work to be done. She stated, in substance: "Nobody submits this amount of documentation if this isn't real, if this isn't happening." This was meaningful to me, and to K., and we felt it was a measure of closure. Both K. and I had already accepted jobs in other districts by that point, knowing that we could not remain in the District given what had occurred.

25. That closure proved short-lived. Shortly after the June 2015 Board meeting, and without adequate public notice, Superintendent Polashek—in the final days of his tenure—arranged for a separate Board meeting in July 2015, during summer when school was not in session. Meeting

notices were posted only at school buildings, which virtually no one would see during summer break. Someone in the community learned of the meeting and its agenda, which included a motion to approve Cromell's promotion to Associate Principal. The motion was approved at that meeting by the Board. The Board of Education of Oconto Falls Public School District—the same Board of Education that is the Defendant in this proceeding, and that also governed Oconto Falls High School—approved Lucas Cromell's promotion to Associate Principal, over all of the objections that K. and I had presented in closed session just weeks earlier.

26. I was not surprised when I later learned that following his promotion, Cromell retaliated against teachers who had complained about him, including a teacher named Bridget Thomas, whom I understand had also reported Cromell's conduct and was eventually non-renewed. Cromell was given the green light by the Board's promotion. That is what happens when an institution promotes an abuser rather than acts on the evidence presented to it.

27. Upon learning about this lawsuit, I was not surprised. I know Amanda Watzka's mother. I watched these young women grow up. I had no knowledge of what was being done to them by teachers at Oconto Falls High School while it was happening. What I do know, and what I am prepared to testify to, is that the Board of Education of Oconto Falls Public School District — the very same Board that governed their high school, and mine and K.'s middle school — received direct, documented, evidence-backed reports that an employee of the District was engaging in sexual harassment and predatory conduct toward female staff and toward a student, and the Board's response was to promote him. When the women in the District who were being harassed tried to speak up, they were threatened, undermined, and silenced by the District's superintendent, with the Board's acquiescence. That is the institution these women were entrusting with their safety and their education.

30. Further Declarant sayeth not.

    I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed on this _____ 03/15/2026 _____, 2026.

_Signed by Tania Jersey_
I approve this document
3/15/2026 6:51 PM UTC

Tania Lynn Jersey