**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF WISCONSIN**

---

**AMANDA WATZKA, et al.,**

**Plaintiffs,**

**v.** **Case No. 26-CV-392**

**THE BOARD OF EDUCATION OF OCONTO FALLS PUBLIC SCHOOL DISTRICT,**

**Defendant.**

---

## DECISION AND ORDER

---

### 1. Background

Amanda Watzka, Brooke La Count, Grace Williams, Kayla Kasper, D.P., and Jesse Kasal allege that the Board of Education of Oconto Falls Public School District has a long history of failing to properly address sexual misconduct. In an expansive third amended complaint that includes allegations spanning decades (ECF No. 29), all plaintiffs except minor D.P. allege discrimination under Title IX, 20 U.S.C. § 1681(a), (Count 1, Watzka; Count 2, Williams; Count 3, La Count; Count 5, Kasper; Count 6, Kasal). All plaintiffs allege retaliation under Title IX (Count 7) and under 42 U.S.C. § 1983, that the defendant violated their right to bodily integrity, as recognized under the Due Process Clause of the Fourteenth Amendment (Count 8). An additional plaintiff voluntarily dismissed her claims. (ECF Nos. 53, 54.)

The Board has moved to dismiss the third amended complaint. (ECF No. 32.) The only details that are properly before the court are the plaintiffs' allegations. Although they are merely allegations that neither the defendant nor the individuals accused of wrongdoing have had an opportunity to challenge, at this stage courts assume that plaintiffs will eventually be able to prove at trial all that they allege. Acting on that presumption, the court considers whether those allegations add up to a plausible claim for relief.

**2. Motion to Dismiss**

A complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court accepts the well-pleaded facts as true and draws all reasonable inferences in favor of the plaintiff. *Ruiz v. Pritzker*, 162 F.4th 886, 889 (7th Cir. 2025).

**3. Supplemental Declarations**

In support of their four separate complaints, the plaintiffs filed 17 declarations from 16 individuals. (*See* Tania Jersey (ECF No. 7-1); Bridget Thomas (ECF No. 7-2) Madison Pecha (ECF No. 7-3) Amara Calmes (ECF No. 7-4); Brianne Carriveau (ECF No. 16 at 1-11); Rebecca Doan (ECF No. 16 at 20-21); Sam Schletty (ECF No. 16 at 22); Jennifer Allen (ECF No. 16 at 14-15); Nicole Coopman (ECF No. 16 at 16-19); Jen McLeod (ECF No. 16 at 12-13); Jesse Kasal (ECF No. 37); Brooke La Count (ECF No.

38); Alexis Neeley (ECF No. 39); Destiny Rabe (ECF No. 40); Eric Sypowicz (ECF No. 41); Michelle Schiltz (ECF Nos. 42, 43).)

While there is a role for declarations to support a pleading, a complaint is the place for the plaintiffs' allegations. Proffering allegations in a declaration is not a best practice, but it is not always improper. Two common ways that a court may properly consider declarations in opposition to a motion to dismiss are when the plaintiff refers to the declarations in the complaint, *Menominee Indian Tribe v. Thompson*, 161 F.3d 449, 456 (7th Cir. 1998); *Earle v. Manchester Vill. Owners Ass'n Inc.*, No. 24-CV-1633, 2025 U.S. Dist. LEXIS 130098, at *13-14 (E.D. Wis. July 9, 2025), or the declarations elaborate on and are consistent with the allegations in the complaint, *Geinosky v. City of Chi.*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

The defendant has moved to strike the declarations the plaintiffs submitted in support of their response to the defendant's motion to dismiss. (*See* ECF No. 44 (regarding Jesse Kasal (ECF No. 37); Brooke La Count (ECF No. 38); Alexis Neeley (ECF No. 39); Destiny Rabe (ECF No. 40); Eric Sypowicz (ECF No. 41); Michelle Schiltz (ECF Nos. 42, 43).) Contrary to the defendant's representation (ECF No. 44 at 3), two of the declarations are referenced in the third amended complaint (Sypowicz (ECF No. 29, ¶ 30); McLeod (ECF No. 29, ¶ 66).) The plaintiffs also reference the previously filed declarations of Neeley (ECF No. 29, ¶ 28) and Doan (ECF No. 29, ¶ 29) in their third amended complaint. Thus, the declarations of Rebecca Doan (ECF No. 16 at 20-21), Jen McLeod (ECF No. 16 at 12-13), Alexis Neeley (ECF No. 39), and Eric Sypowicz (ECF No. 41) are properly before the court.

However, the plaintiffs' third amended complaint makes no reference to eight of the previously filed declarations (*see* Tania Jersey (ECF No. 7-1); Bridget Thomas (ECF No. 7-2) Madison Pecha (ECF No. 7-3) Amara Calmes (ECF No. 7-4); Brianne Carriveau (ECF No. 16 at 1-11); Sam Schletty (ECF No. 16 at 22); Jennifer Allen (ECF No. 16 at 14-15); Nicole Coopman (ECF No. 16 at 16-19)) or the five subsequently filed declarations (*see* Jesse Kasal (ECF No. 37); Brooke La Count (ECF No. 38); Destiny Rabe (ECF No. 40); Michelle Schiltz (ECF Nos. 42, 43)). These declarations are appropriately before the court only insofar as they merely elaborate on the allegations in the third amended complaint. *See Geinosky*, 675 F.3d at 745 n.1.

The elaboration exception, however, has no place with respect to declarations submitted prior to the operative complaint. If plaintiffs amend their complaint after recognizing that their allegations require elaboration, it is incumbent upon the plaintiffs to include those allegations in the amended complaint. Details set forth in a previously filed declaration that is not referenced in the amended complaint are not properly before the court. Thus, the court disregards the declarations of Tania Jersey (ECF No. 7-1), Bridget Thomas (ECF No. 7-2), Madison Pecha (ECF No. 7-3), Amara Calmes (ECF No. 7-4), Brianne Carriveau (ECF No. 16 at 1-11), Sam Schletty (ECF No. 16 at 22), Jennifer Allen (ECF No. 16 at 14-15), and Nicole Coopman (ECF No. 16 at 16-19). With respect to these individuals, the court considers only the details contained in the third amended complaint.

As for the declarations filed in conjunction with the plaintiffs' response to the defendant's motion to dismiss (but not referenced in the third amended complaint)

the declarations of Jesse Kasal (ECF No. 37), Brooke La Count (ECF No. 38), Destiny Rabe (ECF No. 40), and Michelle Schiltz (ECF Nos. 42, 43) are properly before the court but only insofar as they merely elaborate on the allegations in the third amended complaint. Accordingly, the court will deny the defendant's motion to strike. (ECF No. 44.)

Similarly, because the plaintiffs refer to law enforcement's investigation of Brynn Larsen in the third amended complaint, the court may consider police officer Jamie Kuhn's report regarding that investigation. (*See* ECF No. 27-1.)

## 4. Applicable Law

### 4.1. Title IX Discrimination

Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*, provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Discrimination under Title IX may include sexual misconduct by teachers towards students. However, not every manner or degree of sexual misconduct is actionable under Title IX. "[T]he misconduct in question must be 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *C.S. v. Madison Metro. Sch. Dist.*, 34 F.4th 536, 542 (7th Cir. 2022) (quoting *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). Even objectively inappropriate

conduct might not give rise to liability under Title IX if it is not sufficiently severe to effectively deprive the student of educational benefits.

In many areas of the law, an employer is strictly liable for the torts of its employee. This principle, referred to as *respondeat superior*, does not apply to claims under Title IX. *Doe v. St. Francis Sch. Dist.*, 694 F.3d 869, 871 (7th Cir. 2012) (citing *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998)). Schools, school boards, or districts are not liable simply because a teacher sexually harasses or assaults a student. Rather, a recipient of federal funding is liable under Title IX only for its own acts.

A former student has standing to bring a claim under Title IX for discrimination that occurred while a student. A plaintiff who is no longer enrolled lacks standing to seek prospective relief, but a former student can seek compensatory damages for having been denied the benefits of or been subject to discrimination under any educational program or activity of a funding recipient. *See Parker v. Franklin Cty. Cmty. Sch. Corp.*, 667 F.3d 910, 915 (7th Cir. 2012); *Eilenfeldt v. United C.U.S.D. #304 Bd. of Educ.*, No. 12-4029, 2012 U.S. Dist. LEXIS 203072, at *6 (C.D. Ill. Aug. 24, 2012); 20 U.S.C. § 1681(a).

#### 4.1.1. Actual Notice and Deliberate Indifference

"[A] victim of such discrimination may recover money damages from her school only where 'an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct.'" *C.S.*, 34 F.4th at 540 (quoting

*Gebser*, 524 U.S. at 277). "This two-pronged standard—requiring both actual notice and deliberate indifference—is difficult to meet …." *Id.* "Deliberate indifference requires more than negligence or even gross negligence …." *Whitfield v. Spiller*, 76 F.4th 698, 714 (7th Cir. 2023). It "amounts to a standard of criminal recklessness." *Id.*

#### 4.1.2. Pre-Assault Official Policy

Some courts have recognized an alternative theory by which a school may be liable for discrimination perpetrated by third parties. Courts have referred to it by various names, but the court will call it a pre-assault official policy theory. Neither the Supreme Court nor the Court of Appeals for the Seventh Circuit has directly considered this theory of liability.

The theory emerges from the Supreme Court's acknowledgement in *Gebser v. Lago Vista Independent School District*, that in addition to instances where a school was deliberately indifferent to known discrimination, schools are liable for an "official policy" that constitutes discrimination under Title IX. *See Simpson v. Univ. of Colo. Boulder*, 500 F.3d 1170, 1176 (10th Cir. 2007) (quoting *Gebser*, 524 U.S. at 290). Moreover, in concluding that a school is liable for failing to remedy sex discrimination only if its response reflected deliberate indifference, the Court drew parallels to an action under 42 U.S.C. § 1983. *Gebser*, 524 U.S. at 290-91. Courts subsequently built on this foundation to conclude that Title IX recognized a theory of liability similar to that which the Court recognized in *Monell* under § 1983. *See Simpson*, 500 F.3d at 1177-78 (discussing *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 694 (1978)).

At least the Tenth, Ninth, and Sixth Circuit Courts of Appeals have accepted variations of the theory, as have a handful of district courts within the Seventh Circuit. *Doe v. Metro. Gov't & Davidson Cty.*, 35 F.4th 459, 465 (6th Cir. 2022); *Karasek v. Regents of the Univ. of Cal.*, 956 F.3d 1093 (9th Cir. 2020); *Simpson*, 500 F.3d 1170 (10th Cir. 2007); *Kane v. Loyola Univ. of Chi.*, No. 22 CV 6476, 2024 U.S. Dist. LEXIS 47120, at *15 (N.D. Ill. Mar. 18, 2024) (citing *Doe A v. Plainfield Cmty. Consol. Sch. Dist. 202*, No. 21 C 4460, 2023 U.S. Dist. LEXIS 39616, 2023 WL 2428870, at *7 (N.D. Ill. Mar. 9, 2023); *Vander Pas v. Bd. of Regents of Univ. of Wis. Sys.*, No. 21 C 1148, 2022 U.S. Dist. LEXIS 90084, 2022 WL 1597423, at *5 (E.D. Wis. May 19, 2022); *Reed v. S. Ill. Univ.*, No. 18 C 1968, 2020 U.S. Dist. LEXIS 101359, 2020 WL 3077186, at *7 (S.D. Ill. June 10, 2020)).

As articulated by the court in *Karasek*,

> a pre-assault claim should survive a motion to dismiss if the plaintiff plausibly alleges that (1) a school maintained a policy of deliberate indifference to reports of sexual misconduct, (2) which created a heightened risk of sexual harassment that was known or obvious (3) in a context subject to the school's control, and (4) as a result, the plaintiff suffered harassment that was 'so severe, pervasive, and objectively offensive that it can be said to [have] deprive[d] the [plaintiff] of access to the educational opportunities or benefits provided by the school.

*Karasek*, 956 F.3d at 1112 (quoting *Davis*, 526 U.S. at 650) (footnote omitted; brackets in original).

The court agrees that a pre-assault official policy claim is cognizable under Title IX. However, the court finds that this theory is perhaps somewhat narrower than that which the court recognized in *Karasek*.

Central to Title IX is that a funding recipient is liable only for its own intentional sex discrimination. *Davis*, 526 U.S. at 650. Ordinarily, an institution like a school receiving federal funds acts through its official policies. Thus, when an official policy discriminates on the basis of sex, the school is liable. *See, e.g.*, *Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1047-48 (7th Cir. 2017). It was this sort of official policy discrimination to which the Court was referring in *Gebser v. Lago Vista Independent School District.*, 524 U.S. at 290, when it noted that a school is liable under Title IX for an "official policy of the recipient entity," *cf. Jauquet v. Green Bay Area Catholic Educ., Inc.*, 996 F.3d 802, 807 (7th Cir. 2021) (discussing the distinction between claims of "direct" and "indirect" discrimination). The Court was not holding that a school may be liable for official policies that, while not discriminatory in themselves, nonetheless led to discrimination by a teacher or student.

This is in contrast to claims under 42 U.S.C. § 1983, the statute that acts as the vehicle for plaintiffs to bring claims that a government employee or municipality violated their constitutional rights. Under § 1983, there are circumstances whereby a municipality may be liable if its policy leads to an employee violating the plaintiff's constitutional rights, even if the policy was not itself unconstitutional. *See City of Canton v. Harris*, 489 U.S. 378, 392 (1989). An example would be a municipality that has a policy to not train its police officers on the constitutional limits of arrests, searches, or use of force—all matters police officers are certain to encounter in their employment.

Title IX differs from § 1983 in material respects. One important distinction is in the text of the statutes. Under § 1983 a "person" (which includes a municipality) is liable not only if it violates a person's constitutional rights but also if it "causes" a person "to be subjected" to a violation of the Constitution. 42 U.S.C. § 1983. This language readily translates into holding municipalities liable for policies that lead to their employees violating persons' constitutional rights. *See Monell*, 436 U.S. at 692.

Title IX lacks comparably broad language. Thus, while there are reasons to look to § 1983 caselaw for parallels regarding the scope and application of Title IX, *see, e.g.*, *Gebser*, 524 U.S. at 290-91 (pointing to § 1983 to support conclusion that a claim under Title IX required proof of deliberate indifference), the specific theories of causation and liability recognized in cases such as *Monell* or *Canton* do not directly extend to Title IX.

To put this distinction in context, consider the extreme examples of a school that has a policy to not investigate any report of sex discrimination or a school that has a policy to punish any student reporting sex discrimination. Such policies reflect a total lack of concern with sex discrimination of students despite the likelihood that students may experience such discrimination. Either policy would both embolden perpetrators and deter victims from seeking redress. Yet ironically, if a school was liable under Title IX for third-party sex discrimination only after notice and a refusal to intervene, the deliberate indifference reflected in both policies would lead to the absurd result of insulating schools from liability by deterring the requisite reports.

Less extreme informal policies may similarly exhibit deliberate indifference to sex discrimination while emboldening perpetrators and deterring reporting. Thus, the court accepts that a school's policy of deliberate indifference to sex discrimination may violate Title IX. Such policies violate Title IX not because they are otherwise nondiscriminatory policies that cause a person to be subject to discrimination but because they are themselves discriminatory.

However, the Ninth Circuit's articulation of the pre-assault theory may be seen as being in some tension with the Seventh Circuit's *en banc* decision in *C.S. v. Madison Metropolitan School District*, 34 F.4th 536 (7th Cir. 2022). Specifically, an element of the Ninth Circuit's pre-assault claim is that the policy of deliberate indifference "created a heightened risk of sexual harassment that was known or obvious." *Karasek*, 956 F.3d at 1112. The court in *C.S.*, however, disavowed all of its prior suggestions that a mere appreciation of risk of sex discrimination and a failure to act in light of that risk will give rise to a school district's liability under Title IX. Granted, the court in *C.S.* was not discussing the pre-assault theory. Nonetheless, it underscored that "Title IX does not permit institutional liability based solely on knowledge of the risk of future misconduct." *C.S.*, 34 F.4th at 540.

It is unclear whether the court in *Karasek* was referring to the heightened risk of sexual harassment as an attribute of the school's policy or the nature of the relationship necessary between the policy and the plaintiff's injury. If the former, a policy that amounted to deliberate indifference to sex discrimination will presumably always create a heightened risk of sex discrimination. After all, deliberate

indifference is commonly defined in reference to indifference to a known risk. *See, e.g.*, *Calderone v. City of Chi.*, 979 F.3d 1156, 1163 (7th Cir. 2020). In which case, the creation of a heightened risk of sexual harassment is superfluous in that it is subsumed into the deliberate indifference required under the first element. If the latter, it cannot survive in this circuit in light of *C.S.* because the court held that merely creating a heightened risk that a student will suffer sex discrimination is not itself discriminatory.

Thus, the court declines to adopt the "heightened risk" element of a pre-assault theory. Rather, a plaintiff must be able to prove a legally sufficient causal connection between the policy and the third party's conduct. As the Court noted in *Davis*, "If a funding recipient does not engage in harassment directly, it may not be liable for damages unless its deliberate indifference 'subjects' its students to harassment. That is, the deliberate indifference must, at a minimum, 'cause [students] to undergo' harassment or 'make them liable or vulnerable' to it." 526 U.S. at 644-45 (citing Random House Dictionary of the English Language 1415 (1966); Webster's Third New International Dictionary of the English Language 2275 (1961)).

In sum, for a funding recipient to be liable under the pre-assault official policy theory, it must have maintained a policy (whether formal or informal) of deliberate indifference to sex discrimination. That policy must then have caused a student to suffer discrimination by a third party. For the third-party conduct to constitute discrimination under Title IX it must have been so severe, pervasive, and objectively offensive that it deprived the student of access to educational opportunities or

benefits provided by the funding recipient. *Cf. Davis*, 526 U.S. at 644-45; *C.S.*, 34 F.4th at 540; *Karasek*, 956 F.3d at 1112.

Because the funding recipient's liability arises from its own conduct this framework is consistent with the various limitations that exist for actions arising under statutes enacted under the spending clause. *See, e.g.*, *Gebser*, 524 U.S. at 288, ("Congress did not intend to allow recovery in damages where liability rests solely on principles of vicarious liability or constructive notice."). The funding recipient is not vicariously liable for the actions of a third party. Rather, the third party's conduct and the resulting damages are merely the manifestation and consequence of the school's own discrimination.

To ensure that the pre-assault official policy theory does not become a form of vicarious liability, courts must scrupulously and narrowly apply this exception to the ordinary requirement that a school is liable under Title IX only for discrimination it knows about and fails to address. A plaintiff must plausibly allege both the existence of a policy that constituted sex discrimination under Title IX and a causal connection between that policy and the alleged injury.

### 4.2. Title IX Retaliation

In addition to direct discrimination, Title IX prohibits a funding recipient from retaliating against a person who engages in statutorily protected activity. *Burton v. Bd. of Regents*, 851 F.3d 690, 695 (7th Cir. 2017) (citing *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173-74 (2005)). Retaliation for exercising rights protected by

the statute is simply another form of proscribed discrimination. *Jackson*, 544 U.S. at 176-77.

To sustain a retaliation claim, plaintiffs must show that (1) they engaged in activity protected under Title IX; (2) the defendant took a materially adverse action against the plaintiffs; and (3) but for the protected activity the defendant would not have taken the materially adverse action. *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 857 (7th Cir. 2019). Speaking out against sex discrimination or encouraging others to do so is activity protected under Title IX. *Conviser v. DePaul Univ.*, 532 F. Supp. 3d 581, 595 (N.D. Ill. 2021).

A materially adverse action does not include "petty slights or minor annoyances." *Burton*, 851 F.3d at 696 (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). For an action to be materially adverse it must be an action that would dissuade a reasonable person from engaging in protected activity. *Id.* This may include actions that, while "not in and of themselves materially adverse, such as unfulfilled threats," would nonetheless dissuade a reasonable person from protected conduct. *Id.* at 697. Aside from direct evidence connecting the protected activity and the adverse action, circumstantial evidence such as suspicious timing and disparate treatment of similarly situated persons may suggest a causal connection between the protected activity and the adverse action. *Conviser*, 532 F. Supp. 3d at 596 (quoting *Milligan v. Bd. of Trs. of S. Ill. Univ.*, 686 F.3d 378, 388-89 (7th Cir. 2012)).

A plaintiff, however, must have standing to bring a retaliation claim. *Conviser*, 532 F. Supp. 3d at 588 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)). Although the board here does not dispute that the plaintiffs have standing to pursue retaliation claims (ECF No. 33 at 18), the court nonetheless addresses the question pursuant to its independent obligation to police its own jurisdiction. *See Albert v. Oshkosh Corp.*, 47 F.4th 570, 577 (7th Cir. 2022).

In assessing what is required for a plaintiff to have standing, the court starts with the text of the statute. Title IX states that, subject to exceptions not relevant here, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance …." 20 U.S.C. § 1681(a). This language could be read as suggesting that to have standing, at the time of the alleged violation, the plaintiff must have been entitled to participate in or receive benefits of an education program or activity receiving federal funds. *Conviser*, 532 F. Supp. 3d at 588-93. Thus, an outside advocate who complains of discrimination at a funding recipient does not have standing to bring a Title IX claim if the recipient retaliates against the individual. *Rossley v. Drake Univ.*, 958 F.3d 679, 685 (8th Cir. 2020).

The plaintiffs, however, are not mere outside advocates. They are former students with standing to seek compensation for having previously allegedly been "subjected to discrimination under any education program or activity receiving Federal financial assistance."

While only a current student can seek prospective relief, as to both current and former students, the remedy for past discrimination is compensatory damages. *See Parker*, 667 F.3d at 915 (noting that, although a former student's claim for injunctive relief becomes moot upon graduation, a claim for compensatory damages remains alive). Compensatory damages act to remedy the past denial of an educational program or benefit. *Cf. Doe v. Loyola Univ. Chi.*, 100 F.4th 910, 912 (7th Cir. 2024) (discussing compensatory damages under Title IX). A funding recipient that impermissibly deters a current or former student from seeking compensatory relief is denying the student the benefit of the program or activity; compensatory damages take the place of the actual benefit. Construed in this light, retaliation that deters former students from seeking redress for past discrimination is proscribed by Title IX.

### 4.3. The Fourteenth Amendment and the Right to Bodily Integrity

Sexual assault by a person acting under color of state law violates "the right to bodily integrity protected by the Fourteenth Amendment Due Process Clause." *Hess v. Garcia*, 72 F.4th 753, 756 (7th Cir. 2023). There is no such thing as a "constitutional" sexual assault; any manner or degree of sexual assault violates due process. *Id.* at 756, 767. Thus, cases such as *Decker v. Tinnel*, No. 2:04-CV-227, 2005 U.S. Dist. LEXIS 38559 (N.D. Ind. Dec. 20, 2005), on which the defendant relies, where the court found that allegations that a police officer touched a teenage ride-a-long's breasts without consent (as well as touched her inner thigh and repeatedly

kissed her) did not rise to the level of a constitutional violation, cannot be said to be consistent with current Seventh Circuit law.

However, this is not to say that all unwanted contact, *Hwang v. Bd. of Educ. for Oak Park & River Forest High Sch. Dist. 200*, No. 24-cv-8939, 2025 U.S. Dist. LEXIS 165620, at *14 (N.D. Ill. Aug. 26, 2025), or even unwanted contact that might carry a sexualized connotation, *Nagle v. McKernan*, No. 07 C 680, 2007 U.S. Dist. LEXIS 73139, at *6 (N.D. Ill. Sep. 28, 2007), violates the Constitution. Short of sexual assault, the contact must rise to the level of a "serious physical assault" to violate due process. *O'Callaghan v. Univ. of Ill. at Chi.*, No. 19 C 6271, 2025 U.S. Dist. LEXIS 27086, at *51 (N.D. Ill. Feb. 14, 2025) (quoting *Wudtke v. Davel*, 128 F.3d 1057, 1063 (7th Cir. 1997)). It must be the sort of action that "shocks the conscience of federal judges." *Hess*, 72 F.4th at 765 (brackets and internal quotation marks omitted (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992))).

### 4.4. Section 1983 and *Monell*

Section 1983 of Title 42 of the United States Code authorizes persons to bring suit against a person who, under color of state law, subjects or causes a person to be subjected to deprivation of rights protected by the Constitution. 42 U.S.C. § 1983. "In *Monell*, the Supreme Court held that municipalities—such as school districts—are 'person[s]' who may be sued under § 1983." *Thomas v. Neenah Joint Sch. Dist.*, 74 F.4th 521, 523 (7th Cir. 2023) (citing *Monell*, 436 U.S. at 690). "Municipalities may

be sued only for their own violations of federal law, however, and cannot be held vicariously liable for the constitutional torts of their employees." *Id.*

> For a *Monell* claim to survive a motion to dismiss, a plaintiff must plead facts that plausibly suggest that: (1) she was deprived of a constitutional right; (2) the deprivation can be traced to some municipal action (i.e., a policy or custom), such that the challenged conduct is properly attributable to the municipality itself; (3) the policy or custom demonstrates municipal fault, i.e., deliberate indifference; and (4) the municipal action was the moving force behind the federal-rights violation.

*Id.* at 524 (internal quotation marks omitted).

A plausible allegation of the deprivation of a constitutional right is the first step in any § 1983 claim. Absent it, a *Monell* claim necessarily fails. *First Midwest Bank v. City of Chi.*, 988 F.3d 978, 987 (7th Cir. 2021)

As to the municipal action requirement, *Monell* liability arises in three ways: "(1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority." *Thomas*, 74 F.4th at 524 (quoting *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019)). The second theory is perhaps the most common. "To succeed on that theory, [a plaintiff] must allege facts permitting a reasonable inference 'that the practice is widespread and that the specific violations complained of were not isolated incidents.'" *Id.* (quoting *Gill v. City of Milwaukee*, 850 F.3d 335, 344 (7th Cir. 2017)). "Allegations of 'a few sporadic examples of an improper behavior' will not suffice." *Id.* (quoting *Flores v. City of South Bend*, 997 F.3d 725, 733 (7th Cir. 2021)).

When the municipality did not directly violate the person's rights, the plaintiff must satisfy a "rigorous standard of culpability" lest the municipality be improperly held liable for the actions of its employee rather than its own actions. *First Midwest Bank*, 988 F.3d at 986-87 (quoting *Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997)). "It is not sufficient for local government liability for a plaintiff to establish a custom which only lower-level employees are aware of and practice. Rather, some awareness or approval of the custom on the part of the local government or its high-ranking officials is necessary to make the custom *official*." 2 Nahmod, Civil Rights & Civil Liberties Litigation: The Law of Section 1983 § 6:10 (emphasis in original). This "municipal fault" element requires the plaintiff to prove that the municipality acted with deliberate indifference to the plaintiff's constitutional rights. *First Midwest Bank*, 988 F.3d at 987 (quoting *Brown*, 520 U.S. at 405). "This is a high bar. Negligence or even gross negligence on the part of the municipality is not enough." *Id*. There must be deliberate action by the municipality. *Johnson v. Cook Cty.*, 526 F. App'x 692, 695 (7th Cir. 2013) (unpublished) (quoting *Brown*, 520 U.S. at 400). It requires a plaintiff to prove "that it was obvious that the municipality's action would lead to constitutional violations and that the municipality consciously disregarded those consequences." *First Midwest Bank*, 988 F.3d at 987.

Finally, the plaintiff must prove that there was "a 'direct causal link' between the challenged municipal action and the violation of his constitutional rights." *First Midwest Bank*, 988 F.3d at 987 (citing *Brown*, 520 U.S. at 404). The policy must be the "moving force" behind the plaintiff's injury. *Brown*, 520 U.S. at 400 (quoting

*Monell*, 436 U.S. at 694). That the policy was a "contributing factor" is insufficient. *Johnson*, 526 F. App'x at 696.

"These requirements—policy or custom, municipal fault, and 'moving force' causation—must be scrupulously applied in every case alleging municipal liability." *First Midwest Bank*, 988 F.3d at 987.

**4.5. Statute of Limitations**

Because the plaintiffs' alleged injuries arose in Wisconsin, claims under both Title IX and § 1983 are subject to the limitation contained in Wis. Stat. § 893.53. *Eaton v. Carrol*, 827 F. Supp. 3d 1084, 1089 (E.D. Wis. 2026); *Strong v. St. Peter-Immanuel Lutheran Church*, No. 24-cv-0823-bhl, 2025 U.S. Dist. LEXIS 13627, at *7 (E.D. Wis. Jan. 27, 2025). The statute initially imposed a six-year deadline but effective April 5, 2018, the legislature shortened that deadline to three years. 2017 Wis. Act 235, § 26.

Although the court applies state law to determine the statute of limitations, a federal court applies federal law to determine when a § 1983 or Title IX claim accrues. *Cielak v. Nicolet Union High Sch. Dist.*, 112 F.4th 472, 477 (7th Cir. 2024) (citing *McDonough v. Smith*, 588 U.S. 109, 115 (2019)); *Huber v. Anderson*, 909 F.3d 201, 207 (7th Cir. 2018). Federal law "instructs that accrual occurs when 'the plaintiff has a complete and present cause of action, that is, when the plaintiff can file suit and obtain relief.'" *Huber*, 909 F.3d at 207 (internal quotation marks and ellipses omitted) (quoting *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). Specifically, "[a] §1983 claim accrues when the plaintiff knows or should have known that his constitutional rights

have been violated." *Afolayan v. Briggs*, No. 24-cv-1287-pp, 2026 U.S. Dist. LEXIS 126942, at *4-5 (E.D. Wis. June 9, 2026) (quoting *Kelly v. City of Chi.*, 4 F.3d 509, 511 (7th Cir. 1993)).

A *Monell* claim does not accrue until plaintiffs knew or had reason to know both that they suffered a constitutional injury and that the municipal action caused that harm. *Cielak*, 112 F.4th at 477-78. The court finds that the same principle applies to a pre-assault official policy claim under Title IX. Thus, a Title IX pre-assault official policy claim does not accrue until the plaintiff knows or has reason to know that the defendant had a policy of deliberate indifference. *Czerwienski v. Harvard Univ.*, 666 F. Supp. 3d 49, 80 (D. Mass. 2023) (quoting *Karasek v. Regents of the Univ. of Cal.*, 500 F. Supp. 3d 967, 981 (N.D. Cal. 2020)).

As to any claim that accrued when the plaintiff was a minor, the statute of limitations did not begin to run until the plaintiff became an adult. Wis. Stat. § 893.16(1). "Dismissal on statute of limitations grounds is proper on a motion to dismiss only when a plaintiff's allegations clearly establish that the claims are untimely." *Cielak*, 112 F.4th at 477.

## 5. Analysis

### 5.1. Amanda Watzka

Watzka alleges that tech education teacher David Heisel groomed her over three years and sexually assaulted her in 2012. (ECF No. 29, ¶¶ 2, 34-38.) She alleges that administrators observed her and Heisel "together in off-hours in his office and classroom on multiple occasions over three years." (ECF No. 29, ¶ 38.) She also alleges

that she "had confided in teacher Tracy Tate about her relationship with Heisel." (ECF No. 29, ¶ 38.)

#### 5.1.1. Title IX and Notice

Watzka does not plausibly allege that any administrator knew of the alleged sexual abuse. Administrators' alleged observation of Watzka and Heisel together during off-hours does not support the inference of abuse. *See Smith v. Metro. Sch. Dist. Perry Twp.*, 128 F.3d 1014, 1035-36 (7th Cir. 1997) (Coffey, J., concurring); *Doe v. Tippecanoe Sch. Corp.*, No. 4:15-CV-00056, 2017 U.S. Dist. LEXIS 205608, at *28 (N.D. Ind. Dec. 14, 2017). While administrators cannot put their heads in the sand, they are not required to investigate everything that could potentially hint at misconduct. *Doe v. Galster*, 768 F.3d 611, 617-18 (7th Cir. 2014).

Watzka contends that in *Davis v. Joliet Township High School District 204 Board of Education*, No. 24 CV 1701, 2025 U.S. Dist. LEXIS 230560, at *12 (N.D. Ill. Nov. 24, 2025), the court found that administrators seeing the plaintiff and the perpetrator in her office with the door locked and the blinds drawn was sufficient to plausibly allege that administrators knew of the abuse. (ECF No. 36 at 20.) However, in *Davis*, the plaintiff alleged substantially more. Teachers complained to administrators about the perpetrator frequently calling the plaintiff out of class to visit him in her office, and they witnessed students tease the plaintiff about his "affair" with the perpetrator and having "sex" with the perpetrator in her office. *Davis*, 2025 U.S. Dist. LEXIS 230560, at *12. The plaintiff's mother even reported

one incident to the school. *Id.* It was this combination of circumstances that made it plausible that administrators knew of the abuse.

The only staff member to whom Watzka ever allegedly disclosed the abuse was a teacher. What she disclosed and when is ambiguous. She alleges only that she "had confided in teacher Tracy Tate about her relationship with Heisel." (ECF No. 29, ¶ 38.) The board would be liable only for discrimination that occurred after the board learned of it. Therefore, drawing all reasonable inferences in favor of Watzka, the court presumes that, during the period that the abuse was ongoing, Watzka disclosed to Tate that Heisel was sexually abusing her.

However, there is no hint that the teacher was plausibly an official who had authority to implement corrective measures on the board's behalf. *See Gebser*, 524 U.S. at 277 ("We conclude that damages may not be recovered in those circumstances unless an official of the school district who at a minimum has authority to institute corrective measures on the district's behalf has actual notice of, and is deliberately indifferent to, the teacher's misconduct."). Nor can the court infer that the teacher, upon learning of the abuse, then disclosed it to an administrator with corrective authority. While teachers are required to report suspected sexual abuse, Wis. Stat. § 48.981(2)(a), they are required to make such reports to law enforcement or child protective services, not school administrators.

Even if the court could say that Watzka plausibly alleged that the teacher to whom she confided the abuse was an official with corrective authority, or that administrators' observation of her and Heisel together added up to knowledge of the

abuse, it would not advance her claim. Rather, it would mean that her Title IX claim is untimely. Watzka does not allege, for example, that it was only within the past three years that she learned that an administrator knew of Heisel's alleged abuse. Rather, she alleges that a teacher learned of the abuse because she disclosed it. Consequently, for more than a decade she knew both the fact of her injury and the basis for the board's liability, *i.e.*, its failure to take appropriate action upon learning of the abuse. *Cf. Cielak*, 112 F.4th at 478.

Thus, Watzka has failed to plausibly allege that an administrator knew of Heisel's alleged sexual abuse. But even if the court could accept that Watzka's alleged disclosure to a teacher was sufficient to constitute notice to the board, it would mean that her claim is untimely.

**5.1.2. Title IX and Pre-Assault Official Policy**

To render her Title IX claim timely Watzka must rely on a pre-assault official policy theory, and to do so she must thread a needle. She must plausibly allege that the policy existed when she was abused (and thus it caused her injuries) but must also allege that she did not learn of the policy until within three years of filing her complaint (and thus her complaint is timely).

Watzka alleges that there existed an "institutional culture of deliberate indifference fostered by the Board." (ECF No. 36 at 22; *see also, e.g.*, ECF No. 29, ¶¶ 1, 14, 15.)

Watzka's allegations leave significant doubt as to whether she will ultimately be able to prove that, at the time she was allegedly assaulted, the board maintained

a de facto policy of deliberate indifference to teachers' sexual assault of students. As to many of the incidents that Watzka alleges the board failed to investigate, there is no allegation that any administrator knew of the misconduct. Other actions (or inactions), at best, reflect negligence and do not suggest a policy of deliberate indifference. Some are not readily connected to the plaintiffs' allegations. The highest profile and most relevant incident was perhaps the board's decision to promote Lucas Cromell to Associate Principal despite teachers alleging he engaged in sexually inappropriate conduct with coworkers and students. (ECF No. 29, ¶ 68.)

Even the decision to promote Cromell, whether considered in isolation or in conjunction with all other relevant circumstances, does not necessarily suggest that the board had a policy of deliberate indifference to sexual misconduct, much less sexual assault, by staff toward students. Title IX does not require schools to blacklist professionals based on any accusation of sexual misconduct. Schools retain significant flexibility in how to address claims of discrimination. *See Galster*, 768 F.3d at 619 (citing *Davis*, 526 U.S. at 643).

There is then the question of causation. It is not enough that the board had a policy and Watzka was injured. Again, under Title IX an institution is liable only for its own conduct and not the conduct of its employees. Thus, Watzka must plausibly plead and eventually be able to prove that the policy caused her injury. Watzka does not allege, for example, that Heisel knew that the board had a policy of deliberate indifference to teachers sexually abusing students and thus was emboldened to abuse

Watzka or that Watzka, aware of such a policy, was subjectively deterred from reporting Heisel's abuse.

The board, however, argues only that a pre-assault official policy claim is not viable under Title IX. (ECF No. 46 at 7-9.) It does not alternatively argue that, if the theory is viable, the plaintiffs have failed to state a claim. Accordingly, the issues identified above are not properly before the court. Similarly, because Watzka explicitly alleged that she did not know of the alleged policy until 2025 (*see, e.g.*, ECF No. 29, ¶¶ 1, 15, 16), whether her claim accrued earlier is not a question the court can resolve at the motion to dismiss stage. Therefore, Watzka may proceed with a Title IX claim under a pre-assault official policy theory.

**5.1.3. Section 1983**

A constitutional claim under § 1983 and *Monell* is broader than a pre-assault official policy theory under Title IX in that the plaintiff need not allege that the policy or custom was itself unlawful. *See Canton*, 489 U.S. at 392. However, a bodily integrity claim under the Fourteenth Amendment is narrower than a Title IX discrimination claim because it does not proscribe mere sexual discrimination.

The defendant argues that, although Watzka alleges that Heisel "sexually assaulted" her, this is a mere conclusion; she must allege specific facts to support that allegation. (ECF No. 33 at 32.) This is a curious argument because the defendant simultaneously acknowledges that immediately before stating that Heisel sexually assaulted her, she describes in some detail exactly what allegedly occurred: "He inserted himself between her legs, removed her top, groped her breasts, and kissed

her repeatedly. Heisel unbuttoned her belt and pulled her pants down around her ankles. He stood between her legs with his erection felt against her body, his own belt unbuckled and pants unzipped. He sexually assaulted her during this incident." (ECF No. 29, ¶ 36.) Even if the last sentence is intended to suggest that additional assaultive conduct occurred and was not merely a conclusion as to the nature of the prior described conduct, the details she provides readily add up to sexual assault. *See* Wis. Stat. §§ 939.22(19); 940.225(3m), (5)(b); 948.095(2). An allegation of a single incident of sexual assault by an actor under color of state law is sufficient to state a due process claim. The defendant's arguments focusing on the severity and duration of the sexual assault (ECF No. 33 at 32) do not reflect current Seventh Circuit law.

The defendant argues that the alleged policy identified by the plaintiffs—the board's deliberate indifference to sexual misconduct—is too broad. (ECF No. 33 at 23.) A wide variety of conduct could be characterized as sexual misconduct, much of which would not constitute a violation of the constitutional right to bodily integrity.

A plaintiff does not adequately plead the existence of a municipal policy or custom by defining a policy at a high level of generality. In much the same way that care must be taken in the qualified immunity context "not to define clearly established law at too high a level of generality," *City of Tahlequah v. Bond*, 595 U.S. 9, 12 (2021), plaintiffs may not satisfy *Monell* by cobbling together incidents that share only a superficial relationship, *see Terry v. Cty. of Milwaukee*, No. 17-CV-1112-JPS, 2018 U.S. Dist. LEXIS 93298, at *29 (E.D. Wis. June 4, 2018) (rejecting alleged "practice of ignoring medical needs" as overbroad and "stray[ing] too close to being

the functional equivalent of *respondeat superior*"); *Armour v. Country Club Hills*, No. 11 C 5029, 2014 U.S. Dist. LEXIS 1849, at *23 (N.D. Ill. Jan. 8, 2014). A plaintiff could not, for example, point to a collection of disparate incidents and claim that a municipality has a custom or practice of violating the Constitution. The appropriate level of generality will depend on the nature of the claim. In multi-plaintiff cases, the appropriate level of generality is not necessarily the level at which there is a common thread that ties all the plaintiffs together. Each plaintiff must identify an appropriate policy or custom that allegedly caused his or her injury.

In the third amended complaint, the plaintiffs allege that the requisite policy is evidenced by the board's:

> (1) failure to investigate reports of teacher-student sexual misconduct; (2) systematic failure to file mandatory reports under Wis. Stat. § 48.981; (3) failure to flag, discipline, or report accused teachers to licensing authorities or other districts; (4) retaliation against those who report; (5) affirmative promotion of accused perpetrators; (6) tolerance of open, observable teacher misconduct without intervention; (7) permitting staff to socialize with and provide alcohol to students; (8) failure to create a safe reporting environment for students; (9) dismissal of student-on-student sexual assault reports; (10) failure to ensure mandatory reporting compliance for at-home student abuse; (11) public discrediting of student reporters and warning against future reports; and (12) failure to designate child victims following disclosure.

(ECF No. 29, ¶ 125.)

They sum this up as:

> This Defendant has maintained a pervasive unwritten policy, practice, and custom of deliberate indifference to sexual misconduct in all its forms—whether perpetrated by teachers against students, by students against other students, or by staff against staff—that deprived Plaintiffs of their constitutional rights to bodily integrity and personal security under the Fourteenth Amendment, under which reports were dismissed rather than investigated, perpetrators were protected rather than

disciplined, and those who came forward were silenced, discredited, penalized, or threatened rather than supported.

(ECF No. 29, ¶ 125.)

However, in response to the defendant's motion to dismiss, the plaintiffs articulate a more concise alleged policy: "Every incident in the [third amended complaint] and in the supporting declarations involves a teacher or coach exploiting institutional authority to commit sexual misconduct against a student. Every incident produced the same institutional response: inaction, concealment, or promotion." (ECF No. 36 at 39.) Or later stated as: "when a teacher or coach sexually abuses a student, the Board's response is inaction, concealment, or promotion of the perpetrator such that sexual abuse is allowed to flourish, with the outcome that staff is taught they can do it with impunity." (ECF No. 36 at 41.)

Instances in the late 1980s where two basketball coaches had sexual relationships with players (ECF No. 26 at 39-40) are too far removed to be relevant or probative of any board policy that allegedly existed more than 20 years later when Watzka was allegedly sexually assaulted. *See Thomas*, 74 F.4th at 524 (discounting a prior incident in part because it occurred four years earlier). Concurrent or in close proximity to Heisel's alleged sexual assault of Watzka in 2012, the plaintiffs point to allegations of Gayle Gander's two decades of massaging of drama students, Marc Kinziger's self-touching and his unwanted physical contact with Kayla Kasper, and Lucas Cromell's sexual harassment of staff members, sexual communications with students, and eventual promotion.

For purposes of § 1983 and *Monell*, defining the relevant policy as deliberate indifference to sexual misconduct proceeds at too high of a level of generality, particularly because mere sexual misconduct does not necessarily constitute a constitutional violation. *See Abeyta by & Through Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255-56 (10th Cir. 1996). Sexual assault is misconduct of an entirely different degree from the broad swath of actions that might come under the heading of sexual misconduct. Indeed, it was precisely because sexual assault is inherently different that the Seventh Circuit held that any sexual assault violates the right to bodily integrity. *Hess*, 72 F.4th at 756, 767.

Consider a police department with a track record of its officers misusing pepper spray. While both the misuse of pepper spray and an unjustified shooting would be excessive force, a plaintiff who was shot by a police officer could not point to abuse of pepper spray as proof that his injury was caused by a department policy of excessive force. The conduct, while all falling under the broad heading of excessive force, is too dissimilar in terms of degree. Similarly, evidence that a school board failed to respond appropriately to instances of sexual misconduct is insufficient to prove that the board had a policy of deliberate indifference to sexual assaults of students by teachers. Granted, evidence of a municipality mishandling instances of sexual misconduct may ultimately be relevant to proving whether there existed a policy of deliberate indifference to sexual assault of students by teachers. It is only that instances of sexual misconduct, standing alone, cannot establish the existence of a policy

regarding sexual assault. Significantly, none of the incidents that occurred around the time of Heisel's alleged sexual assault of Watzka involved sexual assault.

Moreover, Watzka has failed to plausibly allege that administrators knew of the alleged incidents of sexual misconduct. Proof of administrative actual or constructive knowledge is essential to a *Monell* claim under the widespread practice theory because conduct that officials do not know about cannot reflect an official policy of the municipality. *See Billings v. Madison Metro. Sch. Dist.*, 259 F.3d 807, 818 (7th Cir. 2001). Consequently, Watzka has failed to plausibly allege that the board had a policy or custom of deliberate indifference to teachers sexually assaulting students or engaging in other sexual misconduct that amounted to a violation of due process.

Additionally, Watzka has failed to plausibly allege that any policy or custom caused the alleged violation of her constitutional right to bodily integrity. For example, she does not allege that Heisel subjectively knew of any policy or custom of the district such that it motivated his actions. Nor does Watzka allege that she knew of a policy or custom and it deterred her from reporting the abuse to administrators (and presumably ending it sooner). While there may be other theories by which a policy may give rise to a board's liability for a student's bodily integrity claim, for present purposes it is sufficient that Watzka has plausibly alleged none. Accordingly, the court will grant the defendant's motion to dismiss Watzka's § 1983 claim.

### 5.2. Brooke La Count

La Count alleges that in August 2013, when she was 15 years old, assistant volleyball coach Brynn Larsen began sending her Snapchat messages that included photos of Larsen nude. (ECF No. 29, ¶ 53.) Larsen pressured La Count to send nude photos in return. (ECF No. 29, ¶ 53.) When they first met in person, they engaged in "sexual activity" in the backseat of Larsen's SUV. (ECF No. 29, ¶ 53.) By the autumn of 2013, La Count and Larsen would sleep in the same bed. Larsen would sleep nude, play pornography on her television, and attempt to engage La Count in "sexual acts." (ECF No. 29, ¶ 53.)

"In 2013, a report was made to Athletic Director Jerry Moynihan about Brynn Marie Larsen's improper conduct with [La Count]." (ECF No. 29, ¶ 54.) In response, Moynihan had a discussion with Larsen about "boundaries." (ECF No. 29, ¶ 54.) In May and June of 2014, acting on a report from a person who wished to remain anonymous, police investigated the relationship between Larsen and La Count. (ECF Nos. 27-1; 29, ¶ 54.) As part of the investigation, La Count acknowledged a close friendship with Larsen, disclosed sharing a bed, but denied any sexual activity. (ECF No. 27-1 at 3.) Larsen likewise confirmed their friendship and denied any sexual activity. (ECF No. 27-1 at 4.) The investigating officer shared the information about the extent of the friendship and the sleepovers with the high school principal. (ECF No. 27-1 at 4.)

#### 5.2.1. Title IX and Notice

Unlike Watzka, La Count alleges that an administrator had contemporaneous knowledge of a relationship between her and Larsen. The extent of the athletic director's knowledge, however, is unclear. La Count alleges only that Moynihan learned of "improper conduct." Sleepovers and socializing between a 15-year-old student and a 24-year-old teacher and coach may be characterized as improper conduct that would merit a conversation about "boundaries," but would not reflect sex discrimination under Title IX.

La Count argues that an administrator who receives a report of "improper conduct" involving a student and a coach has an obligation to investigate further and thus the athletic director's response evidences deliberate indifference to sex discrimination. (ECF No. 36 at 22.)

Without an allegation that the athletic director received information that La Count and Larsen were engaged in a sexual relationship, reminding Larsen of the need to maintain appropriate boundaries with student athletes was not plausibly deliberately indifferent. Even if the court could conclude that the athletic director should have investigated further, there is nothing to suggest that any failure to investigate injured La Count. Notably, when questioned about the relationship both denied any sexual conduct. La Count has failed to state a Title IX claim on a theory that the board had notice of the discrimination and was deliberately indifferent.

#### 5.2.2. Title IX and Pre-Assault Official Policy

However, for the same reasons set forth above with respect to Watzka's claim, La Count may proceed with her Title IX claim on a pre-assault official policy theory.

#### 5.2.3. Section 1983

La Count's § 1983 claim fails for largely the same reasons discussed with respect to Watzka's claim. Although La Count is ambiguous by referring merely to "sexual acts" (ECF No. 29, ¶ 53) it is nonetheless reasonable to infer that these acts constituted sexual assault. *See* Wis. Stat. §§ 939.22(19); 948.01(5); 948.02(2).

However, La Count does not plausibly allege a basis for the board to be liable under *Monell*. Although Heisel's alleged sexual assault of Watzka allegedly predated Larsen's alleged sexual assault of La Count, there is no evidence that any administrator knew of Heisel's actions. Consequently, the allegations regarding Heisel do not suggest that the board had a policy of deliberate indifference to sexual assault of students by satff. The court will grant the defendant's motion to dismiss La Count's § 1983 claim.

### 5.3. Grace Williams

Williams alleges that four years after Larsen's abuse of La Count, in 2018, when Williams was 17 years old, Larsen invited her to Larsen's home and "began making out with her." (ECF No. 29, ¶¶ 4, 23. 56-58.) Williams reported the incident to a friend, and her friend reported it to a school resource officer. (ECF No. 29, ¶ 57.) "Despite reports to [the police officer], the principal, and the guidance counselor, the

Board conducted no formal investigation, never formally interviewed Grace, and provided no emotional support or counseling." (ECF No. 29, ¶ 57.)

### 5.3.1. Title IX and Notice

Williams does not plausibly allege that the school resource officer—a police officer employed by the local police department and assigned by that department to handle matters arising in the schools—was a district administrator or that the officer's actions can be imputed to the board. In fact, given the nature of police investigations, there may be circumstances where a school resource officer may learn details related to activities in the school and be unable to share those details with school administrators.

As for the principal, it is unclear specifically what Williams alleges the principal knew. But insofar as Williams is relying on the principal's knowledge to state a claim under Title IX, there are at least two problems. First, that would mean that Williams's claim would appear to be untimely, having accrued in 2018. Second, Williams does not allege that any further discrimination occurred after the principal became aware of the allegation. Indeed, Williams alleges that Larsen was no longer a substitute teacher at the school. (ECF No. 29, ¶ 57.) Except under the pre-assault official policy theory, Title IX does not require schools to stop discrimination before it occurs but rather to end it once they become aware of it. That is what Williams alleges happened when the principal learned of her allegations against Larsen.

That Larsen was allowed to teach and coach despite the athletic director's prior knowledge of Larsen's alleged "improper conduct" does not plausibly suggest that the

board was deliberately indifferent to sex discrimination by Larsen. There is nothing to suggest that the athletic director knew or should have known that Larsen engaged in any conduct that constituted sex discrimination under Title IX. Indeed, while Williams points to the 2014 police investigation as evidence that the board should not have allowed Larsen to continue to teach and coach, the police investigation revealed only that an unusually close friendship existed between a coach and a player. Larsen and La Count both denied any sort of sexual relationship. Consequently, Williams has failed to plausibly allege that the board knew of any sex discrimination against Williams and was deliberately indifferent.

**5.3.2. Title IX and Pre-Assault Official Policy**

However, for the same reasons set forth above with respect to Watzka's claim, Williams may proceed with her Title IX claim on a pre-assault official policy theory.

**5.3.3. Section 1983**

Fundamental to a § 1983 claim under *Monell* is that there must be an underlying constitutional violation. Williams alleges that Larsen's actions constituted a violation of the right to bodily integrity. While the court appreciates the inclination to resort to euphemism and vagaries when discussing sensitive matters of sex and sexual assault, details are often needed to state a plausible claim for relief. A term such as "making out" is inherently ambiguous. Nonetheless, reading the allegations in the light most favorable to the plaintiffs, the court accepts that "making out" may connote some degree of sexual contact, as that term is defined under

Wisconsin law. *See* Wis. Stat. § 948.01(5). Therefore, the allegations plausibly constitute sexual assault by a school staff person. *See* Wis. Stat. § 948.095.

However, Williams has failed to plausibly allege that the constitutional violation was the result of a custom or policy of the board. The board had no knowledge that Larsen had allegedly sexually assaulted any other student. Although the board knew that Larsen had an unusually close relationship with a prior student, both denied that the relationship was sexual. Nor is there any evidence that the board knew of any relevant prior instance of a teacher sexually assaulting a student. Consequently, Williams has failed to plausibly allege that any constitutional violation she suffered was the result of any policy or custom of the board. Accordingly, the court will grant the defendant's motion to dismiss Williams's § 1983 claim.

**5.4. Kayla Kasper**

Kasper alleges that prior to her graduation in 2012, she was subject to years of sexual misconduct by teacher Marc Kinziger and sex-based favoritism by teacher Christian Dory. (ECF No. 29, ¶¶ 6, 25.) She alleges that Kinziger "regularly stood at the front of the class and touched himself in his pocket during lectures, on a daily basis, across two consecutive school years." (ECF No. 29, ¶ 48.) She also alleges that he would caress her shoulder, arm, and on occasion said she was "pretty" or "sexy" and comment on how good her body looked. (ECF No. 29, ¶ 49.) She also complains that her English teacher, Christian Dory, "granted her special privileges, gave her unwarranted favorable grades, and permitted her to refuse class exercises he did not

similarly excuse for other students." (ECF No. 29, ¶ 50.) She never reported Kinziger or Dory, believing that no one would act on her report. (ECF No. 29, ¶ 51.)

#### 5.4.1. Title IX and Notice

Kasper does not plausibly allege that the board was aware of the sexual harassment she experienced. To the contrary, she expressly states that she did not report these incidents. Consequently, she has failed to state a Title IX claim on the theory that the board had notice and was deliberately indifferent.

#### 5.4.2. Title IX and Pre-Assault Official Policy

However, for the same reasons set forth above with respect to Watzka's claim, Kasper may proceed with her Title IX claim on a pre-assault official policy theory.

#### 5.4.3. Section 1983

Kasper's allegations do not plausibly constitute a violation of the Fourteenth Amendment right to bodily integrity. No incident allegedly constituted sexual assault. While the alleged conduct of Kinziger and Dory is certainly inappropriate, it was not allegedly otherwise of a sufficient severity, intrusiveness, or duration to plausibly violate the Constitution. Even if the conduct could be construed as such, Kasper has also failed to plausibly allege that any alleged injury she sustained was the result of any policy or custom of the board. Accordingly, the court will grant the board's motion to dismiss Kasper's § 1983 claim.

### 5.5. Jesse Kasal

Kasal was allegedly subject to repeated massages by drama teacher Gayle Gander in his junior and senior years. (ECF No. 29, ¶¶ 7, 59-64.) Gander allegedly

repeatedly removed Kasal's shirt and massaged him, focusing on sensitive areas such as his nipples and navel. (ECF No. 29, ¶¶ 7, 60.) Gander would remove Kasal's socks and massage his feet, and Gander on multiple occasions attempted to move his hands below Kasal's waistline, but Kasal stopped him. (ECF No. 29, ¶ 60.) In his senior year, these incidents increased in frequency, "occurring approximately twenty to thirty-five times," often following Gander removing Kasal from study hall under the pretext of working on drama productions. (ECF No. 29, ¶ 61.) Kasal did not report this conduct. (ECF No. 29, ¶ 62.)

**5.5.1. Title IX and Notice**

Kasal alleges that in 2025 he learned that the board failed to act on reports of Gander having engaged in similar conduct. (ECF Nos. 29, ¶ 63; 36 at 25.) However, the only allegations that he offers to support his contention that the board had actual or constructive knowledge of Gander's conduct are that three other students were allegedly subject to similar conduct. (ECF No. 29, ¶ 105.) He does not allege that any of those students disclosed the incidents to school administrators. It is also unclear whether these other incidents occurred before or after those involving Kasal. Although Kasal alleges that Gander subjected him to massages in his junior and senior years, he does not allege when this was or what year he graduated. Thus, not

only is it unclear how the other allegations relate to Kasal's allegations, it is unclear if Kasal's claim is timely.

In any event, allegations that Gander subjected other students to similar actions do not plausibly suggest that the school had actual or constructive knowledge of Gander's conduct. Consequently, Kasal has failed to state a claim on this theory.

#### 5.5.2. Title IX and Pre-Assault Official Policy

However, for the same reasons set forth above with respect to Watzka's claim, Kasal may proceed with his Title IX claim on a pre-assault official policy theory.

#### 5.5.3. Section 1983

Kasal's allegations plausibly constitute a violation of the constitutional right to bodily integrity because they constitute sexual assault. *See* Wis. Stat. §§ 939.22(19); 948.01(5); 948.095(2); *State v. Forster*, 2003 WI App 29, ¶15, 260 Wis. 2d 149, 659 N.W.2d 144. However, Kasal has failed to plausibly allege that Gander's conduct was the result of any policy or custom of the school board. Consequently, the court will grant the board's motion to dismiss Kasal's § 1983 claim.

### 5.6. D.P.

D.P. alleges that "Jeffrey Trochil, a physical education teacher at the middle school, entered the girls' locker room without permission on multiple occasions, touched female students on their thighs during stretches, made sexualized comments, required girls to perform exercises bending over in front of him while he watched, and stared at girls during activities." (ECF No. 29, ¶ 72.) D.P. also alleges

that she received shoulder massages from Gayle Gander. (ECF No. 29, ¶¶ 69, 73, 122.)

Brianne Carriveau reported D.P.'s concerns about Trochil to school administrators who responded by saying that D.P. was being "dramatic." (ECF No. 29, ¶ 72.) Other parents reported similar concerns and had their claims either dismissed or received no response. (ECF No. 29, ¶ 72.)

This led Carriveau to post D.P.'s allegations regarding Trochil on a Facebook page for Oconto Falls parents in January 2023. (ECF No. 29, ¶ 72.) The post generated hundreds of comments and led to the board issuing a statement:

> The following is provided as an update concerning the Oconto Falls School District's investigation concerning the contents of a series of social media posts from the last weekend of January. These posts accused a member of the school district staff of inappropriate conduct involving students. After a thorough investigation by district administration and consultation with the Board of Education, the conclusion of the investigation is that there is no evidence supporting any allegation of any inappropriate conduct, nor is there any evidence to support the assertion that the school administration failed to address prior reports of such concerns. No students have been at any time relative to this situation at any risk and there is no reason to believe any present threat exists to the safety of any students.
>
> This investigation was initiated by a social media posting of conclusory statements regarding a staff member's inappropriate conduct. The District values all school staff and wish to remind all that public accusations such as those made in this situation, pose significant threat to the staff member's professional and personal well-being, as well as that of their family members, and creates unnecessary and unjustified concern on the part of all students and parents. The District greatly values and appreciates the community's interest and encourages students or parents with information of potential concerns to please contact a member of the school administration so that the concerns may be investigated. Respectfully consider the potential impact on a person wrongly accused of such conduct before making allegations on a social

> media platform or another public forum. The District's administrative officials will immediately investigate any concerns brought forward regarding student safety in particular, just as was the case in this instance.

(ECF No. 29-1.)

D.P. alleges that this statement by the board dismissed and discredited her. Thus, when she "was subsequently subjected to physical abuse by drama teacher Gayle Gander [she was] was scared to speak up because of the District's prior public shaming." (ECF No. 29, ¶ 8; *see also id.*, ¶¶ 69, 72.) She alleges that the board violated her Fourteenth Amendment right to bodily integrity and retaliated against her in violation of Title IX. (ECF No. 29, ¶ 18.)

A teacher subjecting a student to unwanted shoulder massages is offensive and inappropriate. However, it does not constitute sexual assault. Nor does it rise to the level of shocking the conscience so as to violate the Fourteenth Amendment right to bodily integrity. *See, e.g.*, *Lillard v. Shelby Cty. Bd. of Educ.*, 76 F.3d 716, 726 (6th Cir. 1996) (holding that a teacher rubbing student's stomach while making suggestive comments was not a constitutional violation). Consequently, the court must grant the board's motion to dismiss D.P.'s bodily integrity claim under § 1983. Because the underlying conduct does not plausibly violate due process, it is unnecessary for the court to consider whether the conduct was the result of a policy or custom of the board.

### 5.7. Title IX Retaliation

All plaintiffs allege that the statement that the board issued following the filing of the second amended complaint in this action amounted to retaliation under Title IX. (ECF No. 29, ¶ 111.) "[A] group of internet posters began making personally

attacking posts directed at Plaintiffs and their counsel. Plaintiffs believe, after a reasonable opportunity for discovery, that these posts will be connected to the District." (ECF No. 29, ¶ 115.) The plaintiffs also refer to a statement the board made on February 17, 2023, but they do not allege that the prior statement constituted retaliation. (ECF No. 29, ¶ 118.)

The public is used to institutions issuing what can be generally characterized as "we cannot comment on pending litigation" statements. And for good reason; comments on litigation can give rise to adverse evidence or additional claims. The defendant instead sent the following to all parents in the district:

> To the Oconto Falls School District Community:
>
> The Oconto Falls School District Board of Education has been carefully watching the developments in the lawsuit filed against the District. Out of respect for the plaintiffs who were actually victimized by the misconduct of individuals, the Board has not directly commented on many of the allegations in the complaint. At this time, the Board feels obligated to communicate to our community regarding these continuously evolving allegations.
>
> The Board asks the Oconto Falls School District community to understand that merely because an attorney makes allegations in a complaint, does not mean all of those allegations are factually accurate. Additionally, one must consider the reputation of the attorney making those allegations. A Google search reveals just how this Chicago attorney licensed by the Illinois State Bar tends to practice. Significant aspects of the filings in this matter reflect consistency with this attorney's practices.
>
> The Board also wishes to reassure the community that even prior to the filing of this complaint we have been actively reviewing and conducting investigations concerning the allegations raised in these court filings. The allegations contained in these filings are either allegations that have never been previously communicated to any school official, or that have been previously investigated and either resulted in corrective action or found to lack merit. It will continue to be this Board's

> insistence that any allegations of misconduct be reviewed and fairly investigated. The Board will continue to demand that when an investigation establishes wrongdoing, swift and decisive action be taken in both employment decisions and referrals to law enforcement.
>
> We want to reiterate our support for those who have been victimized. In the future the Board hopes that any concerns be brought to the District or to law enforcement as soon as possible. We will continue efforts to provide a safe and nurturing educational environment for all of our students. We also want to express appreciation for the District staff who have maintained their professionalism and commitment to student achievement. We continue to celebrate the many outstanding staff members, students, and community members that make this an excellent school district.

(ECF No. 29-5.)

The plaintiffs highlight two portions of the statement. First, they contend that by using the phrase, "Out of respect for the plaintiffs who were actually victimized by the misconduct of individuals …" the defendant is saying that some of the plaintiffs were not victimized. Or put more simply, some of the plaintiffs are lying. Second, the plaintiffs point to the paragraph attacking the integrity of their attorney.

The board's comments regarding plaintiffs' counsel are decidedly outside the norms of litigation. It is hard to regard the references to counsel being from Chicago and licensed in Illinois as anything other than transparent attempts to garner disdain and suspicion for counsel for being from outside the local community. And certainly, no one would appreciate having the integrity of their chosen counsel impugned. That said, the comments directed at counsel are not plausibly severe enough to be characterized as materially adverse and constitute actionable retaliation under Title IX. *See Burton*, 851 F.3d at 696 (quoting *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68).

As for the board's comments regarding plaintiffs "who were actually victimized", even accepting the plaintiffs' characterization that the board's statement suggests that some of the plaintiffs may be lying, it nonetheless does not constitute actionable retaliation. "Put simply, an educational institution and its administrators are entitled to defend against accusations of discrimination." *Feminist Majority Found. v. Hurley*, 911 F.3d 674, 697 (4th Cir. 2018) (citing *Dixon v. Int'l Bhd. of Police Officers*, 504 F.3d 73, 84 (1st Cir. 2007)). "[A]n institution and its administrators can explain their denials of discrimination allegations without fear that those denials might create additional liability." *Feminist Majority*, 911 F.3d at 697. Therefore, the court will grant the defendant's motion to dismiss the plaintiffs' Title IX retaliation claim.

### 6. Conclusion

The allegations in the third amended complaint could lead a reasonable person to conclude that there is an extraordinary problem in the Oconto Falls School District. However, a legal claim for relief requires more than allegations that something bad happened. Legal claims have elements, which are specific narrow boxes into which the facts must fit for the claim to be able to proceed. Title IX and the statute for pursuing relief on constitutional claims, 42 U.S.C. § 1983, provide relief in only narrow circumstances. The court's responsibility is to apply the law. Not every wrong gives rise to a claim for relief under federal law. The court cannot disregard the legal

requirements of a claim merely because it finds the alleged conduct disturbing or unacceptable.

Under the laws on which the plaintiffs rely, a municipal entity like a school board is responsible only for its own conduct. There are many instances in the law where an employer is responsible for bad things its employee does. However, that principle does not apply to claims under Title IX or § 1983.

The plaintiffs' claims under Title IX and § 1983 are also different from many other legal claims in that a school board is not responsible if it simply made a mistake or could have done a better job to prevent a bad thing from happening. A mistake, commonly called negligence in the law, is all that is needed to hold a person or entity responsible for many legal wrongs. Under Title IX and § 1983, however, a school board is responsible only if it is deliberately indifferent. That is a high burden. It requires the same level of proof necessary to prove criminal recklessness.

A court must dismiss any claim that is not legally sufficient. Consequently, for the reasons set forth above, the court must grant the school board's motion and dismiss the plaintiffs' Title IX retaliation claim (Count 7) and constitutional claim (Count 8). The court having dismissed all of D.P.'s claims, she is dismissed as a plaintiff from this action.

**IT IS THEREFORE ORDERED** that the defendant's motion to dismiss is **granted in part and denied in part**. The motion is denied with respect to Counts 1 through 3 and Counts 5 and 6 and granted in all other respects. D.P., appearing by her next friend Brianne Carriveau, is dismissed as a party.

**IT IS FURTHER ORDERED** that the defendant's motion to strike (ECF No. 44) is **denied**.

Dated at Green Bay, Wisconsin this 20th day of November, 2026.

*s/ Byron B. Conway*
BYRON B. CONWAY
U.S. District Judge